# 11-2003

## United States Court of Appeals for the Second Circuit

BORIS SHAKHNES, by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated, by his next friend Mikhail Feldman, individually and on behalf of all others similarly situated, by his next friend Fei Mock, individually and on behalf of all, by his next friend Sha-Sha Willis, individually and on behalf of all others similarly situated, by his friend Chaio Zhang, individually and on behalf of all others similarly situated,

*Plaintiff - Appellee,*

v.

ELIZABETH R. BERLIN, Executive Deputy Commissioner of the New York State Office of Temporary and Disability Assistance, NIRAV R. SHAH, as Commissioner of the New York State Department of Health,

*Defendants - Appellants.*

VERNA EGGLESTON, Commissioner, New York City Human Resources Administration,

*Defendant.*

On Appeal from the United States District Court for the Southern District of New York

### JOINT APPENDIX — VOLUME 1 of 3 (JA1-JA256)

NEW YORK LEGAL ASSISTANCE GROUP
450 West 33rd Street, 11th floor
New York, NY 10001
(212) 613-5031
*Attorney for Appellee*

ERIC T. SCHNEIDERMAN
 *Attorney General of the*
 *State of New York*
120 Broadway, 25th Floor
New York, New York 10271
(212) 416-8020
*Attorney for Appellants*

SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
*Attorney for Appellee*

JENNER & BLOCK LLP
919 3rd Avenue, 37th Floor
New York, NY 10022
(212) 891-1696
*Attorney for Appellee*

# TABLE OF CONTENTS

PAGE

**VOLUME 1**

Docket Sheet ........................................................................JA1

Amended Class Action Complaint, filed July 17, 2006................................JA29

State Defendants' Answer to the Amended Complaint,
filed Aug. 9, 2006 ...........................................................JA57

Order, filed Dec. 9, 2008..............................................................JA64

Hearing Transcript, dated Dec. 4, 2008 ......................................JA65

Declaration of Sandra Hauser in Support of Plaintiffs' Motions for
Summary Judgment and Class Certification, filed Oct. 9, 2009................JA93

    Exhibit D - Expert Report of Plaintiff's Expert Richard Faust,
               dated Mar. 6, 2009 ............................................JA99

        Exhibit A - Curriculum Vitae of Richard Faust..........................JA114

        Exhibit B - Statistical Tables.......................................JA117

    Exhibit E - Second Report of Plaintiffs' Expert Richard Faust
               Responding to the June 15, 2009 Reply Report of State
               Defendants' Expert Dr. Karl Heiner...............................JA130

    Exhibit F - Analysis of Time Until Resolution of Home Care Fair
               Hearing Request - Jan. 1, 2004 through Dec. 31, 2008
               by Karl Heiner, dated June, 15 ......................................JA138

    Exhibit H - Memorandum from L. Schlossberg to J. Turly, et al.,
               dated Mar. 8, 1994 ...........................................JA178

    Exhibit I - Excerpts from Deposition Transcript of M. Lacivita,
               taken Mar. 27, 2008 ..........................................JA199

i

# TABLE OF CONTENTS (cont'd)

**VOLUME 1 (cont'd)**

Exhibit Q - Declaration of Robert W. Gifford, dated Mar. 5, 2008 ....JA231

    Exhibit A - Correspondence from E. Lopez-Paredes to G. Alvarez, et al., dated Mar. 1, 2007 with Interrogatories and Document Requests .................JA240

    Exhibit B - Correspondence from E. Lopez-Paredes to G. Alvarez, dated Apr. 13. 2007................................JA252

    Exhibit C - Correspondence from G. Alvarez to E. Lopez-Paredes, dated Apr. 19, 2007 ....................JA254

    Exhibit D - Correspondence from J. Stevens to Judge Holwell, dated May 3, 2007 ......................................JA255

**VOLUME 2**

    Exhibit E - Correspondence from R. Gifford to K. Conway, dated June 6, 2007 .....................................JA257

    Exhibit F - Order, dated Jan. 31, 2008.......................................JA260

    Exhibit G - Excerpt from Deposition Transcript of M. Lacivita, taken Mar. 27, 2008 ...................................JA262

    Exhibit H - Excerpts from Deposition Transcript of M. Lacivita, taken July 31, 2008 ...................................JA264

    Exhibit R - Excerpts from Deposition Transcript of K. Heiner, taken July 14, 2009.........................................JA268

    Exhibit S - Correspondence from G. Alvarez to J. Stevens, dated Oct. 27, 2006.........................................JA283

**VOLUME 2 (cont'd)**

Exhibit T -  Excerpts from Deposition Transcript of S. Addamo,
taken Apr. 3, 2008 ............................................................JA285

Exhibit U -  Excerpts from Deposition Transcript of A. Holm,
taken Aug. 1, 2008 ...........................................................JA314

Exhibit V -  Excerpts from Deposition Transcript of F. Louth,
taken Sept. 9, 2008 ...........................................................JA332

Exhibit W - Excerpts from Deposition Transcript of M. Maloney,
taken Apr. 4, 2008 ............................................................JA348

Exhibit X -  Excerpt from Deposition Transcript of M. Brady,
taken Aug. 5, 2008 with letter from R. Freeman to D.
Hyman, dated Apr. 8, 1998 ...............................................JA354

Exhibit Y -  Hearing transcript, dated Oct. 17, 2008 .........................JA361

Exhibit Z -  Excerpts from Deposition Transcript of D. Sharp,
taken Apr. 8, 2008 ............................................................JA378

Exhibit AA -   Excerpts from Deposition Transcript of K. Sherry,
taken Apr. 14, 2008 ..........................................................JA388

Declaration of Benjamin Taylor, dated Oct. 8, 2009 ..................................JA399

Exhibit E -  Charts re Fair Hearing Statistics ....................................JA404

Plaintiffs' Statement Pursuant to Local Rule 56.1,
dated Oct. 9, 2009 ........................................................................JA448

City Defendant's Local Civil Rule 56.1 Statement of
Undisputed Facts, dated Oct. 9, 2009 .........................................................JA462

# TABLE OF CONTENTS (cont'd)

PAGE

**VOLUME 2 (cont'd)**

Declaration of Jane Greengold Stevens, dated Dec. 10, 2009 ...................JA496

    Exhibit D - Memorandum from S. Demers to Local District
                Commissioners, dated May 29, 1991................................JA500

    Exhibit E - Memorandum of Understanding from J. Turner, et al.,
                dated Sept. 29, 1998.........................................................JA502

    Exhibit O - Administrative Directive from D. Glasel to
                Commissioners of Social Service,
                dated Sept. 29, 1982.........................................................JA507

**VOLUME 3**

Plaintiffs' Response and Counter-Statement to City
Defendant's Local Rule 56.1 Statement, filed Dec. 11, 2009.....................JA511

City Defendant's Response to Plaintiffs' Statement
Pursuant to Local Civil Rule 56.1, filed Dec. 11, 2009 .............................JA541

State Defendants' Response to Plaintiffs'
Rule 56.1 Statement, filed Dec. 14, 2009....................................................JA577

Supplemental Declaration of Benjamin Taylor, filed Jan. 29, 2010.........JA589

Plaintiffs' Reply to City Defendant's "Additional Undisputed Material
Facts" in City Defendant's Response to Plaintiffs' Statement Pursuant
to Local Civil Rule 56.1, filed Jan. 29, 2010 ..............................................JA592

Memorandum Opinion and Order, filed Sept. 30, 2010 ...........................JA610

Correspondence from S. Hauser to Judge Holwell, filed Nov. 24, 2010 ...JA666

# TABLE OF CONTENTS (cont'd)

**VOLUME 3 (cont'd)**

Exhibit A - Order Directing Declaratory and Injunctive Relief against State Defendants (Plaintiffs' Proposed), filed Nov. 24, 2010............................................................JA673

Declaration in Opposition to Plaintiff's Proposed Order, filed Dec. 3, 2010........................................................JA684

Letter from S. Hauser to Judge Holwell, filed Dec. 7, 2010......................JA688

Notice of Appeal, filed May 16, 2011 ..........................................JA692

Remedial Action Plan, filed June 2, 2011.....................................JA694

Order Amending Injunction to State Defendants, filed June 22, 2011........................................................JA700

APPEAL, CASREF, ECF, REOPEN

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:06-cv-04778-RJH

| | |
|---|---|
| Shakhnes et al v. Commissioner Verna Eggleston et al | Date Filed: 06/21/2006 |
| Assigned to: Judge Richard J. Holwell | Jury Demand: None |
| Referred to: Magistrate Judge Ronald L. Ellis (Settlement) | Nature of Suit: 444 Civil Rights: |
| Related Case: 1:09-cv-04103-RJH-RLE | Welfare |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **Boris Shakhnes** | represented by | **Jane Greengold Stevens** |
| *by his next friend Alla Shakhnes,* | | New York Legal Assistance Group |
| *individually and on behalf of all others* | | 450 West 33rd Street |
| *similarly situated* | | 11th Floor |
| | | New York, NY 10001 |
| | | 212 613 5031 |
| | | Fax: 212 750 0820 |
| | | Email: jstevens@nylag.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Michael Scott Gugig**
SNR Denton US LLP (NY)
1221 Avenue of the Americas
New York, NY 10020
212-768-6700
Fax: 212-768-6800
Email: mgugig@saul.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy E Lowenstein**
New York Legal Assistance Group
450 West 33rd Street
11th Floor
New York, NY 10001
(212)-613-5000 x5009
Fax: (212)-750-0820
Email: alowenstein@nylag.org
*TERMINATED: 05/02/2008*

**Caroline Jane Hickey**
New York Legal Assistance Group
450 West 33rd Street
11th Floor

## JA1

New York, NY 10001
(212)-613-5077
Fax: (212)-750-0820
Email: caroline.hickeyzalka@weil.com
*ATTORNEY TO BE NOTICED*

**Eva Lopez-Paredes**
SNR Denton US LLP (NY)
1221 Avenue of the Americas
New York, NY 10020
(212)-398-4877
Fax: (212)-768-6800
Email: elopez@sonnenschein.com
*ATTORNEY TO BE NOTICED*

**Jennifer Beth Magida**
Urban Justice Center
123 William Street,16th Floor
New York, NY 10038
(646)-602-5649
Fax: (212)-533-4598
Email: jmagida@nylag.org
*ATTORNEY TO BE NOTICED*

**Lydia Ann Keaney**
SNR Denton US LLP (NY)
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700 x398-4866
Fax: (212) 768-6800
Email: lydia.keaney@snrdenton.com
*ATTORNEY TO BE NOTICED*

**Sandra Denise Hauser**
SNR Denton US LLP (NY)
1221 Avenue of the Americas
New York, NY 10020
212-768-6802
Fax: 212-768-6800
Email: sandra.hauser@snrdenton.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Boris Shakhnes**                    represented by  **Jane Greengold Stevens**
*by his next friend Mikhail Feldman,*                 (See above for address)
*individually and on behalf of all others*            *LEAD ATTORNEY*
*similarly situated*                                  *ATTORNEY TO BE NOTICED*

                                                      **Michael Scott Gugig**
                                                      (See above for address)

## JA2

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline Jane Hickey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Boris Shakhnes**                    represented by **Caroline Jane Hickey**
*by his next friend Fei Mock,*                        (See above for address)
*individually and on behalf of all others*            *ATTORNEY TO BE NOTICED*
*similarly situated*

                                                      **Jane Greengold Stevens**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Michael Scott Gugig**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Susan Lee Greene**
                                                      New York Legal Assistance Group
                                                      450 West 33rd Street
                                                      11th Floor
                                                      New York, NY 10001
                                                      (212)-613-5000
                                                      Fax: (212)-750-0820
                                                      Email: sgreene@nylag.org
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Boris Shakhnes**                    represented by **Caroline Jane Hickey**
*by his next friend Sha-Sha Willis,*                  (See above for address)
*individually and on behalf of all others*            *ATTORNEY TO BE NOTICED*
*similarly situated*

                                                      **Jane Greengold Stevens**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Michael Scott Gugig**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Boris Shakhnes**                    represented by **Caroline Jane Hickey**
*by his friend Chaio Zhang, Individually*             (See above for address)
*and on behalf of all others similarly*               *ATTORNEY TO BE NOTICED*
*situated*

                                                      **Jane Greengold Stevens**
                                                      (See above for address)

**JA3**

*ATTORNEY TO BE NOTICED*

**Michael Scott Gugig**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Commissioner Verna Eggleston**          represented by   **Kimberly Dorothy Conway**
*of the New York City Human Resources*                     New York City Law Depart. Office of
*Administration*                                           the Corporation Counsel
                                                           100 Church Street
                                                           New York, NY 10007
                                                           212-788-0865
                                                           Fax: 212-788-0877
                                                           Email: kconway@law.nyc.gov
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Robert Doar**                           represented by   **Robert Lewis Kraft**
*as Commissioner of the New York State*                    Office of the Attorney General, New
*Office of Temporary and Disability*                       York State
*Assistance*                                               120 Broadway
                                                           New York, NY 10271
                                                           212-416-8632
                                                           Fax: 212-416-6075
                                                           Email: robert.kraft@ag.ny.gov
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Deborah Ellen Hochhauser**
                                                           Attorney General of the State of New
                                                           York
                                                           120 Broadway
                                                           New York, NY 10271
                                                           (212)416-8629
                                                           Fax: (212)416-6077
                                                           Email:
                                                           Deborah.Hochhauser@oag.state.ny.us
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Antonia C. Novello**                    represented by   **Robert Lewis Kraft**
*as Commissioner of the New York State*                    (See above for address)
*Deparment of Health*                                      *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**JA4**

**Deborah Ellen Hochhauser**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/21/2006 | 1 | COMPLAINT against Verna Eggleston, Robert Doar, Antonia C. Novello. (Filing Fee $ 350.00, Receipt Number not ind)Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Mikhail Feldman, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Fei Mock, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Sha-Sha Willis, individually and on behalf of all others similarly situated).(laq, ) (Entered: 06/23/2006) |
| 06/21/2006 | | SUMMONS ISSUED as to Verna Eggleston, Robert Doar, Antonia C. Novello. (laq, ) (Entered: 06/23/2006) |
| 06/21/2006 | | CASE REFERRED TO Judge Peter k. Leisure as possibly similar to 1:88-cv-8615. (laq, ) (Entered: 06/23/2006) |
| 06/21/2006 | 2 | DECLARATION IN SUPPORT OF REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by Boris Shakhnes(by his next friend Sha-Sha Willis, individually and on behalf of all others similarly situated).(laq, ) Additional attachment(s) added on 6/30/2006 (jeh, ). (Entered: 06/26/2006) |
| 06/21/2006 | 3 | DECLARATION IN SUPPORT OF REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by Boris Shakhnes(by his next friend Mikhail Feldman, individually and on behalf of all others similarly situated).(laq, ) Additional attachment(s) added on 6/30/2006 (jeh, ). (Entered: 06/26/2006) |
| 06/21/2006 | 4 | DECLARATION IN SUPPORT OF REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated).(laq, ) Additional attachment(s) added on 6/30/2006 (jeh, ). (Entered: 06/26/2006) |
| 06/21/2006 | 5 | DECLARATION IN SUPPORT OF REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by Boris Shakhnes(by his next friend Fei Mock, individually and on behalf of all others similarly situated).(laq, ) Additional attachment(s) added on 6/30/2006 (jeh, ). (Entered: 06/26/2006) |
| 06/21/2006 | | CASE DECLINED AS NOT SIMILAR. Case referred as similar to 1:88-cv-8615 and declined by Judge Peter K. Leisure and returned to wheel for assignment. (laq, ) (Entered: 06/26/2006) |
| 06/21/2006 | 6 | NOTICE OF CASE ASSIGNMENT to Judge Richard J. Holwell. Judge Unassigned is no longer assigned to the case. (laq, ) (Entered: 06/26/2006) |
| 06/21/2006 | | Magistrate Judge Ronald L. Ellis is so designated. (laq, ) (Entered: 06/26/2006) |
| 06/21/2006 | | Case Designated ECF. (laq, ) (Entered: 06/26/2006) |

**JA5**

| 06/26/2006 | | Mailed notice to the attorney(s) of record. (laq, ) (Entered: 06/26/2006) |
|---|---|---|
| 06/26/2006 | | ***NOTE TO ATTORNEY TO E-MAIL PDF. Note to Attorney Jane Greengold Stevens for noncompliance with Section (3) of the S.D.N.Y. 3rd Amended Instructions For Filing An Electronic Case or Appeal and Section 1 (d) of the S.D.N.Y. Procedures For Electronic Case Filing. E-MAIL the PDF for Document 4 Declaration in Support of I.F.P., 2 Declaration in Support of I.F.P., 5 Declaration in Support of I.F.P., 3 Declaration in Support of I.F.P. to: case_openings@nysd.uscourts.gov. (laq, ) (Entered: 06/26/2006) |
| 06/27/2006 | 7 | STIPULATION AND ORDER: It is now stipulated and agreed that if not otherwise adjourned by appellant or by the administrative Law Judge for good cause shown stare defendants will hold a fair hearing for named plaintiff Feldman on Monday June 26, 2006 and will issue a DAFH within 8 business days after such fair hearing is held; and defendant Eggleston will implement the DAFH within 4 days thereafter. (Signed by Judge P. Kevin Castel on 6/26/06) (js, ) (Entered: 06/27/2006) |
| 06/30/2006 | 8 | ENDORSED LETTER addressed to Ruchard J. Holwell from Kimberly Conway dated 6/28/2006 re: to request that the Court schedule a conference concerning the Court's order on June 22, 2006 that the plaintiffs are entitled to "limited expedited discovery" concerning the plaintiffs' request for a preliminary injunction.Responses due by 7/21/2006 Replies due by 7/24/2006. ENDORSEMENT: The City's application for stay of expedited discovery is denied. The City will fie its opposition papers on July 14, 2006. The state may file its opposition July 21, 2006. Plaintiffs' Reply, if any, is due July 24, 2006. A preliminary injunction hearing will be held in Courtroom 17B on July 26, 2006 at 3:00 p.m. So Ordered. (Signed by Judge Richard J. Holwell on 6/30/2006) (jmi, ) (Entered: 07/05/2006) |
| 07/06/2006 | 9 | NOTICE OF APPEARANCE by Caroline Jane Hickey on behalf of Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated) (Hickey, Caroline) (Entered: 07/06/2006) |
| 07/10/2006 | 10 | STIPULATED PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material. (Signed by Judge Richard J. Holwell on 7/10/06) (kco, ) (Entered: 07/11/2006) |
| 07/12/2006 | 11 | TRANSCRIPT of proceedings held on 6/22/06 @ 1:30 p.m. before Judge Richard J. Holwell. (kco, ) (Entered: 07/12/2006) |
| 07/13/2006 | 12 | TRANSCRIPT of proceedings held on 6/22/06 before Judge Richard J. Holwell. (jw, ) (Entered: 07/13/2006) |
| 07/17/2006 | 13 | AFFIDAVIT OF SERVICE. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Barbera, Gino) (Entered: 07/17/2006) |
| 07/17/2006 | 14 | AFFIDAVIT OF SERVICE. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Barbera, Gino) (Entered: 07/17/2006) |
| 07/17/2006 | 15 | AFFIDAVIT OF SERVICE. Document filed by Boris Shakhnes(by his next |

## JA6

| | | |
|---|---|---|
| | | friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Barbera, Gino) (Entered: 07/17/2006) |
| 07/17/2006 | 16 | AMENDED CLASS ACTION COMPLAINT amending 1 Complaint against Verna Eggleston, Robert Doar, Antonia C. Novello.Document filed by Boris Shakhnes(by his friend Chaio Zhang, Individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Mikhail Feldman, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Fei Mock, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Sha-Sha Willis, individually and on behalf of all others similarly situated). Related document: 1 Complaint,, filed by Boris Shakhnes,.(db, ) Additional attachment(s) added on 7/19/2006 (db, ). (Entered: 07/19/2006) |
| 07/17/2006 | | ***NOTE TO ATTORNEY TO E-MAIL PDF. Note to Attorney Jane Greengold Stevens for noncompliance with Section (3) of the S.D.N.Y. 3rd Amended Instructions For Filing An Electronic Case or Appeal and Section 1 (d) of the S.D.N.Y. Procedures For Electronic Case Filing. E-MAIL the PDF for Document 16 Amended Complaint,, to: case_openings@nysd.uscourts.gov. (db, ) (Entered: 07/19/2006) |
| 07/19/2006 | 17 | STIPULATION AND ORDER: City defendant will determine, on the following schedule, whether each individual on the State list described above is receiving aid continuing, as set forth in this order. (Signed by Judge Richard J. Holwell on 7/19/2006) (lb, ) (Entered: 07/20/2006) |
| 07/20/2006 | 18 | NOTICE OF APPEARANCE by Amy E Lowenstein on behalf of Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated) (Lowenstein, Amy) (Entered: 07/20/2006) |
| 07/21/2006 | 19 | ORDER that a conference shall be held on 7/25/06 at 3:00 p.m. in the courtroom of the Hon. Richard J. Holwell, Courtroom 17B, 500 Pearl Street; counsel for plaintiffs and state dfts shall attend. If necessary the preliminary injunction hearing previously scheduled for 7/25/06 will be rescheduled at that time. (Signed by Judge Richard J. Holwell on 7/21/06) (dle, ) (Entered: 07/21/2006) |
| 08/09/2006 | 20 | ANSWER to Amended Complaint. Document filed by Robert Doar, Antonia C. Novello. Related document: 16 Amended Complaint,,, filed by Boris Shakhnes,.(Hochhauser, Deborah) (Entered: 08/09/2006) |
| 08/23/2006 | 21 | ENDORSED LETTER addressed to Judge Holwell from Kimberly Conway dated 8/1/06: granting request to extend the City's time to respond to the Amended Complaint to 8/28/06. (Signed by Judge Richard J. Holwell on 8/22/06) (cd, ) (Entered: 08/23/2006) |
| 09/06/2006 | 22 | ANSWER to Amended Complaint. Document filed by Verna Eggleston. Related document: 16 Amended Complaint,,, filed by Boris Shakhnes,. (Conway, Kimberly) (Entered: 09/06/2006) |
| 09/07/2006 | 23 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Kimberly Conway dated 8/25/06 re: Request that the Court extend City defendant's time |

**JA7**

| | | |
|---|---|---|
| | | to respond to plaintiffs' Amended Complaint from August 28, 2006 to September 5, 2006. ENDORSEMENT: Application GRANTED. (Signed by Judge Richard J. Holwell on 9/5/06) (js, ) (Entered: 09/07/2006) |
| 10/03/2006 | 24 | THE PARTIES' JOINT CASE MANAGEMENT REPORT PURSUANT TO FED.R.CIV.P.26(f) : Discovery due by 12/31/2006. Status Conference set for 3/9/2007 at10:30 AM before Judge Richard J. Holwell. (Signed by Judge Richard J. Holwell on 9/29/2006) (jmi, ) (Entered: 10/03/2006) |
| 12/01/2006 | 25 | ENDORSED LETTER: addressed to Judge Richard J. Holwell from Jane Greengold dated 11/28/06 re: Request that a conference with the Court be set for December 8, 11 or 12, or on another date that is convenient for the Court. Should the parties resolve all of their discovery disputes, we will inform the Court that a conference is not necessary. ENDORSEMENT: If discovery dispute remain outstanding a meet and confer, the parties shall submit letter briefs not to exceed five pages. The Court will thereafter schedule a conference if it concludes a conference will be expedient. (Signed by Judge Richard J. Holwell on 12/1/06) (js, ) (Entered: 12/04/2006) |
| 12/18/2006 | 26 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Jane Greengold Stevens dated 12/15/2006 re: to request an extension of the discoverydeadlines in this case. Discovery due by 3/30/2007. Status Conference set for 7/26/2007 10:30 AM before Judge Richard J. Holwell. ENDORSEMENT: SO ORDERED (Signed by Judge Richard J. Holwell on 12/18/2006) (jmi, ) (Entered: 12/19/2006) |
| 03/29/2007 | 27 | SUGGESTION OF DEATH upon the record as to Sha-Sha Willis. Document filed by Verna Eggleston(Conway, Kimberly) (Entered: 03/29/2007) |
| 04/05/2007 | 28 | ORDER: The parties are directed to appear on April 16, 2007 at 10:00 a.m. in the Courtroom of the Honorable Richard J. Holwell, Courtroom 17B, 500 Pearl Street, New York, New York 10007 for a conference to resolve outstanding discovery issues. (Signed by Judge Richard J. Holwell on 4/5/07) (js) (Entered: 04/06/2007) |
| 04/05/2007 | | Set Deadlines/Hearings: Status Conference set for 4/16/2007 10:00 AM before Judge Richard J. Holwell. (js) (Entered: 04/06/2007) |
| 05/16/2007 | 29 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Jane Stevens dated 5/3/07 re: counsel for plaintiffs requests the following discovery schedule: City dft will produce the described fifty case files and all outstanding discovery by 7/2/07; fact discovery will conclude by 9/30/07; each party's expert disclosures and expert reports, if any, will be exchanged by 10/30/07; each party's rebuttal expert disclosures and rebuttal expert reports, if any, will be exchanged by 1/3/08; all discovery, including expert discovery, will conclude by 2/4/08. Above schedule is hereby adopted. A status conference shall be held on 10/12/07 at 10:00 a.m. (Signed by Judge Richard J. Holwell on 5/15/07) (dle) Modified on 5/17/2007 (Lewis, Diahan). (Entered: 05/17/2007) |
| 05/16/2007 | | Set Deadlines/Hearings: Discovery due by 2/4/2008., Status Conference set for 10/12/2007 10:00 AM before Judge Richard J. Holwell. (dle) (Entered: 05/17/2007) |

| | | |
|---|---|---|
| 10/03/2007 | <u>30</u> | ENDORSED LETTER addressed to Judge Richard J. Holwell from Eva Lopez-Paredes dated 9/27/2007 re: The parties propose the following revised schedule: Completion of City document production by 10/20/2007. Fact Discovery concluded by 3/31/2008. Expert disclosures and expert reports of all parties exchanged by 5/1/2008. Rebuttal expert disclosures and rebuttal expert reports exhcanged by 7/1/2007. All Discovery due by 8/1/2008, including expert discovery. ENDORSEMENT: Application granted. Status Conference adjourned to 11/30/2007 at 11:30 AM before Judge Richard J. Holwell. (Signed by Judge Richard J. Holwell on 10/2/2007) (jar) (Entered: 10/03/2007) |
| 11/30/2007 | | Minute Entry for proceedings held before Judge Richard J. Holwell: Status Conference held on 11/30/2007. The Court directs the parties to meet and confer on new request for documents and to inform the court of any disputes. Next PTC set for 12/13/07 at 10:00 a.m. (djc) Modified on 12/11/2007 (djc). (Entered: 12/11/2007) |
| 12/11/2007 | <u>31</u> | MOTION to Intervene *and Class Action Intervenor Complaint*. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Attachments: # 1 Class Action Intervenor Complaint)(Lopez-Paredes, Eva) (Entered: 12/11/2007) |
| 12/11/2007 | <u>32</u> | DECLARATION of Sharna Pinnock in Support re: <u>31</u> MOTION to Intervene *and Class Action Intervenor Complaint*.. Document filed by Boris Shakhnes (by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Lopez-Paredes, Eva) (Entered: 12/11/2007) |
| 12/11/2007 | <u>33</u> | MEMORANDUM OF LAW in Support re: <u>31</u> MOTION to Intervene *and Class Action Intervenor Complaint*.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Lopez-Paredes, Eva) (Entered: 12/11/2007) |
| 12/13/2007 | | Minute Entry for proceedings held before Judge Richard J. Holwell: Status Conference held on 12/13/2007. The Court ruled on some discovery issues; Plaintiff to submit briefing schedule. (db) (Entered: 12/27/2007) |
| 01/24/2008 | <u>34</u> | NOTICE of Withdrawal of Amy Lowenstein as Counsel. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Berkman, Deborah) (Entered: 01/24/2008) |
| 02/07/2008 | <u>35</u> | ORDER: Defendant Verna Eggleston, as Commissioner of the New York Human Resources Administrate shall provide Plaintiffs with fifty additional case files including, the specific types of documents previously requested by Plaintiffs within eight weeks of December 24, 2007, the date it received Plaintiffs' list of additional randomly selected individuals. The City Defendant shall, no later than fourteen (14) days from the execution of this order provide counsel for Plaintiffs with a list of all New York City applicants for, or recipients of, home health services who were threatened with and/or suffered a denial, reduction, or termination of home health services during the three-month period from March 1, 2007, through May 31, 2007. The list shall contain CTN numbers identifying information sufficient to permit plaintiffs to ascertain whether notices were sent to such individuals. The City defendant |

| | | |
|---|---|---|
| | | shall simultaneously certify to the Court and all counsel that any and all notices of adverse action sent to the individuals identified in this list have been produced. (Signed by Judge Richard J. Holwell on 1/31/08) (tro) (Entered: 02/07/2008) |
| 02/07/2008 | 36 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Jane Greengold Stevens dated 1/29/08 re: Counsel for Plaintiffs request that the deadline for fact discovery be extended from 3/31/08 until 5/12/08. ENDORSEMENT: Application Granted. No further extensions. ( Discovery due by 5/12/2008.) (Signed by Judge Richard J. Holwell on 2/1/08) (tro) (Entered: 02/07/2008) |
| 04/28/2008 | 37 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Eva Lopez-Paredes dated 4/22/08 re: Request for the following revised scheduling - Fact Discovery concluded by 6/30/08; All Discovery including Expert Discovery due 9/30/08. ENDORSEMENT: Application Granted. SO ORDERED. (Expert Discovery due by 9/30/2008.) (Signed by Judge Richard J. Holwell on 4/25/08) (db) (Entered: 04/28/2008) |
| 05/02/2008 | 38 | NOTICE OF WITHDRAWAL: Please be advised that Amy E. Lowenstein is no longer employed by the New York Legal Assistance Group, effective June 14, 2007, and accordingly withdraws as counsel in the above-captioned case. Attorney Amy E Lowenstein terminated. (Signed by Judge Richard J. Holwell on 5/2/08) (tro) (Entered: 05/02/2008) |
| 06/17/2008 | 39 | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT - MOTION to Amend/Correct State Defendants' Answer to First Amended Complaint(LETTER). Document filed by Robert Doar, Antonia C. Novello. (Attachments: # 1 Exhibit Proposed Amended Answer)(Hochhauser, Deborah) Modified on 6/18/2008 (KA). (Entered: 06/17/2008) |
| 06/17/2008 | 40 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Settlement. Referred to Magistrate Judge Ronald L. Ellis. (Signed by Judge Richard J. Holwell on 6/12/08) (js) (Entered: 06/17/2008) |
| 06/18/2008 | | ***NOTE TO ATTORNEY THAT THE ATTEMPTED FILING OF Document No. 39 HAS BEEN REJECTED. Note to Attorney Deborah Ellen Hochhauser : THE CLERK'S OFFICE DOES NOT ACCEPT LETTERS FOR FILING, either through ECF or otherwise, except where the judge has ordered that a particular letter be docketed. Letters may be sent directly to a judge. (KA) (Entered: 06/18/2008) |
| 06/18/2008 | 41 | SETTLEMENT CONFERENCE ORDER Settlement Conference set for 7/29/2008 at 11:00 AM in Courtroom 18D, 500 Pearl Street, New York, NY 10007 before Magistrate Judge Ronald L. Ellis. No request for adjournment will be considered unless made at least three business days before the scheduled conference and only after the parties have consulted with each other. Direct inquires to Michael Brantley, 212-805-0242. (Signed by Magistrate Judge Ronald L. Ellis on 6/18/08) (mme) (Entered: 06/18/2008) |
| 06/23/2008 | 42 | ENDORSED LETTER addressed to Richard J. Holwell from Deborah Hochhauser dated 6/17/2008 re: Requesting permission for State defendants |

| | | to amend their answer to the amended complaint. ENDORSEMENT: State defendants may file a motion for leave to amend supported by appropriate legal authorities. Motion to be filed by July 7, 2008. Opposition papers to be filed by July 21, 2008. No reply papers are necessary. SO ORDERED. (Signed by Judge Richard J. Holwell on 6/23/2008) (jpo) (Entered: 06/23/2008) |
|---|---|---|
| 06/23/2008 | 43 | ORDER: Telephone Conference set for 6/26/2008 at 04:00 PM before Judge Richard J. Holwell. Plaintiff's counsel shall initiate the call to the Chambers of Judge Richard J. Holwell. The telephone number for Chambers is (212) 805-0256. (Signed by Judge Richard J. Holwell on 6/23/2008) (jpo) (Entered: 06/23/2008) |
| 06/25/2008 | 44 | NOTICE OF APPEARANCE by Robert Lewis Kraft on behalf of Robert Doar, Antonia C. Novello (Kraft, Robert) (Entered: 06/25/2008) |
| 07/21/2008 | 45 | MOTION to Amend/Correct 20 Answer to Amended Complaint. Document filed by Robert Doar, Antonia C. Novello.(Kraft, Robert) (Entered: 07/21/2008) |
| 07/21/2008 | 46 | DECLARATION of Robert L. Kraft in Support re: 45 MOTION to Amend/Correct 20 Answer to Amended Complaint.. Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 07/21/2008) |
| 07/21/2008 | 47 | MEMORANDUM OF LAW in Support re: 45 MOTION to Amend/Correct 20 Answer to Amended Complaint.. Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 07/21/2008) |
| 07/31/2008 | 48 | ORDER withdrawing 31 Motion to Intervene. By letter dated July 21, 2008, Plaintiffs informed the Court that they have withdrawn their Motion to Intervene 31 . The clerk of the court is requested to mark this motion as resolved. (Signed by Judge Richard J. Holwell on 7/21/08) (tro) (Entered: 07/31/2008) |
| 08/08/2008 | 49 | NOTICE OF APPEARANCE by Jennifer Beth Magida on behalf of Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated) (Magida, Jennifer) (Entered: 08/08/2008) |
| 08/18/2008 | 50 | MEMORANDUM OF LAW in Opposition re: 45 MOTION to Amend/Correct 20 Answer to Amended Complaint.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Attachments: # 1 Appendix Unreported Cases) (Lopez-Paredes, Eva) (Entered: 08/18/2008) |
| 10/03/2008 | 51 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Sandra Hauser dated 9/23/08 re: Request for a premotion conference. ENDORSEMENT: A conference will be held on 10/17/08 at 10:30 am. ( Conference set for 10/17/2008 at 10:30 AM before Judge Richard J. Holwell.) (Signed by Judge Richard J. Holwell on 10/2/08) (cd) (Entered: 10/03/2008) |
| 10/10/2008 | 52 | ORDER setting argument on the State Defendants motion for 10/31/08 at 3:00 pm. Because the issues are closely related, the Court will treat the State |

**JA11**

| | | |
|---|---|---|
| | | Defendants' motion, in the alternative, as a motion to dismiss the complaint...Any party wishing to make a supplemental filing must do so by 10/24/08. Set Deadlines/Hearing as to 45 MOTION to Amend/Correct 20 Answer to Amended Complaint. ( Motion Hearing set for 10/31/2008 at 03:00 PM before Judge Richard J. Holwell.) (Signed by Judge Richard J. Holwell on 10/10/08) (cd) (Entered: 10/10/2008) |
| 10/23/2008 | 53 | TRANSCRIPT of proceedings held on 10/17/08 before Judge Richard J. Holwell. (cd) (Entered: 10/23/2008) |
| 10/28/2008 | 54 | SCHEDULING ORDER: (1) Plaintiffs shall serve no more than five interrogatories regarding each of the case files produced by the City by Friday, October 24,2008. Plaintiffs may request that the City produce any documents or electronically stored information used by the City in responding to plaintiffs' interrogatories. (2) The City shall advise the Court of how long it will require to respond to plaintiffs' requests by Wednesday, November 12, 2008. (3) A discovery conference, as well as oral argument on all pending motions to dismiss, shall be held on Friday, November 21,2008 at 2:30 p.m. in thecourtroom of the Honorable Richard J. Holwell, Courtroom 17B, 500 Pearl Street, New York, New York 10007.(Discovery Hearing set for 11/21/2008 at 02:30 PM in Courtroom 17B, 500 Pearl Street, New York, NY 10007 before Judge Richard J. Holwell. Oral Argument set for 11/21/2008 at 02:30 PM in Courtroom 17B, 500 Pearl Street, New York, NY 10007 before Judge Richard J. Holwell.) Set Hearing as to 45 MOTION to Amend/Correct 20 Answer to Amended Complaint: (Motion Hearing set for 11/21/2008 at 02:30 PM in Courtroom 17B, 500 Pearl Street, New York, NY 10007 before Judge Richard J. Holwell.) (Signed by Judge Richard J. Holwell on 10/28/08) (db) (Entered: 10/28/2008) |
| 11/07/2008 | 55 | MOTION to Dismiss for Lack of Jurisdiction *lack of Art 3 standing and failure to join party needed for defendants to provide complete relief to plaintiffs.* Document filed by Robert Doar, Antonia C. Novello. Return Date set for 11/21/2008 at 02:30 PM.(Kraft, Robert) (Entered: 11/07/2008) |
| 11/07/2008 | 56 | DECLARATION of Robert L. Kraft in Support re: 55 MOTION to Dismiss for Lack of Jurisdiction *lack of Art 3 standing and failure to join party needed for defendants to provide complete relief to plaintiffs..* Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 11/07/2008) |
| 11/07/2008 | 57 | MEMORANDUM OF LAW in Support re: 55 MOTION to Dismiss for Lack of Jurisdiction *lack of Art 3 standing and failure to join party needed for defendants to provide complete relief to plaintiffs..* Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 11/07/2008) |
| 11/07/2008 | 58 | MEMORANDUM OF LAW in Opposition re: 55 MOTION to Dismiss for Lack of Jurisdiction *lack of Art 3 standing and failure to join party needed for defendants to provide complete relief to plaintiffs. Filed pursuant to the Court's October 10, 2008 Order treating State Defendants' motion for leave to amend answer as a motion to dismiss for failure to join necessary parties..* Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Gugig, Michael) (Entered: 11/07/2008) |

| 11/10/2008 | <u>59</u> | FILING ERROR - DEFICIENT DOCKET ENTRY - MOTION to Dismiss *A Claim*. Document filed by Verna Eggleston.(Conway, Kimberly) Modified on 11/12/2008 (jar). (Entered: 11/10/2008) |
| 11/10/2008 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Kimberly Conway to RE-FILE Document <u>59</u> MOTION to Dismiss *A Claim*. ERROR(S): Supporting Documents must be filed individually. Use event type Declaration in Support found under event list Replies, Oppositions, Supporting Documents. (jar) (Entered: 11/12/2008) |
| 11/13/2008 | 60 | MOTION to Dismiss *A Claim*. Document filed by Verna Eggleston.(Conway, Kimberly) (Entered: 11/13/2008) |
| 11/13/2008 | <u>61</u> | DECLARATION of Kimberly Conway in Support re: <u>60</u> MOTION to Dismiss *A Claim*., <u>55</u> MOTION to Dismiss for Lack of Jurisdiction *lack of Art 3 standing and failure to join party needed for defendants to provide complete relief to plaintiffs*.. Document filed by Verna Eggleston. (Conway, Kimberly) (Entered: 11/13/2008) |
| 11/17/2008 | <u>62</u> | SUPPLEMENTAL MEMORANDUM OF LAW in Opposition re: <u>60</u> MOTION to Dismiss *A Claim*., <u>55</u> MOTION to Dismiss for Lack of Jurisdiction *lack of Art 3 standing and failure to join party needed for defendants to provide complete relief to plaintiffs*.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Gugig, Michael) (Entered: 11/17/2008) |
| 11/21/2008 | <u>63</u> | SCHEDULING ORDER: the City defendants shall produce the documents referenced in the Court's 10/28/08 Scheduling Order by Jan. 13, 2009. Plaintiffs may file supplemental memorandum of law, not to exceed 1,000 words on the issue of justiciability. The conference and oral argument previously scheduled for Friday, November 21, 2008 at 2:30 p.m. is rescheduled to Thursday, December 4, 2008 at 10:00 a.m. (Signed by Judge Richard J. Holwell on 11/21/08) (tro) (Entered: 11/21/2008) |
| 11/21/2008 | | Set Deadlines/Hearings:Discovery Hearing set for 12/4/2008 at 10:00 AM before Judge Richard J. Holwell. Motion Hearing set for 12/4/2008 at 10:00 AM before Judge Richard J. Holwell. (tro) (Entered: 11/21/2008) |
| 11/24/2008 | <u>64</u> | ENDORSED LETTER addressed to Judge Richard J. Holwell from Kimberly Conway dated 11/7/08 re: Counsel for Defendant City request that the Court extend their time to submit City defendant's papers joining the State's motion to dismiss all claims in the Amended Class Action Complaint until 11/13/08. ENDORSEMENT: SO ORDERED. (Signed by Judge Richard J. Holwell on 11/24/08) (tro) (Entered: 11/24/2008) |
| 12/04/2008 | | Minute Entry for proceedings held before Judge Richard J. Holwell: Status Conference held on 12/4/2008. The Court denies motion to amend. The Court to enter scheduling order. (mro) (Entered: 12/30/2008) |
| 12/09/2008 | <u>65</u> | ORDER; For the reasons stated on the record, defendants' motions (45,60] are denied. (Signed by Judge Richard J. Holwell on 12/4/08) (pl) (Entered: 12/09/2008) |

**JA13**

| 12/15/2008 | 66 | SCHEDULING ORDER: Plaintiffs' Motion for Class Certification due by 5/13/2009. Response (up to 17,500 words) due by 6/12/2009. Reply (up to 7,500 words) due by 7/2/2009. All Discovery due by 4/13/2009, see document for other discovery deadlines. Status Conference set for 4/23/2009 at 10:30 AM in Courtroom 17B, 500 Pearl Street, New York, NY 10007 before Judge Richard J. Holwell. (Signed by Judge Richard J. Holwell on 12/12/08) (cd) (Entered: 12/15/2008) |
|---|---|---|
| 01/07/2009 | 68 | TRANSCRIPT of proceedings held on December 4, 2008 before Judge Richard J. Holwell. (djc) (Entered: 02/24/2009) |
| 01/09/2009 | 67 | TRANSCRIPT of proceedings held on 12/4/2008 before Judge Richard J. Holwell. (D'Avanzo, Daniel) (Entered: 01/21/2009) |
| 03/05/2009 | 69 | SCHEDULING ORDER: The following schedule is established for fact discovery, expert discovery, and class certification motions: Plaintiffs expert report due: March 6, 2009; Defendants expert report (if any) due : March 23, 2009; Completion of fact and expert discovery: May 5, 2009; Plaintiffs motion for class certification due: June 4, 2009; Defendants opposition to class certification due: July 6, 2009; Plaintiffs class certification reply due: July 24, 2009; Next PTC 05/15/09 at 10:00 AM. (Signed by Judge Richard J. Holwell on 3/2/09) (mme) (Entered: 03/05/2009) |
| 03/20/2009 | 70 | ORDER The pretrial conference scheduled for April 23, 2009 is rescheduled to May 08, 2009, at 10:30 a.m., in the courtroom of the Honorable Richard J. Holwell, Courtroom 17B, 500 Pearl Street, New York, New York 10007. (Signed by Judge Richard J. Holwell on 3/17/09) (mme) (Entered: 03/20/2009) |
| 04/03/2009 | 71 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Robert L. kraft dated 3/27/09 re: Counsel for defendants request that the Court approve an extension of time from March 23, 2009 to April 27, 2009 for all defendants to submit their expert reports, and revision dates in a previously agreed upon briefing schedule to account for the extension of time. All parties consent to the proposed extension and briefing schedule. Defendants' expert report(s) (if any) due April 27, 2009; Plaintiff rebuttal report (if any) due May 29, 2009:Completion off fact and expert discovery June 9, 2009; Plaintiff' motion for class certification due July 9, 2009; Defendants' opposition to class certification due August 10, 2009; Plaintiffs' class certification reply due September 7, 2009. ENDORSEMENT: So Ordered. ( Discovery due by 6/9/2009. Motions due by 7/9/2009. Replies due by 9/7/2009. Responses due by 8/10/2009) (Signed by Judge Richard J. Holwell on 4/2/09) (js) (Entered: 04/03/2009) |
| 05/12/2009 | 72 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Kimberly Conway dated 4/28/09 re: Counsel respectfully request that the Court adjourn the pretrial conference currently scheduled from 5/8/09 to any day during the week of 5/10/09 that is convenient for the Court. ENDORSEMENT: Conference adjourned to 5/22/09 at 10:30. (Signed by Judge Richard J. Holwell on 5/11/09) (tro) (tro). (Entered: 05/12/2009) |
| 05/12/2009 | 73 | ENDORSED LETTER: addressed to Judge Richard J. Holwell from Robert |

**JA14**

| | | |
|---|---|---|
| | | L. Kraft dated 4/27/09 re: Counsel for defendants request that the Court approve an extension of time from April 27, 2009 to June 15, 2009, for all defendants to submit their expert reports, and revision of dates in a previously agreed upon briefing schedule by 49 days to account for the extension of time. Counsel requests an additional two week extension beyond June 1 so that State Defendants' counsel may properly review his submission and prepare supporting papers. City defendant's counsel joins the request and plaintiffs counsel neither consents to nor opposes my request. If approved, the revised schedule is as follows: Defendants' expert report(s) (if any) due June 15, 2009; Plaintiffs' rebuttal report (if any) due July 17, 2009; Completion of fact and expert discovery 7/28/09; Plaintiffs' motion for class certification due August 27, 2009. Defendants' opposition to class certification due September 28, 2009. Plaintiffs' class certification reply due 10/26/09. ENDORSEMENT: So Ordered. (Signed by Judge Richard J. Holwell on 5/11/09) (js) (Entered: 05/12/2009) |
| 05/22/2009 | | Minute Entry for proceedings held before Judge Richard J. Holwell: Interim Pretrial Conference held on 5/22/2009. The Court entered the following Order: Dispositive motions to be filed by 9/18/09. Opposition papers due by 10/19/09. Reply papers due by 11/2/09. (tro) (Entered: 06/11/2009) |
| 05/22/2009 | | Set/Reset Deadlines: Motions due by 9/18/2009. Replies due by 11/2/2009. Responses due by 10/19/2009 (tro) (Entered: 06/11/2009) |
| 06/19/2009 | 74 | ORDER. Dispositive motions to be filed by 9/18/09; Opposition papers due by 10/19/09; reply papers due by 11/2/09. (Signed by Judge Richard J. Holwell on 6/1/09) (djc) (Entered: 06/19/2009) |
| 06/24/2009 | 75 | MOTION to Intervene *Mayra Valle, by her next friend Shirley Campos-Valle.* Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). Return Date set for 7/8/2009 at 10:00 AM.(Magida, Jennifer) (Entered: 06/24/2009) |
| 06/24/2009 | 76 | MEMORANDUM OF LAW in Support re: 75 MOTION to Intervene *Mayra Valle, by her next friend Shirley Campos-Valle..* Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Magida, Jennifer) (Entered: 06/24/2009) |
| 06/24/2009 | 77 | FILING ERROR - DEFICIENT DOCKET ENTRY - DECLARATION of Jane Greengold Stevens in Support re: 75 MOTION to Intervene *Mayra Valle, by her next friend Shirley Campos-Valle..* Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Attachments: # 1 Exhibit A - Campos-Valle Declaration, # 2 Exhibit B- Kenneally Declaration, # 3 Exhibit C - Valle Decision After Fair Hearing, # 4 Exhibit D - Transcript of 12.4.08 Hearing) (Magida, Jennifer) Modified on 6/25/2009 (jar). (Entered: 06/24/2009) |
| 06/24/2009 | 78 | DECLARATION of Jane Greengold Stevens in Support re: 75 MOTION to Intervene *Mayra Valle, by her next friend Shirley Campos-Valle..* Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Attachments: # 1 Exhibit A-Campos-Valle Declaration, # 2 Exhibit B-Kenneally Declaration, # 3 Exhibit C- Valle |

| | | Decision After Fair Hearing, # 4 Exhibit D-Transcript Excerpt 12.4.08 Oral Argument, # 5 Exhibit E-Proposed Intervenor Complaint)(Magida, Jennifer) (Entered: 06/24/2009) |
|---|---|---|
| 07/13/2009 | 79 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Kimberly Conway dated 7/6/2009 re: Requesting that the Court grant City defendant an extension of time to submit opposition papers to plaintiffs' motion for leave to intervene. ENDORSEMENT: So ordered. (Signed by Judge Richard J. Holwell on 7/13/2009) (jpo) Modified on 7/15/2009 (jpo). (Entered: 07/13/2009) |
| 07/22/2009 | 80 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Kimberly Conway dated 7/15/09 re: City defendant respectfully requests an extension of the to 8/11/09 to permit City defendant to depose the proposed intervenor and provide sufficient notice for said deposition. ENDORSEMENT: Application Granted. (Signed by Judge Richard J. Holwell on 7/21/09) (tro) (Entered: 07/22/2009) |
| 08/26/2009 | 81 | NOTICE OF APPEARANCE by Sandra Denise Hauser on behalf of Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated) (Hauser, Sandra) (Entered: 08/26/2009) |
| 08/26/2009 | 82 | NOTICE OF APPEARANCE by Lydia Ann Keaney on behalf of Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated) (Keaney, Lydia) (Entered: 08/26/2009) |
| 09/21/2009 | 83 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Michael S. Gugig dated 9/16/2009 re: Specifically, the parties have agreed to the following schedule for simultaneous briefing of, any dispositive motions they may file, along with Plaintiffs' class certification motion: Opening Papers due on or before October 9, 2009; Opposition Papers due on or before December 4, 2009; and Reply Papers due on or before January 15, 2010. ENDORSEMENT: SO ORDERED. ( Motions due by 10/9/2009, Replies due by 1/15/2010, Responses due by 12/4/2009) (Signed by Judge Richard J. Holwell on 9/17/2009) (jmi) (Entered: 09/21/2009) |
| 10/09/2009 | 84 | MOTION to Dismiss *Complaint*. Document filed by Robert Doar, Antonia C. Novello. Responses due by 12/4/2009(Kraft, Robert) (Entered: 10/09/2009) |
| 10/09/2009 | 85 | MEMORANDUM OF LAW in Support re: 84 MOTION to Dismiss *Complaint*.. Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 10/09/2009) |
| 10/09/2009 | 86 | MOTION for Summary Judgment. Document filed by Verna Eggleston. (Conway, Kimberly) (Entered: 10/09/2009) |
| 10/09/2009 | 87 | DECLARATION of Kimberly Conway in Support re: 86 MOTION for Summary Judgment.. Document filed by Verna Eggleston. (Attachments: # 1 Exhibit, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H, # 9 Exhibit Exhibit I, # 10 Exhibit Exhibit J, # 11 Exhibit Exhibit K, # 12 Exhibit Exhibit L, # 13 Exhibit Exhibit M, # 14 Exhibit Exhibit N, # 15 Exhibit Exhibit O, # 16 Exhibit Exhibit P, # 17 Exhibit Exhibit Q, # 18 |

# JA16

| | | |
|---|---|---|
| | | Exhibit Exhibit R, # 19 Exhibit Exhibit S, # 20 Exhibit Exhibit U, # 21 Exhibit Exhibit V, # 22 Exhibit Exhibit W, # 23 Exhibit Exhibit Y, # 24 Exhibit Exhibit Z, # 25 Exhibit Exhibit AA, # 26 Exhibit Exhibit BB, # 27 Exhibit Exhibit CC, # 28 Exhibit Exhibit DD, # 29 Exhibit Exhibit EE, # 30 Exhibit Exhibit FF, # 31 Exhibit Exhibit GG, # 32 Exhibit Exhibit HH, # 33 Exhibit Exhibit II, # 34 Exhibit Exhibit JJ, # 35 Exhibit Exhibit KK, # 36 Exhibit Exhibit LL, # 37 Exhibit Exhibit MM, # 38 Exhibit Exhibit NN, # 39 Exhibit Exhibit OO, # 40 Exhibit Exhibit PP- part I, # 41 Exhibit Exhibit PP- Part II, # 42 Exhibit Exhibit PP- Part III, # 43 Exhibit Exhibit PP- Part IV, # 44 Exhibit Exhibit PP- Part VI, # 45 Exhibit Exhibit PP- Part VI)(Conway, Kimberly) (Entered: 10/09/2009) |
| 10/09/2009 | 88 | MOTION for Partial Summary Judgment. Document filed by Boris Shakhnes (by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). Responses due by 12/4/2009(Hauser, Sandra) (Entered: 10/09/2009) |
| 10/09/2009 | 89 | MEMORANDUM OF LAW in Support re: 88 MOTION for Partial Summary Judgment.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Hauser, Sandra) (Entered: 10/09/2009) |
| 10/09/2009 | 90 | DECLARATION of Sandra D. Hauser in Support re: 88 MOTION for Partial Summary Judgment.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Attachments: # 1 Exhibit A through F, # 2 Exhibit G through P, # 3 Exhibit Q through X, # 4 Exhibit Y through CC, # 5 Exhibit DD)(Hauser, Sandra) (Entered: 10/09/2009) |
| 10/09/2009 | 91 | DECLARATION of Benjamin Taylor in Support re: 88 MOTION for Partial Summary Judgment.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Attachments: # 1 Exhibit A through C, # 2 Exhibit D through F)(Hauser, Sandra) (Entered: 10/09/2009) |
| 10/09/2009 | 92 | NOTICE of Plaintiffs' Statement of Undisputed Facts Pursuant to Local Rule 56.1 re: 88 MOTION for Partial Summary Judgment.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Hauser, Sandra) (Entered: 10/09/2009) |
| 10/09/2009 | 93 | MOTION to Certify Class. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). Responses due by 12/4/2009(Hauser, Sandra) (Entered: 10/09/2009) |
| 10/09/2009 | 94 | MEMORANDUM OF LAW in Support re: 93 MOTION to Certify Class.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Hauser, Sandra) (Entered: 10/09/2009) |
| 10/09/2009 | 95 | DECLARATION of Sandra D. Hauser in Support re: 93 MOTION to Certify Class.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Attachments: # 1 Exhibit A through F, # 2 Exhibit G through P, # 3 Exhibit Q through X, # 4 |

**JA17**

| | | |
|---|---|---|
| | | Exhibit Y through CC, # 5 Exhibit DD)(Hauser, Sandra) (Entered: 10/09/2009) |
| 10/09/2009 | 96 | DECLARATION of Benjamin Taylor in Support re: 93 MOTION to Certify Class.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Attachments: # 1 Exhibit A through C, # 2 Exhibit D through F)(Hauser, Sandra) (Entered: 10/09/2009) |
| 10/12/2009 | 97 | MEMORANDUM OF LAW in Support re: 86 MOTION for Summary Judgment.. Document filed by Verna Eggleston. (Conway, Kimberly) (Entered: 10/12/2009) |
| 10/12/2009 | 98 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - AFFIRMATION in Support re: 86 MOTION for Summary Judgment. Document filed by Verna Eggleston. (Conway, Kimberly) Modified on 10/14/2009 (db). (Entered: 10/12/2009) |
| 10/12/2009 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney Kimberly Dorothy Conway to RE-FILE Document 98 Affirmation in Support of Motion. Use the event type Rule 56.1 Statement found under the event list Other Answers. (db) (Entered: 10/14/2009) |
| 10/14/2009 | 99 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Kimberly Conway dated 10/7/2009 re: Pursuant to Your Honor's Individual Practices, I write to respectfully request that the Court grant City defendant permission to submit a memorandum of law in support of City defendant's motion for summary judgment in excess of 25 pages. Specifically, City defendant seeks permission to submit a memorandum of law containing 40 pages. ENDORSEMENT: SO ORDERED. (Signed by Judge Richard J. Holwell on 10/8/2009) (jmi) (Entered: 10/14/2009) |
| 10/14/2009 | 100 | RULE 56.1 STATEMENT. Document filed by Verna Eggleston. (Conway, Kimberly) (Entered: 10/14/2009) |
| 12/03/2009 | 101 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Kimberly Conway dated 12/1/09 re: Counsel request that the Court grant City defendants a one-week extension of time to submit opposition papers to plaintiffs' motion for partial summary judgment and plaintiffs' renewed motion for class certification. Plaintiffs and the State defendant consent to this requests on the condition that the 12/4/09 deadline be extended to 12/11/09 for all parties to simultaneously submit motion papers. The parties further request that the current deadline for the submission of reply papers be extended one additional week from 1/5/2010 to 1/22/2010. ENDORSEMENT: SO ORDERED. (Signed by Judge Richard J. Holwell on 12/2/09) (tro) (Entered: 12/03/2009) |
| 12/10/2009 | 102 | MEMORANDUM OF LAW in Opposition re: 93 MOTION to Certify Class. *filed by State Defendants*. Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 12/10/2009) |
| 12/10/2009 | 103 | DECLARATION of Russell J. Hanks in Opposition re: 93 MOTION to Certify Class.. Document filed by Robert Doar, Antonia C. Novello. (Kraft, |

| | | |
|---|---|---|
| | | Robert) (Entered: 12/10/2009) |
| 12/11/2009 | 104 | MEMORANDUM OF LAW in Opposition re: 86 MOTION for Summary Judgment.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Hauser, Sandra) (Entered: 12/11/2009) |
| 12/11/2009 | 105 | DECLARATION of Jane Greengold Stevens in Opposition re: 84 MOTION to Dismiss *Complaint*., 86 MOTION for Summary Judgment.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Attachments: # 1 Exhibit Exhibits A-E, # 2 Exhibit Exhibit F Part 1, # 3 Exhibit Exhibit F Part 2, # 4 Exhibit Exhibits G - O, # 5 Exhibit Exhibits P through T)(Hauser, Sandra) (Entered: 12/11/2009) |
| 12/11/2009 | 106 | MEMORANDUM OF LAW in Opposition re: 84 MOTION to Dismiss *Complaint*.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Hauser, Sandra) (Entered: 12/11/2009) |
| 12/11/2009 | 107 | COUNTER STATEMENT TO 100 Rule 56.1 Statement. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Hauser, Sandra) (Entered: 12/11/2009) |
| 12/11/2009 | 108 | MEMORANDUM OF LAW in Opposition re: 88 MOTION for Partial Summary Judgment.. Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 12/11/2009) |
| 12/11/2009 | 109 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU (Counter Statement to Rule 56.1) - RESPONSE in Opposition re: 88 MOTION for Partial Summary Judgment. *Response To Plaintiffs' Local Civil Rule 56.1 Statement*. Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) Modified on 12/14/2009 (jar). (Entered: 12/11/2009) |
| 12/11/2009 | 110 | MEMORANDUM OF LAW in Opposition re: 88 MOTION for Partial Summary Judgment.. Document filed by Verna Eggleston. (Conway, Kimberly) (Entered: 12/11/2009) |
| 12/11/2009 | 111 | MEMORANDUM OF LAW in Opposition re: 93 MOTION to Certify Class.. Document filed by Verna Eggleston. (Conway, Kimberly) (Entered: 12/11/2009) |
| 12/11/2009 | 112 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU (Counter Statement to Rule 56.1) - RULE 56.1 STATEMENT. Document filed by Verna Eggleston. (Conway, Kimberly) Modified on 12/14/2009 (jar). (Entered: 12/11/2009) |
| 12/11/2009 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney Robert Kraft to RE-FILE Document 109 Response in Opposition to Motion. Use the event type Counter Statement to Rule 56.1 found under the event list Other Answers. (jar) (Entered: 12/14/2009) |
| 12/11/2009 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney Kimberly Conway to RE-FILE Document 112 |

**JA19**

| | | |
|---|---|---|
| | | Rule 56.1 Statement. Use the event type Counter Statement to Rule 56.1 found under the event list Other Answers. (jar) (Entered: 12/14/2009) |
| 12/14/2009 | 113 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Jane Greengold Stevens dated 12/9/09 re: Plaintiffs write to respectfully request that the Court grant plaintiffs permission to filed their Memorandum in Response to City Defendants' Motion for Summary Judgment five pages over the 25 page limit. ENDORSEMENT: SO ORDERED. (Signed by Judge Richard J. Holwell on 12/11/09) (tro) (Entered: 12/14/2009) |
| 12/14/2009 | 114 | COUNTER STATEMENT TO Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 12/14/2009) |
| 12/15/2009 | 115 | COUNTER STATEMENT TO 100 Rule 56.1 Statement. Document filed by Verna Eggleston. (Conway, Kimberly) (Entered: 12/15/2009) |
| 12/15/2009 | 116 | DECLARATION of Kimberly Conway in Opposition re: 93 MOTION to Certify Class., 88 MOTION for Partial Summary Judgment.. Document filed by Verna Eggleston. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B- part I, # 3 Exhibit Exhibit B- part II, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D- Part I, # 6 Exhibit Exhibit D- Part II, # 7 Exhibit Exhibit E- Part I, # 8 Exhibit Exhibit E- Part II, # 9 Exhibit Exhibit F, # 10 Exhibit Exhibit G, # 11 Exhibit Exhibit H, # 12 Exhibit Exhibit I, # 13 Exhibit Exhibit J, # 14 Exhibit Exhibit K, # 15 Exhibit Exhibit L, # 16 Exhibit Exhibit M, # 17 Exhibit Exhibit N, # 18 Exhibit Exhibit O, # 19 Exhibit Exhibit P, # 20 Exhibit Exhibit Q, # 21 Exhibit Exhibit R, # 22 Exhibit Exhibit S, # 23 Exhibit Exhibit T, # 24 Exhibit Exhibit U, # 25 Exhibit Exhibit V, # 26 Exhibit Exhibit W- Part II, # 27 Exhibit Exhibit W- Part II, # 28 Exhibit Exhibit X, # 29 Exhibit Exhibit Y)(Conway, Kimberly) (Entered: 12/15/2009) |
| 01/22/2010 | 117 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Kimberly Conway dated 1/21/2010 re: Requesting that the January 22nd deadline be extended to January 29th for all parties to simultaneously submit reply papers. ENDORSEMENT: Extension Granted. (Signed by Judge Richard J. Holwell on 1/21/2010) (jpo) (Entered: 01/22/2010) |
| 01/29/2010 | 118 | REPLY MEMORANDUM OF LAW in Support re: 84 MOTION to Dismiss *Complaint*.. Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 01/29/2010) |
| 01/29/2010 | 119 | REPLY MEMORANDUM OF LAW in Support re: 93 MOTION to Certify Class. *Reply Memorandum of Law in Support of Plaintiff's Renewed Motion for Class Certification*. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Hauser, Sandra) (Entered: 01/29/2010) |
| 01/29/2010 | 120 | REPLY MEMORANDUM OF LAW in Support re: 88 MOTION for Partial Summary Judgment. *Plaintiffs' Memorandum of Law in Support of Their Motion for Partial Summary Judgment*. Document filed by Boris Shakhnes (by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Hauser, Sandra) (Entered: 01/29/2010) |
| 01/29/2010 | 121 | DECLARATION of Benjamin Taylor in Support re: 93 MOTION to Certify |

**JA20**

| | | |
|---|---|---|
| | | Class., 88 MOTION for Partial Summary Judgment.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Hauser, Sandra) (Entered: 01/29/2010) |
| 01/29/2010 | 122 | DECLARATION of Sandra D. Hauser in Support re: 93 MOTION to Certify Class., 88 MOTION for Partial Summary Judgment.. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Attachments: # 1 Exhibit Exhibits A and B) (Hauser, Sandra) (Entered: 01/29/2010) |
| 01/29/2010 | 123 | COUNTER STATEMENT TO 112 Rule 56.1 Statement. Document filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated). (Hauser, Sandra) (Entered: 01/29/2010) |
| 01/30/2010 | 124 | REPLY MEMORANDUM OF LAW in Support re: 86 MOTION for Summary Judgment.. Document filed by Verna Eggleston. (Conway, Kimberly) (Entered: 01/30/2010) |
| 02/01/2010 | 125 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Kimberly Conway dated 1/21/2010 re: ACC writes requesting that the Court grant City defendant a one-week extension of time to submit reply papers to plaintiffs' opposition to City defendant's motion for summary judgment. City defendant seeks an extension of the impending deadline until Friday, January 29, 2010. ENDORSEMENT: SO ORDERED. (Signed by Judge Richard J. Holwell on 1/29/2010) (tve) (Entered: 02/01/2010) |
| 02/01/2010 | 126 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Jennifer Magida dated 1/27/2010 re: Counsel for plaintiff writes to respectfully suggest that filing 2 reply briefs of 20 pages or less would be the most efficient way to proceed in support of Plaintiff's motions for class certification and partial summary judgment. ENDORSEMENT: Application Granted. SO ORDERED. (Signed by Judge Richard J. Holwell on 2/1/2010) (tve) (Entered: 02/01/2010) |
| 03/04/2010 | 127 | ORDER TO SHOW CAUSE filed by Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Mikhail Feldman, individually and on behalf of all others similarly situated), Boris Shakhnes(by his friend Chaio Zhang, Individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Fei Mock, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Sha-Sha Willis, individually and on behalf of all others similarly situated). defendants shall show cause as to why an order should not be entered granting a preliminary injunction as further set forth herein. Show Cause Hearing set for 3/8/2010 at 02:00 PM in Courtroom 17C, 500 Pearl Street, New York, NY 10007 before Judge Richard J. Holwell. (Signed by Judge Shira A. Scheindlin on 3/3/10, Part One) (dle) (Entered: 03/04/2010) |
| 03/08/2010 | 128 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Jane Greengold Stevens dated 3/8/2010 re: Counsel for Plaintiffs write regarding Plaintiffs' request for a preliminary injunction on behalf of class members Christopher Carter. Plaintiffs are currently seeking official confirmation from |

**JA21**

| | | |
|---|---|---|
| | | Defendants that ongoing home health services have been authorized for Mr. Carter, so that Plaintiffs can be assured that the issues raised by Plaintiffs' motion are not likely to recur. Assuming Defendants are able to provide such confirmation, and at such time, Plaintiffs will withdraw their motion. ENDORSEMENT: The OSC hearing is adjourned sine die. (Signed by Judge Richard J. Holwell on 3/8/2010) (tro) (Entered: 03/08/2010) |
| 06/16/2010 | 129 | SCHEDULING ORDER: The Court hereby schedules oral argument on the pending motions in these matters for 3:30 PM on Wednesday, June 30, 2010. The parties are to appear in the courtroom of the Honorable Richard J. Holwell, Courtroom 17B, 500 Pearl Street, New York, NY 10007. So Ordered (Signed by Judge Richard J. Holwell on 6/16/09) (js) (Entered: 06/16/2010) |
| 06/21/2010 | 130 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Jane Greengold Stevens dated 6/17/10 re: counsel for plaintiff write on behalf of all parties to the Shakhnes case as well as the parties in the related case Menking v. Daines, to request an adjournment of the oral argument on all pending motions in both cases, now scheduled by the Court to be beard on June 30, 2010. We make this request to accommodate counsels' schedules and case demands. I spoke with Mr. Donald and he advised that the Court is available to hear the arguments on July 22, 2010 at 10:30. ENDORSEMENT: So Ordered. (Signed by Judge Richard J. Holwell on 6/18/10) (pl) (Entered: 06/21/2010) |
| 07/22/2010 | | Minute Entry for proceedings held before Judge Richard J. Holwell: Status Conference held on 7/22/2010. Oral argument held on motion. The Court reserves decision, will filed opinion in short order. (mro) (Entered: 08/05/2010) |
| 07/30/2010 | 131 | TRANSCRIPT of proceedings held on July 22, 2010 11:11 a.m. before Judge Richard J. Holwell. (ajc) (Entered: 07/30/2010) |
| 09/30/2010 | 132 | MEMORANDUM OPINION AND ORDER #99505 For the foregoing reasons the motions to dismiss in both Shakhnes and Menking are denied as to the 90 day claims. (06-cv-04778 84; 09-cv-04103 12 Motion to Dismiss.) The State defendants motion to dismiss in Shakhnes is granted in part: the notice and inadequate supervision claims against State defendants are dismissed without prejudice. Additionally in the Shakhnes action. Plaintiffs' motion and class certification 93 is granted and the following class is certified pursuant to Fed.R.Civ.P. 23(b)(2). City defendants motion for summary judgment 86 is denied. (3) Plaintiffs motion for partial summary judgment 88 is granted as against the State defendants and denied as against the City. In lieu of entering an order providing for specific injunctive and remedial relief, the Court directs the parties to submit, within twenty (20) days of the filing of this opinion, letter briefs addressing (a) the appropriate injunctive, declaratory and remedial measures consistent with this opinion, and (b) whether an evidentiary hearing is needed to resolve factual issues related to (a). (Signed by Judge Richard J. Holwell on 9/30/10) (djc) (Entered: 10/01/2010); (djc) Modified on 10/4/2010 (ajc). (Entered: 10/01/2010) |
| 10/07/2010 | 133 | NOTICE OF CHANGE OF ADDRESS by Lydia Ann Keaney on behalf of |

| | | |
|---|---|---|
| | | Boris Shakhnes(by his next friend Fei Mock, individually and on behalf of all others similarly situated), Boris Shakhnes(by his friend Chaio Zhang, Individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Sha-Sha Willis, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Mikhail Feldman, individually and on behalf of all others similarly situated). New Address: SNR Denton US LLP (NY), 1221 Avenue of the Americas, New York, New York, USA 10020, (212) 398-4866. (Keaney, Lydia) (Entered: 10/07/2010) |
| 10/07/2010 | 134 | NOTICE OF CHANGE OF ADDRESS by Sandra Denise Hauser on behalf of Boris Shakhnes(by his next friend Fei Mock, individually and on behalf of all others similarly situated), Boris Shakhnes(by his friend Chaio Zhang, Individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Sha-Sha Willis, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Mikhail Feldman, individually and on behalf of all others similarly situated). New Address: SNR Denton US LLP (NY), 1221 Avenue of the Americas, New York, New York, USA 10020, (212) 768-6802. (Hauser, Sandra) (Entered: 10/07/2010) |
| 10/21/2010 | 135 | ENDORSED LETTER: addressed to Judge Richard J. Holwell from Kimberly Conway dated 10/19/2010 re: Counsel writes on behalf of all the parties in this action to request that the Court grant the parties a three week extension of time to comply with the directive of the Court's Opinion and Order dated September 30, 2010 that the parties submit, by October 21, 2010, letter briefs addressing (a) the appropriate injunctive, declaratory and remedial measures consistent with the opinion, and (b) whether an evidentiary hearing is needed to resolve factual issues related to (a) The parties seek an extension of this impending deadline until November 10, 2010, and have not requested any prior extensions with respect to the letter briefs at issue. the parties request this extension in order to explore the possibility of resolving this case in its entirety, or at least narrow the issues before the Court. ENDORSEMENT: So Ordered. (Signed by Judge Richard J. Holwell on 10/20/2010) (js) (Entered: 10/21/2010) |
| 11/17/2010 | 136 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Jane Greengold Stevens dated 11/9/10 re: Request that the impending deadline in the 9/30/10 Opinion be extended an additional two weeks, until 11/24/10. ENDORSEMENT: So Ordered. (Signed by Judge Richard J. Holwell on 11/15/10) (cd) (Entered: 11/17/2010) |
| 11/24/2010 | 137 | BRIEF *Plaintiffs' Letter Brief and Proposed Order*. Document filed by Boris Shakhnes(by his next friend Fei Mock, individually and on behalf of all others similarly situated), Boris Shakhnes(by his friend Chaio Zhang, Individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Sha-Sha Willis, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated), Boris Shakhnes(by |

| | | his next friend Mikhail Feldman, individually and on behalf of all others similarly situated). (Attachments: # 1 Exhibit Plaintiffs' Exhibit A: Proposed Order)(Keaney, Lydia) (Entered: 11/24/2010) |
|---|---|---|
| 12/01/2010 | 138 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Jane Greengold Stevens dated 11/5/10 re: Plaintiff writes to seek assistance from the Court on behalf of Ramon Cruz. Plaintiff respectfully requests that the Court schedule a conference on this matter at its earliest convenience. ENDORSEMENT: A telephone conference shall be held on December 2, 2010 at 10:00 a.m. Plaintiffs' counsel to initiate the call. SO ORDERED. ( Telephone Conference set for 12/2/2010 at 10:00 AM before Judge Richard J. Holwell.) (Signed by Judge Richard J. Holwell on 11/30/10); (djc) (Entered: 12/01/2010) |
| 12/01/2010 | 139 | DECLARATION of Robert L. Kraft re: 138 Endorsed Letter,,, Set Deadlines/Hearings,, *with Decision After Fair Hearing.* Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 12/01/2010) |
| 12/03/2010 | 140 | AFFIDAVIT in Opposition re: 137 Brief,,., DECLARATION in Opposition re: 137 Brief,,. Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 12/03/2010) |
| 12/07/2010 | 141 | BRIEF re: 139 Declaration *Letter filed in Response to State Defendants' Declaration of David B. Amiraian.* Document filed by Boris Shakhnes(by his next friend Fei Mock, individually and on behalf of all others similarly situated), Boris Shakhnes(by his friend Chaio Zhang, Individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Sha-Sha Willis, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Alla Shakhnes, individually and on behalf of all others similarly situated), Boris Shakhnes(by his next friend Mikhail Feldman, individually and on behalf of all others similarly situated).(Hauser, Sandra) (Entered: 12/07/2010) |
| 12/08/2010 | 142 | BRIEF re: 138 Endorsed Letter,,, Set Deadlines/Hearings,, *Letter Brief In Opposition To Plaintiffs' Proposed Order.* Document filed by Robert Doar, Antonia C. Novello.(Kraft, Robert) (Entered: 12/08/2010) |
| 12/08/2010 | 143 | DECLARATION of Robert L. Kraft in Opposition re: 138 Endorsed Letter,,, Set Deadlines/Hearings,,. Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 12/08/2010) |
| 12/14/2010 | 144 | ORDER, the evidentiary record must be supplemented before the Court can determine the nature and content of any order. Plaintiffs are directed to file by December 17, 2010 both (a) a sworn affidavit from Mr. Cruz's treating physician at Kingsbridge Heights Rehabilitation and Care Center as to the physician's opinion regarding whether Mr. Cruz's "health and supportive needs can be met safely and adequately at home and (b) any supplemental argument concerning the satisfaction or absence of any further conditions to Mr. Cruz's legal entitlement to twenty-four hour home health services. The State Defendants shall file a statement of their position by 5:00 p.m. on December 20, 2010. If either party requests a hearing, it shall be held on December 21, 2010 at 2:30 p.m. SO ORDERED. (Signed by Judge Richard J. |

**JA24**

| | | Holwell on 12/14/2010) (lnl) (Entered: 12/14/2010) |
|---|---|---|
| 12/23/2010 | 145 | NOTICE OF APPEARANCE by Susan Lee Greene on behalf of Boris Shakhnes(by his next friend Fei Mock, individually and on behalf of all others similarly situated) (Greene, Susan) (Entered: 12/23/2010) |
| 04/18/2011 | 146 | ORDER: For the reasons set forth in this Court's Memorandum and Order dated September 30, 2010, see 2010 WL 3817369 (S.D.N.Y. Sept. 30,2010), the Court hereby DECLARES that: The New York State Office of Temporary and Disability Assistance ("OTDA") and the New York State Department of Health ("DOH") (collectively, "State Defendants") have a custom and practice of failing to take and/or ensure Final Administrative Action within 90 days of the date of Medicaid-funded home health services applicants' and recipients' requests for fair hearings challenging adverse actions regarding their home health services as further set forth within. (Signed by Judge Richard J. Holwell on 4/15/2011) (jfe) (Entered: 04/18/2011) |
| 05/16/2011 | 147 | NOTICE OF APPEAL from 146 Order. Document filed by Elizabeth R. Berlin, and Nirav R. Shah. Filing fee $ 455.00, receipt number 465401006886. (tp) (Entered: 05/17/2011) |
| 05/17/2011 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 147 Notice of Appeal. (tp) (Entered: 05/17/2011) |
| 05/17/2011 | | Transmission of Notice of Appeal to the District Judge re: 147 Notice of Appeal. (tp) (Entered: 05/17/2011) |
| 05/17/2011 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 83 Endorsed Letter, Set Deadlines, 71 Endorsed Letter, Set Deadlines/Hearings, 117 Endorsed Letter, Set Deadlines/Hearings, 77 Declaration in Support of Motion, filed by Boris Shakhnes, 10 Protective Order, 82 Notice of Appearance filed by Boris Shakhnes, 46 Declaration in Support of Motion filed by Robert Doar, Antonia C. Novello, 52 Order, Set Motion and R&R Deadlines/Hearings, 118 Reply Memorandum of Law in Support of Motion filed by Robert Doar, Antonia C. Novello, 56 Declaration in Support of Motion, filed by Robert Doar, Antonia C. Novello, 19 Order, 108 Memorandum of Law in Opposition to Motion filed by Robert Doar, Antonia C. Novello, 99 Endorsed Letter, 14 Affidavit of Service Complaints filed by Boris Shakhnes, 39 MOTION to Amend/Correct *State Defendants' Answer to First Amended Complaint* filed by Robert Doar, Antonia C. Novello, 93 MOTION to Certify Class filed by Boris Shakhnes, 32 Declaration in Support of Motion, filed by Boris Shakhnes, 120 Reply Memorandum of Law in Support of Motion, filed by Boris Shakhnes, 69 Scheduling Order, 105 Declaration in Opposition to Motion, filed by Boris Shakhnes, 122 Declaration in Support of Motion, filed by Boris Shakhnes, 114 Counter Statement to Rule 56.1 filed by Robert Doar, Antonia C. Novello, 65 Order on Motion to Amend/Correct, Order on Motion to Dismiss, 137 Brief, filed by Boris Shakhnes, 16 Amended Complaint, filed by Boris Shakhnes, 74 Order, Set Deadlines/Hearings, 55 MOTION to Dismiss for Lack of Jurisdiction *lack of Art 3 standing and failure to join party needed for defendants to provide complete relief to plaintiffs* filed by Robert Doar, Antonia C. Novello, 123 Counter Statement to Rule 56.1 filed by Boris |

Shakhnes, 23 Endorsed Letter, 41 Order, Set Hearings, 88 MOTION for Partial Summary Judgment filed by Boris Shakhnes, 106 Memorandum of Law in Opposition to Motion filed by Boris Shakhnes, 143 Declaration in Opposition filed by Robert Doar, Antonia C. Novello, 58 Memorandum of Law in Opposition to Motion, filed by Boris Shakhnes, 126 Endorsed Letter, 38 Order, Add and Terminate Attorneys, 2 Declaration in Support of I.F.P., filed by Boris Shakhnes, 121 Declaration in Support of Motion, filed by Boris Shakhnes, 5 Declaration in Support of I.F.P. filed by Boris Shakhnes, 138 Endorsed Letter, Set Deadlines/Hearings, 139 Declaration filed by Robert Doar, Antonia C. Novello, 72 Endorsed Letter, Set Deadlines/Hearings, 54 Scheduling Order, Set Hearings, Set Motion and R&R Deadlines/Hearings, 47 Memorandum of Law in Support of Motion filed by Robert Doar, Antonia C. Novello, 34 Notice (Other) filed by Boris Shakhnes, 15 Affidavit of Service Complaints filed by Boris Shakhnes, 141 Brief, filed by Boris Shakhnes, 136 Endorsed Letter, 109 Response in Opposition to Motion, filed by Robert Doar, Antonia C. Novello, 42 Endorsed Letter, Set Deadlines/Hearings, 35 Order, 113 Endorsed Letter, 37 Endorsed Letter, Set Deadlines, 147 Notice of Appeal filed by Robert Doar, Antonia C. Novello, 21 Endorsed Letter, 17 Stipulation and Order, 75 MOTION to Intervene *Mayra Valle, by her next friend Shirley Campos-Valle* filed by Boris Shakhnes, 63 Scheduling Order, 13 Affidavit of Service Complaints filed by Boris Shakhnes, 4 Declaration in Support of I.F.P., filed by Boris Shakhnes, 22 Answer to Amended Complaint filed by Verna Eggleston, 102 Memorandum of Law in Opposition to Motion filed by Robert Doar, Antonia C. Novello, 111 Memorandum of Law in Opposition to Motion filed by Verna Eggleston, 78 Declaration in Support of Motion, filed by Boris Shakhnes, 59 MOTION to Dismiss *A Claim* filed by Verna Eggleston, 85 Memorandum of Law in Support of Motion filed by Robert Doar, Antonia C. Novello, 129 Scheduling Order, 135 Endorsed Letter, Set Deadlines/Hearings, 9 Notice of Appearance filed by Boris Shakhnes, 62 Memorandum of Law in Opposition to Motion, filed by Boris Shakhnes, 98 Affirmation in Support of Motion filed by Verna Eggleston, 31 MOTION to Intervene *and Class Action Intervenor Complaint* filed by Boris Shakhnes, 133 Notice of Change of Address, filed by Boris Shakhnes, 1 Complaint, filed by Boris Shakhnes, 36 Endorsed Letter, Set Deadlines/Hearings, 57 Memorandum of Law in Support of Motion, filed by Robert Doar, Antonia C. Novello, 33 Memorandum of Law in Support of Motion, filed by Boris Shakhnes, 28 Order, 50 Memorandum of Law in Opposition to Motion, filed by Boris Shakhnes, 132 Memorandum & Opinion, 130 Endorsed Letter, Set Scheduling Order Deadlines, 142 Brief filed by Robert Doar, Antonia C. Novello, 24 Case Management Plan, 128 Endorsed Letter, 48 Order on Motion to Intervene, 124 Reply Memorandum of Law in Support of Motion filed by Verna Eggleston, 101 Endorsed Letter, Set Deadlines, 76 Memorandum of Law in Support of Motion, filed by Boris Shakhnes, 29 Endorsed Letter, 84 MOTION to Dismiss *Complaint* filed by Robert Doar, Antonia C. Novello, 60 MOTION to Dismiss *A Claim* filed by Verna Eggleston, 107 Counter Statement to Rule 56.1 filed by Boris Shakhnes, 44 Notice of Appearance filed by Robert Doar, Antonia C. Novello, 43 Order, Set Deadlines/Hearings, 18 Notice of Appearance filed by Boris Shakhnes, 27 Suggestion of Death filed by Verna Eggleston, 127 Order to Show Cause,

| | | |
|---|---|---|
| | | filed by Boris Shakhnes, 134 Notice of Change of Address, filed by Boris Shakhnes, 64 Endorsed Letter, Set Deadlines/Hearings, 104 Memorandum of Law in Opposition to Motion filed by Boris Shakhnes, 70 Order, Set Hearings, 30 Endorsed Letter, Set Deadlines/Hearings, 20 Answer to Amended Complaint filed by Robert Doar, Antonia C. Novello, 49 Notice of Appearance filed by Boris Shakhnes, 119 Reply Memorandum of Law in Support of Motion, filed by Boris Shakhnes, 91 Declaration in Support of Motion, filed by Boris Shakhnes, 110 Memorandum of Law in Opposition to Motion filed by Verna Eggleston, 66 Scheduling Order, 146 Order, 80 Endorsed Letter, Set Deadlines/Hearings, 125 Endorsed Letter, Set Motion and R&R Deadlines/Hearings, 140 Affidavit in Opposition, Declaration in Opposition filed by Robert Doar, Antonia C. Novello, 94 Memorandum of Law in Support of Motion filed by Boris Shakhnes, 96 Declaration in Support of Motion, filed by Boris Shakhnes, 145 Notice of Appearance filed by Boris Shakhnes, 3 Declaration in Support of I.F.P., filed by Boris Shakhnes, 95 Declaration in Support of Motion, filed by Boris Shakhnes, 92 Notice (Other), Notice (Other) filed by Boris Shakhnes, 51 Endorsed Letter, Set Deadlines/Hearings, 86 MOTION for Summary Judgment filed by Verna Eggleston, 115 Counter Statement to Rule 56.1 filed by Verna Eggleston, 90 Declaration in Support of Motion, filed by Boris Shakhnes, 6 Notice of Case Assignment/Reassignment, 40 Order Referring Case to Magistrate Judge, 8 Endorsed Letter, Set Deadlines/Hearings, 112 Rule 56.1 Statement filed by Verna Eggleston, 89 Memorandum of Law in Support of Motion filed by Boris Shakhnes, 25 Endorsed Letter, 87 Declaration in Support of Motion, filed by Verna Eggleston, 144 Order, 26 Endorsed Letter, Set Deadlines/Hearings, 61 Declaration in Support of Motion, filed by Verna Eggleston, 116 Declaration in Opposition to Motion, filed by Verna Eggleston, 97 Memorandum of Law in Support of Motion filed by Verna Eggleston, 103 Declaration in Opposition to Motion filed by Robert Doar, Antonia C. Novello, 45 MOTION to Amend/Correct 20 Answer to Amended Complaint filed by Robert Doar, Antonia C. Novello, 100 Rule 56.1 Statement filed by Verna Eggleston, 81 Notice of Appearance filed by Boris Shakhnes, 79 Endorsed Letter, Set Motion and R&R Deadlines/Hearings, 73 Endorsed Letter, Set Deadlines/Hearings, 7 Stipulation and Order, were transmitted to the U.S. Court of Appeals. (tp) (Entered: 05/17/2011) |
| 06/02/2011 | 148 | RESPONSE re: 146 Order,, *Remedial Action Plan*. Document filed by Robert Doar, Antonia C. Novello. (Kraft, Robert) (Entered: 06/02/2011) |
| 06/22/2011 | 149 | ORDER AMENDING INJUNCTION AS TO STATE DEFENDANTS re: 132 Memorandum & Opinion. For the reasons set forth in the Memorandum and Order, dated September 30, 2010, the Court hereby DECLARES that: The Court's Order dated 4/18/2011 is amended by the addition of the following paragraph: Ninety (90) days after the Effective Date of this Order, and every ninety (90) days thereafter, while this Order is in effect, State Defendants shall file with the Court, and provide to all parties, a report setting forth, for each fair hearing number listed in the reports provided pursuant to paragraph 11 of the April 18, 2011 order: a. the date the fair hearing was requested; b. the date the fair hearing was first scheduled; c. if adjournments, any subsequent dates on which the hearing was scheduled; d. the date the Decision After Fair Hearing was issued; and e. the date that final |

**JA27**

| | | |
|---|---|---|
| | | administrative action was achieved. (Signed by Judge Richard J. Holwell on 6/21/2011) (tro) (Entered: 06/22/2011) |
| 07/21/2011 | 150 | ENDORSED LETTER addressed to Judge Richard J Holwell from Jane Greengold Stevens dated 7/8/11 re: Request for a 60 day extension of the 7/17/11 deadline for plaintiffs' Attorneys' fees application. ENDORSEMENT: So Ordered. (Signed by Judge Richard J. Holwell on 7/19/11) (cd) (Entered: 07/21/2011) |
| 08/01/2011 | 151 | ENDORSED LETTER addressed to Judge Richard J. Holwell from Robert L. Kraft dated 7/19/2011 re: Counsel request a 2 week extension of time to file the first report required by the Court's 4/18 injunction. ENDORSEMENT: So Ordered. (Signed by Judge Richard J. Holwell on 7/28/2011) (jfe) (Entered: 08/01/2011) |
| 08/02/2011 | 152 | STATUS REPORT. Document filed by Robert Doar, Antonia C. Novello. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Kraft, Robert) (Entered: 08/02/2011) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/23/2011 10:39:27 | | |
| **PACER Login:** | ny0010 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:06-cv-04778-RJH |
| **Billable Pages:** | 22 | **Cost:** | 1.76 |

## JA28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x



BORIS SHAKHNES by his next friend ALLA
SHAKHNES, MIKHAIL FELDMAN, FEI MOCK,
SHA-SHA WILLIS, and CHAIO ZHANG
Individually and on behalf
of all others similarly situated,

                                    Plaintiffs,                    06 Civ. 04778 (RJH)

              -against-

                                                                  **AMENDED CLASS ACTION**
VERNA EGGLESTON, as Commissioner                                  **COMPLAINT**
of the New York City Human Resources
Administration, ROBERT DOAR, as
Commissioner of the New York State Office
of Temporary and Disability Assistance;
and ANTONIA C. NOVELLO, as
Commissioner of the New York State
Department of Health,

                                    Defendants.
---------------------------------------------------------------x

### PRELIMINARY STATEMENT

1.      Plaintiffs Boris Shakhnes by his next friend Alla Shakhnes, Mikhail Feldman, Fei

Mock, Sha-Sha Willis and Chaio Zhang, bring this class action pursuant to 28 U.S.C. §§ 1331,

1343, and 1367, and 42 U.S.C. § 1983 for injunctive and declaratory relief, on behalf of

themselves and a class of New York City Medicaid funded home health services applicants and

recipients who have requested or will request fair hearings challenging denials, discontinuances

and/or reductions of such services who are being or will be improperly denied timely and

adequate notice of denials, discontinuance and/or reductions; and/or "aid-continuing" benefits

pending Decisions After Fair Hearings ("DAFHs"); and/or final administrative action within 90

days of their fair hearing requests to which they are entitled under the law.

**JA29**

2.      Plaintiffs challenge the custom and practice of Defendant EGGLESTON

(hereinafter "City Defendant" or "HRA") and Defendants DOAR and NOVELLO (hereinafter

"State Defendants") (collectively hereinafter "Defendants") of (a) failing to take and/or ensure

final administrative action within 90 days after requests for fair hearings on Medicaid home

health cases, in violation of 42 U.S.C.§ 1396a(a)(3), 42 C.F.R. § 431.244(f)(1)(ii), 18 N.Y.C.R.R

§ 358-6.4(a), and the Due Process clauses of the 14th Amendment to the United States

Constitution, U.S. Const. amend. XIV, § 1, and of the New York State Constitution, N.Y. Const.

art. I, § 6; (b) failing to provide timely and adequate notice of denials, reductions, or terminations

of Medicaid home health services in violation of 42 U.S.C.§ 1396a(a)(3), 42 C.F.R. §§ 435.912,

435.919,  435.919,  431.206(b), (c) and 431.210, New York Social Services Law § 22(12); 18 N.Y.C.R.R

§§ 505.14(b)(3)(iv)(f)(2) and 358-3.3, and the Due Process clauses of the 14th Amendment to

the United States Constitution, U.S. Const. amend. XIV, § 1, and of the New York State

Constitution, N.Y. Const. art. I, § 6; and (c) failing to provide required "aid-continuing" benefits

pending the issuance of fair hearing decisions in violation of 42 U.S.C.§ 1396a(a)(3), 42 C.F.R.

§§ 431.230(a), 431.231(c), 18 N.Y.C.R.R. § 358-3.6 and the Due Process clauses of the 14th

Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1, and of the New

York State Constitution, N.Y. Const. art. I, § 6.  Plaintiffs also challenge State Defendants'

custom and practice of failing to properly oversee and supervise City Defendant's customs and

practices concerning the provision of notice, aid-continuing and implementation of fair hearing

decisions in Medicaid home health cases in violation of 42 U.S.C. § 1396a(a)(5), 42 C.F.R. §§

431.10, 431.50, and 435.903, and N.Y. Soc. Serv. Law §§ 22, 363-a(1) and 364(2).

2

**JA30**

## JURISDICTION AND VENUE

3.      Jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331,

1343 and 1367.  Plaintiffs' claims for relief under federal law also arise under 42 U.S.C. § 1983,

as Defendants have acted under color of state law.

4.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391(b) in that it is the judicial district in which a substantial part of the events giving rise to

the claims occurred.

## PARTIES

5.      Boris Shakhnes is a 56-year-old man who lives by himself at 2818 West 8th Street,

Brooklyn, New York.  Alla Shakhnes is his ex-wife, power of attorney and next friend.

6.      Mikhail Feldman is a 77-year-old man who lives by himself at 2785 Ocean

Parkway, Brooklyn, New York.  When Mr. Feldman became a naturalized citizen, he adopted

the more western spelling of his first name, and sometimes signs his first name as "Michael."

7.      Fei Mock is a 25-year-old woman who lives by herself at 332 East 29th Street

New York, New York.

8.      Sha-Sha Willis is a 34-year-old man who lives by himself at 177 Sands Street,

Brooklyn, New York.

9.      Chaio Zhang is a 56-year-old woman who lives in a rented single room at 140-30

Ash Avenue, Flushing, New York.

10.     Defendant VERNA EGGLESTON is the Commissioner of the New York City

Human Resources Administration ("HRA") and as such is responsible for the overall operations

and decisions of that agency including the Home Care Service Program ("HCSP") and Adult

Protective Services ("APS").  She maintains an office at 180 Water Street, New York, New

York.

3

**JA31**

11.     Defendant ROBERT DOAR is the Commissioner of the New York State Office

of Temporary and Disability Assistance ("OTDA") and as such is responsible for the operations

of the Office of Fair Hearings, including but not limited to scheduling and conducting fair

hearings, issuing recommended decisions after fair hearings, and ensuring compliance with fair

hearing decisions involving the Medicaid program.  He maintains an office at 14 Boerum Place,

Brooklyn, New York.

12.     Defendant ANTONIA C. NOVELLO is the Commissioner of the New York State

Department of Health ("DOH"), and as such is responsible for the administration of the

Medicaid program in the State of New York.  She maintains an office at Corning Tower, Empire

State Plaza, Albany, New York.

### CLASS ACTION ALLEGATIONS

13.     Named Plaintiffs Boris Shakhnes by his next friend Alla Shakhnes, Mikhail

Feldman, Fei Mock, Sha-Sha Willis and Chaio Zhang bring this action, pursuant to Rule 23(b)(2)

of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class

of:

> All New York City applicants for, and recipients of, Medicaid
> funded home health services, who have requested or will request
> fair hearings challenging denials, reductions, or terminations of
> their home health services and who (1) do not receive final
> administrative action from Defendants within ninety days of their
> requests for fair hearings; and/or (2) do not receive timely and
> adequate notice of denials, reductions, or terminations of their
> home health services; and/or (3) do not receive aid-continuing
> when they meet all the requirements for it.

14.     The class is so numerous that joinder of all class members in this action would be

impracticable.  Upon information and belief, there are hundreds of persons in the class.

15.     Moreover, it would be impracticable for potential plaintiffs, who are, by

definition, disabled and indigent individuals, to obtain legal services on an individual basis for

4

**JA32**

their claims. Hence their rights under the law may well be meaningless without certification of a class action seeking common redress.

16.     Questions of law and fact common to the class predominate over any individual questions, namely whether Defendants' custom and practice of failing to provide, and/or ensure the provision of, final administrative action within the 90-day time frame required by law to home health services applicants and recipients who request fair hearings violates applicable federal and state statutes and regulations, and the Constitutions of the United States and the State of New York; whether Defendants' custom and practice of failing to provide, and/or ensure the provision of, timely and adequate notice of denials, reductions, or terminations of home health services violates applicable federal and state statutes and regulations, and the Constitutions of the United States and the State of New York; and whether Defendants' custom and practice of failing to provide, and/or ensure the provision of, aid-continuing to eligible home health services recipients violates applicable federal and state laws and regulations and the Constitutions of the United States and the State of New York.

17.     Named Plaintiffs Boris Shakhnes, Mikhail Feldman, Fei Mock and Sha-Sha Willis claims are typical of the claims of the class in that all have requested fair hearings but have not received final administrative action within 90 days.

18.     Named Plaintiff Sha-Sha Willis's claims are typical of the claims of the class in that he did not receive timely and adequate notice of the termination of his home health services, did not receive aid-continuing to which he was and is entitled, and did not receive final administrative action within 90 days of his fair hearing request.

5

19.     Named Plaintiff Chaio Zhang's claims are typical of the claims of the class in that she is not receiving the aid-continuing to which she is entitled despite a directive from the State Defendants that she is entitled to aid-continuing.

20.     Named Plaintiffs will adequately represent the interests of the class. Named Plaintiffs are members of the proposed class and there are no conflicts of interest between Named Plaintiffs and other proposed class members in that all proposed class members would benefit by obtaining timely final administrative action; and/or timely and adequate notice of home health service denials, reductions or terminations; and/or aid-continuing pending the issuance of fair hearing decisions.

21.     Plaintiffs are represented by the New York Legal Assistance Group ("NYLAG") and by Sonnenschein Nath & Rosenthal, LLP. Both firms are experienced in class action litigation and attorneys at NYLAG are experienced in class action litigation concerning Medicaid, including the Medicaid home health services program.

22.     A class action is the superior method for a fair and efficient adjudication of this matter in that Defendants have acted in a manner generally applicable to the class and a class action will avoid numerous separate actions by class members that would unduly burden the courts and create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate as to the class as a whole.

**STATUTORY AND REGULATORY SCHEME**

*A.*     *Framework of the Medicaid Program*

23.     The Medical Assistance Program ("Medicaid") is a joint federal-state program established under Title XIX of the Social Security Act (the "Medicaid Act") that provides federal

6

**JA34**

funding for state programs that furnish medical assistance and rehabilitation and other services to needy individuals. 42 U.S.C. § 1396 et seq.; 42 C.F.R. § 430 et. seq.

24.     States do not have to participate in the Medicaid program, but if they do, they must conform to federal law and regulations in order to qualify for federal financial participation. 42 U.S.C. §§ 1396, 1396a, 1396c.

25.     Any state participating in the Medicaid program must adopt an approved State plan, and must administer the program through a "single state agency." 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b)(1).  New York has elected to participate in the Medicaid program, and the "single state agency" responsible for the administration of the Medicaid program in New York is the New York State Department of Health. N.Y. Soc. Serv. Law § 363-a(1).

26.     Effective October 1, 1996, DOH assumed the responsibility, formerly held by the New York Department of Social Services ("NYDSS"), for administration of New York's Medicaid program.  All regulations of NYDSS with respect to the Medicaid program continued, in full force and effect, as regulations of DOH. N.Y. Soc. Serv. Law § 363-a(1); 1996 N.Y. Session Law, c. 474, § 242.

27.     DOH is authorized to delegate and has delegated certain responsibilities for administering the Medicaid program to local districts. 42 U.S.C. § 1396a(a)(1); N.Y. Soc. Serv. Law § 365(1).

28.     HRA is the local social services provider for the district of New York City, and is responsible for the day-to-day operations of certain aspects of the Medicaid program, pursuant to a local plan developed and maintained by HRA under the guidance of DOH. N.Y. Soc. Serv. Law § 61; 18 N.Y.C.R.R. § 501.1.  With respect to the administration of the Medicaid program, HRA acts as the agent of DOH.

7

**JA35**

29. Notwithstanding any delegation of authority to the local districts, DOH, as the "single state agency," remains ultimately responsible to supervise the actions of its agents, including HRA, and to ensure that its agents comply with the federal and state statutes and regulations governing the Medicaid program. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 431.10, 431.50, 435.903; N.Y. Soc. Serv. Law §§ 22, 363-a(1), 364(2).

30. Furthermore, DOH may not delegate to HRA, or any other agent, authority to exercise administrative discretion in the administration or supervision of the State plan, or issue policies, rules, and regulations on program matters. 42 C.F.R. § 431.10(e)(1).

31. Among other remedies, DOH has the authority to withhold or deny reimbursement to HRA in the event of HRA's failure to comply with the Medicaid program's rules and regulations. N.Y. Soc. Serv. Law § 20(3)(e).

**B.** **_Fair Hearing Process and Requirements_**

32. Federal law and regulations require a state's Medicaid program to provide Medicaid applicants and recipients with recourse to an administrative fair hearing when Medicaid benefits are denied, reduced, or terminated. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.220.

33. When determinations are made to deny, reduce, or terminate Medicaid, applicants and recipients must be given timely and adequate notice of their right to a fair hearing. 42 U.S.C.§ 1396a(a)(3); 42 C.F.R. §§ 435.919, 435.912, 431.206(b), 431.206(c), 431.210; N.Y. Soc. Serv. Law § 22(12); 18 N.Y.C.R.R § 505.14(b)(3)(iv)(f)(2).

34. When determinations are made to reduce or terminate Medicaid benefits, recipients who request a fair hearing in a timely manner are entitled to receive their benefits unchanged (called "aid-continuing") until a Decision After Fair Hearing ("DAFH") is issued. 42

8

U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.230(a), 431.231(c); 18 N.Y.C.R.R. §§ 358-3.6, 505.23(13)(i)(d); U.S. Const. Amend. XIV, § 1; N.Y. Const. Art. I, § 6.

35.    "Final administrative action" must be taken within 90 days from the date a fair hearing is requested.  42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.244(f); 18 N.Y.C.R.R. § 358-6.4(a).

36.    To provide "final administrative action," the state must schedule a fair hearing, hold the fair hearing, render a Decision After Fair Hearing, and take action implementing the decision.

37.    Although DOH retains ultimate responsibility for making final administrative determinations regarding individual fair hearings, the hearings themselves are scheduled and conducted by hearing officers employed by OTDA who issue recommended decisions to the Commissioner of DOH pertaining to the individual fair hearings.  N.Y. Session Law 1996, c. 474 § 364.

38.    Local districts must comply with State fair hearing decisions.  42 C.F.R. § 431.10(e)(3); 18 N.Y.C.R.R. § 358-6.4(c).

39.    New York regulations require that "upon receipt of a complaint that a social services agency has not complied with the fair hearing decision, the commissioner will secure compliance by whatever means is deemed necessary and appropriate under the circumstances of the case."  18 N.Y.C.R.R. § 358-6.4.

## C.    *Home Health Services Under Medicaid*

40.    Under the Medicaid Act, states must provide home health services, at a minimum, to any individual who, under the State plan, is entitled to nursing facility services.  42 U.S.C. § 1396a(a)(10)(D).

9

41.     In New York City, home health services are provided through a variety of different programs which provide different levels and types of services to individual Medicaid recipients based on their particular medical needs.

42.     Most "personal care services" are provided through the Home Care Services Program ("HCSP") and some are provided by Adult Protective Services ("APS"). Both programs are administered by HRA. N.Y. Soc. Serv. Law § 62; 18 N.Y.C.R.R. § 505.14.

43.     Personal care services generally include "hands on" assistance provided to a patient at his/her home, including but not limited to "some or total assistance with personal hygiene, dressing and feeding, nutritional and environmental support functions, and health-related tasks," and other activities that require only minimal medical skill. 18 N.Y.C.R.R. § 505.14(a)(1).

44.     Under 18 N.Y.C.R.R. § 505.14(a)(3), a Medicaid eligible individual who, because of his or her medical condition or disability "requires total assistance with toileting and/or walking and/or transferring and/or feeding at unscheduled times during the day and night" is entitled to receive continuous 24-hour personal care services, provided by more than one person. 18 N.Y.C.R.R. § 505.14(a)(3).

45.     HRA contracts with private vendors to supply personal care services to eligible individuals. N.Y. Soc. Serv. Law § 367-p.

46.     DOH – and HRA, as DOH's delegate – retains the power and responsibility to ensure and enforce vendors' compliance with its rules, regulations and official directives. 18 N.Y.C.R.R. § 504.3.

47.     Although the majority of home health care recipients in New York City can be, and are, serviced by HRA through HCSP, many other home health service recipients require a

10

**JA38**

higher, more skilled, level of care than may be provided by HCSP. Most of these individual

recipients receive their care from Certified Home Health Agencies ("CHHAs"), which are

privately-owned vendors under contract with DOH. 10 N.Y.C.R.R. § 763.11(a)(7).

48.     CHHA services generally comprise assistance with tasks requiring some medical

skill, such as "nursing services, physical therapy and home health aide services." 18 N.Y.C.R.R.

§ 505.23(a)(3)(i).

49.     Although CHHAs do not contract with HRA directly, HRA acts as the agent of

DOH for the purpose of ensuring that CHHAs do not improperly deny or terminate the services

of eligible recipients, and CHHAs must notify HRA when making such determinations. 18

N.Y.C.R.R. § 505.23(f) ("Revised Catanzano Implementation Plan").

50.     When a CHHA determines to deny home health services to a new applicant the

CHHA must notify HRA of its decision. 18 N.Y.C.R.R. § 505.23(f) I. § 1.0 A. § 100.

51.     When HRA receives notice from a CHHA that the CHHA has determined to deny

services, HRA must evaluate whether the CHHA's determination to deny was correct. 18

N.Y.C.R.R. § 505.23(f) I. § 1.0 A. § 102.

52.     If HRA determines that the CHHA determination to deny services is correct, then

HRA must notify the applicant by timely and adequate notice. 18 N.Y.C.R.R. § 505.23(f) I. § 1.0

A. § 103(a).

53.     If HRA determines that the CHHA determination to deny is incorrect, then HRA

must either find another CHHA that is willing to provide services, or direct a CHHA to provide

services. 18 N.Y.C.R.R. § 505.23(f) I. § 1.0 A. § 103(b).

54.     When a CHHA decides to terminate the services of a current recipient of CHHA

services, contrary to the orders of the recipient's treating physician, the CHHA must either refer

11

**JA39**

the case to another CHHA that is willing to continue services or notify HRA that it wishes to terminate the recipient's services.  18 N.Y.C.R.R. § 505.23(f) I. § 1.0 B. § 202.

55.     When HRA receives notice from a CHHA that the CHHA has decided to terminate services, HRA must evaluate whether the CHHA's decision to terminate is correct.  18 N.Y.C.R.R. § 505.23(f) I. § 1.0 B. § 203.

56.     If HRA determines that the CHHA decision to terminate services is correct, then HRA must notify the applicant by a timely and adequate notice.  18 N.Y.C.R.R. § 505.23(f) I. § 1.0 B. § 204(a).  If the recipient requests a fair hearing prior to the effective date of the notice, the CHHA must provide aid-continuing until a DAFH is issued.  18 N.Y.C.R.R. § 505.23(f) I. § 1.0 B. § 205.

57.     If HRA determines that the CHHA decision to terminate is incorrect, then HRA must direct the CHHA to provide the services in accordance with the physician's order.  18 N.Y.C.R.R. § 505.23(f) I. § 1.0 B. § 204(b).

## FACTS OF THE INDIVIDUAL NAMED PLAINTIFFS

### A.    *Boris Shakhnes*

58.     Boris Shakhnes is a Medicaid recipient who currently receives home health services through HCSP.

59.     Mr. Shakhnes was diagnosed with Multiple Sclerosis over ten years ago.  His disease is incurable and worsening over time.

60.     As a result of his medical condition, Mr. Shakhnes now requires total assistance with all of his activities of daily living.  He is incapable of doing anything independently.

61.     Currently Mr. Shakhnes is cared for by a Medicaid home attendant who is paid to care for him 24 hours per day on a "sleep in" basis.

12

**JA40**

62. While the aide is able to satisfy Mr. Shakhnes's daytime needs, she is unable to satisfy his nighttime needs because she needs to sleep. When she tries to care for him at night, she becomes so tired that she cannot care for him adequately during the day.

63. Mr. Shakhnes has many nighttime needs. He must be turned every two hours to prevent bedsores. He requires frequent oral hydration to prevent urinary tract infections. In addition, due to his incontinence, Mr. Shakhnes needs to be changed frequently to prevent skin breakdown.

64. Because of Mr. Shakhnes's many nighttime needs, his physician determined that it is medically necessary that Mr. Shakhnes receive home health services in two 12-hour shifts in order to maintain his heath and safety in the community and on October 2, 2005, the physician submitted a Medical Request for Home Care form to HCSP requesting these split-shift services.

65. On October 24, 2005, a notice was sent to Mr. Shakhnes that denied the increase, stating merely that "the current service plan is sufficient to maintain your health and safety in the home."

66. On October 31, 2005, Mr. Shakhnes requested a fair hearing to challenge the denial of the request for additional services.

67. During the past year, Mr. Shakhnes has suffered serious bedsores on his body for approximately seven months, causing him severe pain, and posing a serious threat to his health and safety.

68. Until Mr. Shakhnes receives the nighttime care that he needs, he is at high risk of developing bedsores again.

69. As of June 20, 2006, 233 days after Mr. Shakhnes requested a fair hearing, no fair hearing has been scheduled.

13

**JA41**

*B.*    *Mikhail Feldman*

70.    Mikhail Feldman suffers from diabetes, hypertension, and arthritis. He also experiences dizziness, which makes it difficult for him to go outside alone. The closest store is too far from his home for him to reach it safely alone and he has trouble carrying home groceries.

71.    Because Mr. Feldman is diabetic he must maintain a strict diabetic diet.

72.    Mr. Feldman needs a home attendant to help him buy groceries and to prepare diabetes-appropriate home cooked meals.

73.    Mr. Feldman has two inguinal hernias and an umbilical hernia, all of which cause him intermittent pain. His doctor has told him that he needs to have these hernias repaired because they can become strangulated and cause a life-threatening medical emergency.

74.    Mr. Feldman has not scheduled these surgeries because, without home care, he will have to come home alone with no one to help him while he recovers. The hospital does not have to arrange home care for him because he will not have to be admitted overnight for the surgeries he needs.

75.    Mr. Feldman has cataracts in both eyes and needs to have them removed, but he is afraid to have these procedures for the same reasons. Yet without the surgeries it is getting increasingly difficult for him to see at all.

76.    Mr. Feldman first applied for home care in July of 2004. At that time his physician sent a Medical Request for Home Care form to HCSP.

77.    On July 30, 2004, Mr. Feldman received a notice of denial of home care services on the basis that he did not have any unmet service needs.

14

**JA42**

78. Because his physician and Mr. Feldman both believe that he does have unmet service needs, Mr. Feldman requested a fair hearing on September 1, 2004 to challenge the denial of home health services.

79. In addition to requesting a fair hearing, in October of 2004 Mr. Feldman submitted a second Medical Request for Home Care form with additional documentation of his medical condition.

80. That request was denied on October 27, 2004 and, on December 1, 2004, Mr. Feldman requested another fair hearing in order to challenge the second denial of home care benefits.

81. Mr. Feldman's fair hearing concerning the July 2004 denial was scheduled for August 24, 2005. That hearing was adjourned because Mr. Feldman was seeking representation.

82. A fair hearing concerning both denials was rescheduled for October 13, 2005. It was adjourned because Mr. Feldman's attorney was not available.

83. Since then, Mr. Feldman has called OTDA multiple times to request that his fair hearing be rescheduled.

84. As of June 20, 2006, 300 days after his first fair hearing was adjourned, neither of Mr. Feldman's fair hearings has been rescheduled.

**D.  *Fei Mock***

85. As a child, Fei Mock contracted poliomyelitis and as a result she now suffers from severe scoliosis, which causes her to be in constant pain and drastically reduces her mobility.

15

**JA43**

86. As a result of Ms. Mock's scoliosis, she is unable to walk or stand on her own and must use a wheelchair. She has some use of her arms, but is unable to perform many necessary activities of daily living and is unable to transfer independently.

87. Ms. Mock needs assistance to cook, clean, eat, transfer in and out of bed, transfer in and out of her wheelchair, transfer in the bathroom, and to clean, groom and dress herself.

88. Ms. Mock receives Medicaid-funded home health services from HCSP.

89. Currently Medicaid pays for Ms. Mock to receive a home attendant 24 hours per day on a "sleep in" basis.

90. Having only a "sleep in" aide causes significant problems for Ms. Mock because she needs more assistance at night when the home attendant must sleep. She needs to be turned every hour to prevent bedsores. If she is not repositioned frequently she suffers extreme, often excruciating, pain due to her scoliosis. She also needs to go to the bathroom frequently, which requires her home attendant to transfer her to her wheelchair, take her to the bathroom, and then return her to bed.

91. Because of Ms. Mock's nighttime needs, her physician determined that it is medically necessary that she receive home health services in two 12-hour shifts in order to preserve her health and safety in the community and in September 2005 the physician submitted a Medical Request for Home Care form to HCSP requesting such services.

92. On December 2, 2005, Ms. Mock received a notice stating that her physician's request for additional hours was being denied.

93. Ms. Mock requested a fair hearing on December 8, 2005, in order to challenge HRA's determination.

16

**JA44**

94.    As of June 20, 2006, 194 days since her fair hearing request, Ms. Mock's fair hearing has not yet been scheduled.

**E.    *Sha-Sha Willis***

95.    Sha-Sha Willis has been a quadriplegic since 1993.

96.    Although Mr. Willis can live at home safely with assistance, he needs help with all of his activities of daily living.  Because of his quadriplegia, he requires assistance with all transferring, mobility, dressing, bathing, toileting, cooking, cleaning and all other household chores.

97.    Mr. Willis is a recipient of Medicaid benefits through the New York State Medical Assistance Program.

98.    Prior to February 14, 2004, Mr. Willis received 24-hour continuous split-shift home health services paid for by Medicaid and provided by Visiting Nurse Services of New York ("VNS"), a certified home health agency that contracts directly with DOH.

99.    On February 14, 2004, a representative from VNS, several people from APS, and two police officers arrived at Mr. Willis's apartment and brought him to Brooklyn Hospital against his will.  They informed Mr. Willis that his home health services were being terminated and that he was being brought to the hospital because he was unable to care for himself.

100.    Later that day Mr. Willis was released from the hospital and picked up by his mother who brought him home.  Since then Mr. Willis has been cared for by his mother and friends.

101.    Mr. Willis was never given a notice of termination, nor was he ever informed of his right to a fair hearing and aid-continuing.

17

**JA45**

102.    In November of 2005 Mr. Willis contacted the New York Legal Assistance
Group.

103.    On January 3, 2006 NYLAG, on behalf of Mr. Willis, requested a fair hearing to
challenge the termination of his home health services.

104.    As of June 21, 2006, 169 days since the fair hearing request, no fair hearing has
been scheduled and Mr. Willis has not received aid-continuing.

**F.    *Chaio Zhang***

105.    Chaio Zhang suffers from diabetes, recurrent angina, hypothyroidism, high blood
pressure and a brain tumor.

106.    Ms. Zhang's brain tumor narrows her field of vision and she has difficulty seeing
beyond her immediate surroundings.  The brain tumor also affects her balance and she can only
walk very short distances with the help of a walker.  For anything longer than a couple of
minutes, Ms. Zhang needs a wheelchair.

107.    Ms. Zhang is a recipient of Medicaid benefits through the New York State
Medical Assistance Program.

108.    Ms. Zhang is unable to cook, shop or do her laundry without assistance.  Without
such help, Ms. Zhang cannot provide for herself.  Ms. Zhang also needs help to go nearly
everywhere because she has to be pushed in her wheelchair.  Without assistance, she cannot visit
her diabetes specialist or go to physical therapy .

109.    From  October 2003 and until May 3, 2006, Ms. Zhang received 8 hours a day,
seven days a week, home health services through the Franklin Long Term Home Health Care
Program.

18

**JA46**

110.    On April 19, 2006, the Franklin Hospital Medical Center informed Ms. Zhang that unless she moved from her apartment, her home care services would be terminated on May 3, 2006.

111.    Ms. Zhang immediately contacted NYLAG who, on her behalf, requested a Fair Hearing and aid-continuing.

112.    Several days later, OTDA issued an "Acknowledgement of Fair Hearing Request and Confirmation of Aid Status," directing that aid-continued be provided.

113.    On June 19, 2006, a DAFH was issued reversing the termination of Ms. Zhang's home health services.

114.    On June 29, 2006, almost two months after Ms. Zhang's services were improperly terminated, Ms. Zhang was informed that a reduced version of her home health services would commence in the form of 4-hours-a-day, 5-days-a-week service instead of the 8 hours-a-day, seven-days-a-week service ordered by the State as aid-continuing.

## FACTS CONCERNING THE CLASS

115.    Medicaid-funded home health services enable people who need assistance with the activities of daily living – who, for example, cannot perform essential life activities such as bathing or eating on their own – to receive care from a home attendant, home health aide, or visiting nurse while remaining safely in their own homes, rather than having to permanently reside in a Medicaid nursing home or other institution.

116.    Currently, more than 62,000 New York City residents receive home health services through the Medicaid program, in the form of either (or both) personal care services or home health care services.

117.    Defendants, separately and together, have a custom and practice of routinely failing to take one or more – and sometimes all – of the steps required by law and regulation

19

**JA47**

when denying requests for home care services or increases, when threatening reductions or terminations of such services, and in the administration of the fair hearings challenging such determinations.

118. Defendant Eggleston has a custom and practice of routinely failing to provide timely and adequate notice of denials, reductions or terminations of home health services. State Defendants have a custom and practice of routinely failing to supervise Defendant Eggleston to ensure that she provides timely and adequate notice of denials, reductions, or terminations of home health services.

119. Defendants, separately and together, have a custom and practice of allowing CHHAs to illegally terminate or deny home health services to eligible individuals.

120. Defendants, separately and together, have a custom and practice of failing to provide, and failing to ensure the provision of, aid-continuing to those home health care recipients who timely request fair hearings to challenge reductions or terminations.

121. Defendant Eggelston has a custom and practice of refusing to comply with aid continuing directives issued by State Defendants.

122. Defendants, separately and together, have a custom and practice of routinely failing to provide final administrative action within 90 days of applicants' and recipients' requests for fair hearings, leaving vulnerable, needy Medicaid home health services-eligible individuals without care for weeks, months and even years longer than is permissible under the law.

123. Defendant Doar has a custom and practice of failing to timely schedule fair hearings. Defendant Novello has a custom and practice of failing to ensure that Defendant Doar schedules fair hearings promptly.

20

**JA48**

124.    When CHHAs illegally terminate recipients' services, State Defendants have a custom and practice of issuing Aid-Continuing Orders and DAFHs which run against Defendant Eggelston even though Defendant Eggleston does not contract with CHHAs.  This routinely results in compliance problems because Defendant Eggleston takes the position that she does not have any control over CHHAs.

125.    Defendant Eggelston routinely fails to follow the regulations pertaining to CHHAs codified in the Catanzano Implementation Plan.

126.    Although responsibility for providing home health services to New York City residents is divided between Defendants Eggleston and Novello, all of the services are in practice out-sourced to private home care vendors which actually provide the services.  Defendant Eggelston contracts with the vendors that provide personal care services; Defendant Novello with the vendors that provide CHHA services.

127.    Defendants, separately and together, routinely fail to exercise their authority to ensure that vendors under contract with them actually provide home health services to individuals entitled to the services.

128.    Other recipients of Medicaid-funded home health services known to Plaintiffs' attorneys have also received no notices of termination and no aid-continuing and have suffered equally long delays in obtaining final administrative action at every stage, including scheduling of their fair hearings, receiving decisions after their fair hearings, and in obtaining compliance with those fair hearing decisions.  See Declaration of Jane Greengold Stevens, dated June 19, 2006 ("Stevens Decl."), Exs. J - O.

129.    This is not the first time Defendants have been before this Court for their routine failure to take final administrative action in a timely manner on Medicaid cases.  In 1989, this

21

**JA49**

Court certified a class of "all New York City applicants for or recipients of Medicaid who receive Decisions After Fair Hearings from the New York State Department of Social Services but do not obtain final administrative action in a timely manner." See Cutler v. Perales, 128 F.R.D. 39 (S.D.N.Y. 1989) (J. Leisure). The parties ultimately entered into a Court-approved settlement agreement that, *inter alia*, established monitoring for 18 months. Cutler v. Bane, No. 88Civ8615, 1993 WL 267294 (S.D.N.Y. July 12, 1993).

130.    Now, more than 10 years later, Defendants have again engaged in the customs and practices challenged in that case, with severe consequences for New York's Medicaid-eligible population.

## FIRST CAUSE OF ACTION

131.    Defendants' custom and practice of failing to take and/or ensure final administrative action within 90 days from the date class members request fair hearings challenging the denial, discontinuance and/or reduction of Medicaid home health services violates Plaintiffs' rights under 42 U.S.C.§ 1396a(a)(3), 42 C.F.R. § 431.244(f)(1)(ii), 18 N.Y.C.R.R § 358-6.4(a), and the Due Process clauses of the 14th Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, § 6.

## SECOND CAUSE OF ACTION

132.    Defendants' custom and practice of failing to provide, and/or ensure the provision of, timely and adequate notice of denials, reductions, or terminations of home health services violates Plaintiffs' rights under 42 U.S.C.§ 1396a(a)(3), 42 C.F.R. §§ 435.912, 435.919, 431.206(b),(c) and 431.210, New York Social Services Law § 22(12), 18 N.Y.C.R.R §§ 505.14(b)(3)(iv)(f)(2) and 358-3.3, and the Due Process clauses of the 14th Amendment to the

22

United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New York State Constitution, N.Y. Const. Art. I, § 6.

## THIRD CAUSE OF ACTION

133. Defendants' custom and practice of failing to provide, and/or ensure the provision of, home health services pending Decisions After Fair Hearings to recipients who make timely requests for hearings and for aid-continuing violates Plaintiffs' rights under 42 U.S.C. § 1396a(a)(3), 42 C.F.R. §§ 431.230(a), 431.231(c), New York Social Services Law § 22(12), 18 N.Y.C.R.R § 358-3.6, and the Due Process clauses of the 14th Amendment to the United States Constitution and of the New York State Constitution.

## FOURTH CAUSE OF ACTION

134. State Defendants' custom and practice of failing to properly oversee and supervise City Defendant's customs and practices concerning the provision of notice, aid-continuing and implementation of fair hearing decisions in Medicaid home health cases violates 42 U.S.C. § 1396a(a)(5), 42 C.F.R. §§ 431.10, 431.50, 435.903; and New York Social Services Law §§ 22, 363-a(1) and 364(2).

23

**JA51**

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment:

    I.      Granting a temporary restraining order or preliminary injunction directing:

        (a)  Defendants, within three (3) working days of the date appearing on the Order, to restore to Named Plaintiff WILLIS continuous home health services in the amount of two 12-hour shifts per day, to continue until he receives a decision on his pending fair hearing request;

        (b)  Defendants, within seven (7) working days of the date appearing on the Order, to hold fair hearings and issue DAFHs for Named Plaintiffs SHAKHNES, MOCK, and FELDMAN; and implement those DAFHs within three (3) working days thereafter;

        (c)  In the alternative to the relief set out in I.(b), Defendants, within seven (7) working days of the date appearing on the Order, to provide relief in the form of home health services in the amount and at the level requested by their physicians, pending DAFHs in their cases, for Named Plaintiffs SHAKHNES, MOCK, and FELDMAN;

    II.     Grant a preliminary injunction directing:

        (a)  State Defendants, within ten (10) working days of the date appearing on the Order, to identify all current members of the proposed class for whom State Defendants have directed aid-continuing pending DAFHs and who are not receiving aid-continuing; and

        (b)  all Defendants, collectively, within three (3) working days of the completion of the identification required in paragraph II.(a), to provide aid-continuing to

all proposed class members identified pursuant to paragraph II.(a), pending

their receipt of DAFHs;

III.    Certifying, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, a

plaintiff class defined as:

> All New York City applicants for, and recipients of, Medicaid
> funded home health services, who have requested or will
> request fair hearings challenging denials, reductions, or
> terminations of their home health services and who (1) do not
> receive final administrative action from Defendants within
> ninety days of their requests for fair hearings; and/or (2) do not
> receive timely and adequate notice of denials, reductions, or
> terminations of their home health services; and/or (3) do not
> receive aid-continuing when they meet all the requirements for
> it;

IV.    Declaring that:

a.   Defendants' custom and practice of failing to take and/or ensure final

administrative action within 90 days from the date class members request fair

hearings challenging the denial, discontinuance and/or reduction of Medicaid

home health services violates Plaintiffs' rights under 42 U.S.C. § 1396a(a)(3),

42 C.F.R. § 431.244(f)(1)(ii), 18 N.Y.C.R.R § 358-6.4(a), and the Due

Process clauses of the 14th Amendment to the United States Constitution,

U.S. Const. Amend. XIV, § 1, and of the New York State Constitution, N.Y.

Const. Art. I, § 6;

b.   Defendants' custom and practice of failing to provide and/or to ensure the

provision of timely and adequate notice of denials, reductions, or terminations

of home health services violates Plaintiffs' rights under 42 U.S.C.

§ 1396a(a)(3), 42 C.F.R. §§ 435.919, 435.912, 431.206(b), 431.206(c) and

431.210, New York Social Services Law § 22(12), 18 N.Y.C.R.R

25

§§ 505.14(b)(3)(iv)(f)(2) and 358-3.3, and the Due Process clauses of the 14th

Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1,

and of the New York State Constitution, N.Y. Const. Art. I, § 6;

c. Defendants' custom and practice of failing to provide and/or ensure the

provision of home health services pending Decisions After Fair Hearings

when recipients make timely requests for hearings and for aid-continuing

violates Plaintiffs' rights under 42 U.S.C.§ 1396a(a)(3), 42 C.F.R.

§§ 431.230(a), 431.231(c), New York Social Services Law § 22(12), 18

N.Y.C.R.R § 358-3.6, and the Due Process clauses of the 14th Amendment to

the United States Constitution, U.S. Const. Amend. XIV, § 1, and of the New

York State Constitution, N.Y. Const. Art. I § 6;

d. State Defendants' custom and practice of failing to properly oversee and

supervise City Defendant's customs and practices concerning the provision of

notice, aid-continuing and implementation of fair hearing decisions in

Medicaid home health cases violates 42 U.S.C. § 1396a(a)(5), 42 C.F.R.

§§ 431.10, 431.50, 435.903; and New York Social Services Law §§ 22, 363-

a(1) and 364(2);

V.   Enjoining:

a. All Defendants, separately and together, to adopt and implement policies and

procedures so as to take and/or ensure final administrative action, including

scheduling and holding hearings, issuing Decisions After Fair Hearings, and

implementing those decisions, within 90 days from the date class members

26

**JA54**

request fair hearings challenging the denial, discontinuance and/or reduction of Medicaid home health services;

b. Defendant Eggleston to provide, and State Defendants to ensure the provision of, timely and adequate notice of denials, reductions, or terminations of home health services to all proposed class members;

c. All Defendants, separately and together, to adopt and implement policies and procedures so as to provide, and/or ensure the provision of, aid-continuing pending Decisions After Fair Hearings when home health services recipients make timely requests for hearings and for aid-continuing;

d. State Defendants to supervise HRA and ensure HRA's compliance with the State of New York's plan implementing the Medicaid program and the statutes and regulations governing home health services;

VI.   Awarding reasonable attorneys' fees, as provided by 42 U.S.C. § 1988;

VII.   Awarding costs and disbursements; and

VIII.   Granting such other and further relief as the Court deems equitable and just.

27

**JA55**

Dated:      New York, New York
            June 30, 2006

_____ /sdh
YISROEL SCHULMAN, ESQ
New York Legal Assistance Group
Jane Greengold Stevens, of counsel (JS 4790)
Caroline Hickey, of counsel (CH1410)
Benjamin Taylor, on-the-brief
Amy E. Lowenstein, on-the-brief
450 West 33rd St., 11th Floor
New York, NY 10001
212-613-5000

_____
SONNENSCHEIN NATH & ROSENTHAL LLP
Sandra D. Hauser (SH 3283)
Christine Lepera (CL 9311)
Michael S. Gugig (MSG 6000)
Joshua S. Akbar (JA 3589)
Robert Gifford (RWG 9825)
Eva Lopez-Paredes (ELP 3476)
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020
Ph.: (212) 768-6700

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x
BORIS SHAKHNES by his next friend ALLA          :
SHAKHNES, MIKHAIL FELDMAN, FEI MOCK             :
SHA-SHA WILLIS, and CHAIO ZHANG,                :
individually and on behalf of all others        :
similarly situated,                             :
                                                : 06 Civ. 04778(RJH)
                            Plaintiffs,          :
                                                : **STATE DEFENDANTS'**
            -against-                            : **ANSWER TO THE**
                                                : **AMENDED COMPLAINT**
                                                :
VERNA EGGLESTON, as Commissioner of the         :
New York City Human Resources Administration,   :
ROBERT DOAR, as Commissioner of the New         :
York State Office of Temporary and Disability   :
Assistance; and ANTONIA C. NOVELLO,             :
as Commissioner of the New York State           :
Department of Health,                           :
                                                :
                            Defendants.          :
------------------------------------------------x

        Defendants ROBERT DOAR, as Commissioner of the New York

State Office of Temporary and Disability Assistance and ANTONIA

C. NOVELLO, as Commissioner of the New York State Department of

Health (collectively, "State defendants"), by their attorney,

ELIOT SPITZER, Attorney General of the State of New York, answer

the Amended Complaint ("Complaint"), as follows:

        1. With respect to paragraphs 1 and 2 of the Complaint,

no response is necessary because they set forth the purported

nature of the complaint; to the extent a response is deemed

necessary, State defendants deny the allegations have merit.

        2.   Deny the allegations contained in paragraphs 3 and

4 of the Complaint.

        3.   Deny knowledge or information sufficient to form a

belief as to the truth or accuracy of the allegations contained

in paragraphs 5-9.

        4.   Deny the allegations contained in paragraph 10,

**JA57**

except admit that defendant Eggleston is the Commissioner of the New York City Human Resources Administration ("HRA"), and respectfully refer the Court to the New York State Social Services Law ("SSL") and regulations enacted pursuant thereto for a description of Commissioner Eggleston's responsibilities.

5.   Deny the allegations contained in paragraph 11, except admit that defendant Doar is the Commissioner of the New York State Office of Temporary and Disability Assistance, and respectfully refer the Court to the New York State Social Services Law ("SSL") and regulations enacted pursuant thereto for a description of Commissioner Doar's responsibilities.

6.   Deny the allegations contained in paragraph 12, except admit that defendant Novello is the Commissioner of the New York State Department of Health, and respectfully refer the Court to the New York State Social Services Law ("SSL"), Public Health Law ("PHL") and regulations enacted pursuant thereto for a description of Commissioner Novello's responsibilities.

7. With respect to paragraph 13, no response is necessary because it sets forth the nature of plaintiffs' proposed class; to the extent a response is deemed necessary, State defendants deny.

8.   Deny the allegations contained in paragraphs 14-22.

9.   With respect to paragraphs 23-40, 42-46 and 48-57 and respectfully refer the Court to the statutes and regulation referenced therein for the contents, meaning and effect thereof, and deny any characterization given thereto by plaintiffs.

10.   Deny the allegations contained in paragraph 41.

11.   With respect to paragraph 47, deny knowledge or

2

**JA58**

information sufficient to form a belief as to the truth or accuracy of the allegations in the first sentence and deny the second sentence to the extent that it purports that CHHA's are "privately-owned vendors under contract with DOH" and respectfully refer the court to the regulation referenced therein for the contents, meaning and effect thereof, and deny any characterization given thereto by plaintiff.

12.   Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraphs 58-64.

13.   With respect to paragraph 65, respectfully refer the Court to the notice referenced therein for the contents, meaning and effect thereof, and denies any characterization given to that regulation by plaintiffs.

14.   With respect to paragraph 66, admit that plaintiff Shakhnes requested a fair hearing.

15.   Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraphs 67-68.

16.   Admit the allegation in paragraph 69; but affirmatively state that plaintiff Shakhnes is receiving personal care services pursuant to an aid-continuing directive.

17.   Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraphs 70-77.

18.   With respect to paragraph 78, admit that plaintiff Feldman requested a fair hearing.

19.   Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained

3

in paragraph 79.

20. Admit the allegations in paragraph 80.

21. Admit the allegations in paragraphs 81 and 82.

22. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 83.

23. Deny the allegations contained in paragraph 84.

24. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraphs 85-87.

25. With respect to paragraph 88, deny that plaintiff Mock receives "home health services," and affirmatively asserts, on information and belief, that she receives personal care services.

26. Deny the allegations contained in paragraph 89.

27. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraphs 90-91.

28. With respect to paragraph 92, respectfully refers the Court to the notice referenced therein for the contents, meaning and effect thereof, and denies any characterization given to that regulation by plaintiffs.

29. With respect to paragraph 93, admit that plaintiff Mock requested a fair hearing.

30. Admit the allegation in paragraph 94; but affirmatively state that plaintiff Mock is receiving personal care services pursuant to an aid-continuing directive.

31. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained

4

**JA60**

in paragraphs 95-96.

32. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 97.

33. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 98, except deny that DOH contracts with CHHA's.

34. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraphs 99-102.

35. Admit the allegations in paragraph 103.

36. Admit the allegation in paragraph 104; but affirmatively state, upon information and belief, that plaintiff Willis is receiving services pursuant to the Consumer Directed Personal Assistance Program.

37. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraphs 105-106.

38. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraphs 107-111.

39. Admit the allegations in paragraphs 112-113.

40. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraphs 114.

41. Deny the allegations in paragraph 115.

42. Deny knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 116.

43.   Deny that allegations in paragraphs 117-128.

44.   With respect to paragraph 129, respectfully refer the Court to the action cited therein for the contents, meaning and effect thereof, and deny any characterization given to that regulation by plaintiffs.

45.   Deny the allegations in paragraphs 130-134.

### FOR A FIRST DEFENSE

46.   The complaint fails to state a claim upon which relief may be granted against the State Commissioners.

### FOR A SECOND DEFENSE

47.   Plaintiffs' lack a private right of action to enforce their claims against the State Commissioners.

### FOR A THIRD DEFENSE

48.   To the extent plaintiffs purport to be claiming that State defendants violated State law, such claims are barred by the Eleventh Amendment to the United States Constitution.

### FOR A FOURTH DEFENSE

49.   Plaintiffs are not entitled to class certification of this action.

**WHEREFORE**, the State Commissioners respectfully requests that this Court dismiss this action in its entirety, and grant such other and further relief as to the Court seems just and proper.

Dated:   New York, New York
         August 9, 2006

                              ELIOT SPITZER
                              Attorney General of the
                               State of New York
                              <u>Attorney for State defendants</u>


                              By:_____


6

**JA62**

George A. Alvarez (GA-2335)
Deborah Hochhauser (DH-0940)
Assistant Attorneys General
120 Broadway
New York, New York  10271
(212) 416-8663/(212) 416-8629

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/9/08

BORIS SHAKHNES, ET AL.,

                    Plaintiffs,

        - against -

VERNA EGGLESTON, ET AL.,

                    Defendants.

1:06-cv-04778-RJH

**ORDER**

Richard J. Holwell, District Judge:

    For the reasons stated on the record, defendants' motions **[45, 60]** are denied.

Dated: New York, New York
        December 4, 2008

Richard J. Holwell
United States District Judge

**JA64**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BORIS SHAKHNES, et al.,

        Plaintiffs,

        v.                       06 Civ. 4778

VERNA EGGLESTON, et al.,

        Defendants.

------------------------------x

                             December 4, 2008
                             10:30 a.m.

Before:

           HON. RICHARD J. HOLWELL,

                          District Judge

                APPEARANCES

SONNENSCHEIN, NATH & ROSENTHAL, L.L.P.
    Attorneys for Plaintiffs
BY:  SANDRA D. HAUSER

    - and -

LEGAL ASSISTANCE GROUP
BY:  JANE G. STEVENS
      BENJAMIN W. TAYLOR
      JENNIFER MAGIDA

KIMBERLY CONWAY, ESQ.
    NEW YORK CITY LAW DEPARTMENT
    Attorney for Defendant City of New York

ROBERT KRAFT, ESQ.
    OFFICE OF ATTORNEY GENERAL
    Attorney for Defendant State of New York

1        (Case called)

2        MS. MAGIDA:  Ready, your Honor.

3        MR. KRAFT:  Ready, your Honor.

4        THE COURT:  Alright.

5        Let's take the state's motion to amend or to dismiss

6  depending on how you view it.

7        MR. KRAFT:  First, I appreciate your Honor's order

8  allowing us to make the motion to dismiss.  Your Honor had

9  originally instructed me to make the motion to amend, and I did

10  that, but it really brings the question of dismissal to the

11  forefront and we might as well consider them together.

12        As we said in our papers, our main reason for wanting

13  to dismiss not the whole case but the claims against Certified

14  Home Health Agencies, also known as CHAA, is that right now we

15  don't have a named plaintiff who is being treated by a CHAA,

16  who was injured by a CHAA, and so our position is that the

17  named plaintiffs don't have standing to bring that particular

18  claim.

19        Now, plaintiffs have responded to our motion by saying

20  that the regulations that they are seeking to enforce apply to

21  the whole Medicaid program and so they can bring a case

22  involving those regulations against the CHAAS even though they

23  do not now have a CHAA plaintiff.

24        It's worth noting here that they have --

25        THE COURT:  How many distinct types of service

1   providers are there?

2         MR. KRAFT:  Well, across the whole Medicaid program

3   there are many.

4         THE COURT:  This is directed to home health care

5   services?

6         MR. KRAFT:  Right.

7         THE COURT:  So across that horizon.

8         MR. KRAFT:  Across that horizon the amended complaint

9   tells us that you have got the home care system that the city

10  runs for people who need basically mainly housekeeping

11  services, and then not much medical but they can't take care of

12  their daily needs, and then most people, the complaint points

13  out, are covered by this system.  And discovery has revealed

14  how the city makes contracts with agencies to provide

15  nonmedical maid and housekeeping services to these people.  And

16  these are the housekeepers who clean the house and sometimes

17  help to transfer things and go to the store for them and do

18  things they can't do.  But they don't do wound care or give

19  meds or anything like that.  They can't make someone take meds

20  if they forget to do it.  They are there to help but they are

21  basically directed by the recipient of these services.

22         There are a couple of other areas that look a lot more

23  like nursing homes but without rules because these are people

24  who have needs that include a need for medical supervision.

25  One of them is called the Lombardi program, which is not at

issue but it's out there. And they tend to be run by hospital
or nursing homes, but they give patient care instead of inside
the building.

And then the CHAAS, which is at issue today -- the
CHAAS, they are home health agencies and they can be either
independent agencies or they are either run by hospitals or
nursing homes and the way a CHAA works is if I am in a hospital
and my treating physician realizes that I don't need
hospitalization any more but I need some kind of medical care
at home, either wound care for a big wound I have after the
surgery, or they have to give me medications through shots, or
whatever kind of out-of-the-hospital medical care is needed,
the physician will refer me to a CHAA. My treating physician
will do that.

I would have to be accepted by a CHAA. The CHAA has
to decide that it can provide the medical care that the
treating physician thinks I need. And then I get care in my
home from a CHAA. And the CHAAS' main mandate comes from my
treating physician. It has to follow his or her orders. And I
may have a housekeeper, a maid sort of caretaker as part of
that care, so there is some overlap with regular home care.
But that person, if I have one, is going to be supervised by a
nurse or other medical professional who will come in and make
determinations about my care. And if I need medicine the
medical person will come give me the shot. The housekeeper

1  shouldn't be giving me the shot.

2        So the CHAAS see themselves as arms of the medical

3  profession, whereas the regular home care that most of these

4  plaintiffs, the named plaintiffs, get and most members of the

5  proposed class would get, if such a class is certified, they

6  basically get -- they are treated by people who don't see

7  themselves as part of the medical profession. I mean, they are

8  basically giving housekeeping care. And the difference that

9  has emerged in discovery that led to the first motion, the

10  motion to amend to say that we need the CHAAS in the case, is

11  that the city does not have contracts with these CHAAS. The

12  state does not have contracts with these CHAAS other than the

13  CHAAS licensure as home care agencies, and if the state can't

14  compel the CHAAS to do anything and the city can't compel the

15  CHAAS to do anything --

16        THE COURT: The state doesn't have the power to take a

17  license away?

18        MR. KRAFT: Yes, it does. And plaintiffs point that

19  out. But that is a mighty big hammer. I mean --

20        THE COURT: So they are unsupervised?

21        MR. KRAFT: They are supervised by the treating

22  physicians who make sure their orders are being followed, and

23  they are supervised by the part of the Department of Health

24  that regulates --

25        THE COURT: What happens when a CHAA fails to provide

1    care that is mandated?

2            MR. KRAFT:  Mandated is an important word.

3            THE COURT:  Say there is a hearing and the hearing

4    decides that certain services are to be provided and the CHAA

5    fails to do so, does the state or city do nothing?

6            MR. KRAFT:  The state will give a fair hearing

7    decision that gives what you would call a mandate and we

8    forward that decision to the city, as we forward other

9    decisions, and the city tells the CHAA about the decision.

10   Sometimes we may forward it directly to the CHAA.  I wouldn't,

11   but the point is once that happens --

12           THE COURT:  I assume on occasion with some service

13   providers they fail to perform.

14           MR. KRAFT:  Right.

15           THE COURT:  So then what happens?

16           MR. KRAFT:  Right now nothing happens because the

17   CHAAS -- we don't have a remedy other than starting the process

18   of de-licensing, decertification, and they have rights too so

19   decertification isn't overnight.  We don't have a remedy to

20   deal with the fact that one person's decision after fair

21   hearing isn't being followed or getting the aid the state

22   directed.  It's all or nothing.

23           THE COURT:  Structurally why is that?  Is that the

24   preference of the state legislature?

25           MR. KRAFT:  It's because of how the federal Medicaid

1  law, which provides for CHAAS as separate entities, defines

2  them and the state legislature defines them too in the public

3  health law and the state legislature never made it clear by law

4  that the CHAAS are obligated to follow all of the directions of

5  the part of the Department of Health that deals with fair

6  hearings.  It would have to follow the directions of the

7  Department of Health that regulates things like the office, the

8  sanitation in the office.  And they have inspections just like

9  all doctors' offices have inspections.  That part of the

10 Department of Health they are more willing to deal with, but

11 most of this care is given in the homes so that is not as much

12 of an issue here.

13       So that is why we made the motion to add them as

14 parties.  Then your Honor directed us to address the motion to

15 dismiss and we focused more on standing and the state

16 defendants believe that plaintiffs right now do not have

17 standing.  They did have standing at the beginning of the case

18 when plaintiff Willis was alive.  The correct procedure was

19 followed when he died.  A suggestion of death was made on the

20 record and plaintiff's counsel had the obligation to respond to

21 that.  And plaintiff's counsel chose not to do that.

22       THE COURT:  At the present point we are pre-summary

23 judgment so we are still at the pleading stage and the

24 complaint doesn't plead that the injury -- that is, the failure

25 to comply with the 90-day rules and regulations is the

1  injury -- and the plaintiffs, whether their service is provided

2  by a CHAA or by some other service provider, raise a common

3  issue.

4          I understand the argument you are making but isn't the

5  argument you are making more a class certification argument

6  that the class shouldn't include people who are served by CHAAS

7  and so under Rule 23 I shouldn't certify such a class?

8          MR. KRAFT:  I will be happy to make that argument at

9  that time also.

10          THE COURT:  I am sure you will, but the argument you

11  are making now is constitutional standing and I think it's a

12  little tougher row to hoe.

13          MR. KRAFT:  I actually think it's not that hard to

14  understand.  The plaintiffs admit or plead in response to our

15  motion that, look, these regulations apply across the Medicaid

16  program, not just to regular home care.  They apply to CHAAS

17  also.  In fact, they apply to the whole Medicaid program,

18  people who are out in the community.

19          So technically plaintiffs could be representing every

20  recipient of Medicaid in the state.  The regulations apply that

21  broadly.  But they have chosen not to, and I think that is

22  because of their understanding that there is a standing

23  requirement.  The plaintiffs are only receiving home care

24  services, so their proposed class doesn't include plaintiffs

25  who are receiving some other kind of service and not receiving

1  it within 90 days of the hearing, and I think that is smart and
2  constitutionally appropriate.

3       And given that, I think it's also constitutionally
4  appropriate to say that you can attack the issues that you have
5  a plaintiff for now to raise but you can't challenge the
6  programs that are distinctly separate, and we believe that
7  CHAAS are handled in a separate way from regular home care.
8  The discovery has shown that.  I tried to put in appropriate
9  pages from the transcripts to show that, and Health admits it
10  cannot provide the relief requested because it does not control
11  the CHAAS with as much specificity as the city controls the
12  regular home care providers.

13       THE COURT:  I have asked the question and you have
14  answered it and maybe it's my failure to understand, but you
15  say the state can't control.  Is that because the state is
16  prohibited from controlling or because the state for its own
17  reasons has chosen not to exert greater control?

18       MR. KRAFT:  Let me give you a nutshell history of the
19  CHAAS from Health's point of view.

20       In 1989 a case started upstate called Catanzano.  The
21  basic issue that started the case was there was a daughter,
22  young Catanzano, who was being serviced by a CHAA and I believe
23  they cut her care without proper notice and her father brought
24  the lawsuit.  That was resolved at the preliminary injunction
25  stage and the case just sat around and in '92 the legislature

1  passed a statute, Social Services Law 367-J, which required the

2  CHAAS to do fiscal assessments to see whether it was in fact

3  less expensive to provide care under CHAAS or some other way.

4  I think there was a thought at the time that the CHAAS were too

5  expensive.

6       Catanzano sort of went off the rails from the

7  individual case that had gotten started about aid continuing

8  and lack of notice and they charted challenging this statute,

9  and it went on for about 7 more years, the case, and they

10 fought about how the CHAAS should implement the statute.  In

11 1994 Judge Larimer was getting ready to enter an injunction.

12 He had ruled in the plaintiff's favor on a number of issues.

13       THE COURT:  Against whom?  Who were the defendants?

14       MR. KRAFT:  The State Department of Health and the

15 county, which I believe was Monroe County.  The CHAAS were not

16 named.

17       When the CHAAS saw that there was an injunction

18 coming, they moved to intervene.  They wanted control over how

19 that would be handled.  And this is described in Judge

20 Larimer's 1994 or 1995 opinion, I forget the numbers right now,

21 but Judge Larimer denied their motion to intervene.  And he did

22 it because I think he accepts the arguments that plaintiffs are

23 making here, which is the state defendant and the county are

24 enough.  They should be able to control the CHAAS and make the

25 CHAAS do whatever this court tells them to do.

1       The Second Circuit affirmed Judge Larimer's exercise

2   of discretion about the intervention.  Judge Larimer directed

3   or made an order and it was required that a set of standards be

4   published that is now part of state regulations.

5       THE COURT:  So he did enter an injunction.

6       MR. KRAFT:  He did.  And the state originally

7   published the standards as a bulletin to the CHAAS basically

8   saying, okay, CHAAS, this is what the court has told you to do.

9       Do you know what the CHAAS did?  They sued.  There is

10  a case called the New York Association of Health Care Agencies

11  versus Dowling and they sued and they said, Health Department,

12  you can't do this without running it through SAPA, the State

13  Administrative Procedure Act.  Even though it was a court order

14  and clearly it was done in compliance with the court, they

15  sued.  They didn't want to be told what to do.

16      The state courts granted the CHAAS motion and said,

17  okay, State Department of Health, you can't require them to do

18  anything until you go through SAPA.  So the State Department of

19  Health re-promulgated or promulgated a regulation as a

20  regulation, as an appendix to 18 NYC RR Part 523, and that is

21  where it sits today.

22      Since then the CHAAS have not really followed that

23  regulation.  A lot of the regulation is meaningless now because

24  a lot of it dealt with the implementation of that statute,

25  Social Services Law 367-J, and 367-J expired by its own terms

1  in '98 or '99.  So a great deal of the Catanzano case is now

2  meaningless simply because the statute that was being written

3  about is no longer there.

4    THE COURT:  Was that a class action, by the way?

5    MR. KRAFT:  I believe, yes, a class was certified.

6    THE COURT:  What were the parameters of the class?

7    MR. KRAFT:  I don't remember.  I would have to look.

8    THE COURT:  Alright.

9    MR. KRAFT:  But the regulations are out there as an

10  appendix.  The CHAAS don't comply with them.  They sued

11  initially to try be kept from just following the court order

12  and then the Health Department has sort of been in limbo with

13  the CHAAS since then.  They don't have specific powers under

14  those regulations to make the CHAAS do anything.  The

15  regulations talk about what the CHAAS have to do but they don't

16  say as part of them "and if you don't do it the Health

17  Department can do A, B, C."

18    THE COURT:  Do they have the power to do that though?

19  Could the Department of Health in fact issue regulations that

20  exercise more control?

21    MR. KRAFT:  Well, the Department of Health feels

22  constrained -- and it issued the regulations.  It issued the

23  text first as a bulletin and later as regulations.  It issued

24  the text that Judge Larimer ordered it to issue.  And it feels

25  that that is controlling until someone decides that it should

1   be changed.  So the Department of Health I don't believe is

2   planning to issue more regulations involving the CHAAS since

3   there is a federal order in place.  So that is basically -- I

4   am sorry, it's off topic.

5        THE COURT:  It's helpful as background.

6        MR. KRAFT:  It shows why the Department of Health and

7   the CHAAS are sort of in different leagues.  The CHAAS as a

8   group -- and there may be an individual CHAA that complies with

9   fair hearing decisions and we never hear about them because we

10  have happy patients, but the CHAAS as a group don't feel bound

11  to comply with the Catanzano regulations and sued about them

12  and --

13        THE COURT:  How many CHAAS are there in New York,

14  operating in New York?

15        MR. KRAFT:  I don't know.

16        THE COURT:  I mean, is it 10, 100, or is it 10,000?

17        MR. KRAFT:  It's certainly not 10,000.  I would assume

18  less than 100, but that is just an educated guess.

19        THE COURT:  Alright.

20        Let me ask you a procedural question.

21        If I were to bring 100 CHAAS into the case, would you

22  then oppose class certification on the grounds that it was no

23  longer manageable?

24        MR. KRAFT:  You could certify a defendant class.

25  Judge Scheindlin did that in Brown --

1        THE COURT:  I am talking about the plaintiffs' class.

2    This is a class action.

3        MR. KRAFT:  Before you do that your Honor has to deal

4    with the standing issue and decide that plaintiffs have the

5    standing right now to bring a claim against CHAAS.  If your

6    Honor decides that the plaintiffs in fact do have that right,

7    then I would say, yeah, bring them in.

8        Frankly, we believe that the CHAAS need to feel the

9    weight of a federal injunction at least once.

10        THE COURT:  So why doesn't the state seek to bring in

11    the CHAAS?

12        MR. KRAFT:  Well, because I am not sure of the current

13    order in this case, if there was ever a limit placed on

14    amendment and pleadings or joinder of parties.  I don't know

15    whether that time has expired or not because this is sort of an

16    older case.  But the state chose to approach the issue by

17    asking to amend its answer and see what plaintiffs would do.

18        Part of our problem is, Judge, we don't have a

19    certified class.  If Mr. Willis was still alive we could bring

20    in his CHAA on behalf of all the CHAAS.  But if we were to

21    bring in as third-party defendants all the CHAAS, they would

22    say, what is the beef?  And I don't know if I have specific

23.    facts to give them.  That is because I am not a proper

24    plaintiff.

25        Plaintiffs are supposed to have people so that we can

1  say, well, look, here was the one we know about, Mr. Willis,

2  and here is Mr. Willis and this is what you did to him that

3  violated Medicaid regulations, and they are supposed to have

4  more people like that so we have the basis of fact to throw

5  against the CHAAS and that your Honor can use as findings of

6  fact.  We don't have that.  Plaintiffs have basically decided

7  we don't need that.  All we need to do is put forward facts

8  about people who receive regular home care and because the

9  regulations are broader than that we can include a request to

10  regulate the CHAAS without having any CHAA patients as named

11  plaintiffs.

12         THE COURT:  Let me hear from plaintiffs on this issue.

13         MS. MAGIDA:  Good morning, your Honor.  My name is

14  Jennifer Magida of the New York Legal Assistance Group and I am

15  representing the plaintiffs in this case.

16         The issue before the court today is the requirement

17  that decisions after fair hearings be implemented within the

18  90-day period or within 90 days from the request of that

19  hearing.  According to federal law defendants are responsible

20  for scheduling the fair hearings, the decision after fair

21  hearings, and insuring there is compliance with those decisions

22  within the 90-day period.  The injury to the plaintiffs

23  resulting from the failures to adhere to the law is identical

24  for every single plaintiff in this this case.  There are

25  excessive delays in the administrative process and, as a

1   result, the plaintiffs didn't receive the home health care

2   benefits to which they are entitled.  The defendants state that

3   the named plaintiffs in this case do not have standing because

4   there is no longer a plaintiff who receives services from the

5   CHAAS.

6       THE COURT:  Why doesn't plaintiff simply move this

7   whole point by bringing forth another class representative who

8   is being serviced or not by a CHAA?

9       MS. MAGIDA:  Your Honor, we can certainly do that but

10  we don't feel it's necessary in this case because in this

11  particular -- the case is about all kinds of home health care

12  services.  There is no distinction.

13      THE COURT:  You should consider that before your class

14  action motion comes forward in any event.

15      MS. MAGIDA:  We certainly will do that, your Honor.

16      But we believe that the defendants in this case are

17  making a distinction between the CHAAS and other types of home

18  health care that is not supported by law; that the law simply

19  says that the states must ensure compliance within the 90-day

20  period, and there is no distinction between the different kinds

21  of home health care services.

22      THE COURT:  There appear to be factual distinctions.

23      MS. MAGIDA:  There are factual distinctions but no

24  legal distinctions, and there is no legal distinction with

25  regard to that 90-day claim.  Therefore, we believe that the

1    laws requiring state defendants to ensure that the entire

2    process occur within 90 days and that the plaintiffs, as a

3    result, have the exact same injury. And they all have suffered

4    from the results of the prolonged delays. The injury is real

5    and immediate and all of the named plaintiffs have established

6    the requisite case in controversy.

7        It seems to us that the defendants are trying to shift

8    some of the obligations from themselves on to the CHAAS but

9    this case is about the delays resulting from their failures and

10   not from any failures that might be resulting from what the

11   CHAAS are or or not willing to do. Therefore, we feel that

12   standing is not an issue in this case at this point and it

13   should not be addressed at this time.

14       Your Honor, we also contend that the CHAAS are not

15   necessary parties in this action. The state defendant is

16   required by law to ensure complete relief for the plaintiffs

17   and the defendants are able to do so. The state defendants

18   claim that with the current system in place they are unable to

19   compel compliance from the CHAAS. But that does not mean they

20   don't have the power to compel compliance from the CHAAS. They

21   simply haven't put in a system that enables them to do so.

22       The defendants have made no showing at any point that

23   they are unable to demand compliance from the CHAAS. They are

24   simply alleging that at this point they can't under the current

25   system compel compliance.

1    Furthermore, the plaintiffs have alleged during many

2    points during the briefing that the state defendant has this

3    legal obligation to do so and the defendants have not disagreed

4    with this contention.  The defendants at this time are able to

5    compel compliance with every other kind of home health care

6    provider and they are not requesting intervention of any other

7    kind of provider.  Despite the fact that the CHAAS might

8    institute a different kind of service, that does not change the

9    obligation of the defendants to ensure compliance with the

10   CHAAS.

11   THE COURT:  What good does it do the plaintiffs or the

12   class in this case to get a judgment in this court if the

13   result is simply going to be what Mr. Kraft indicated in the

14   case in the '90s upstate and that will just result in

15   subsequent litigation by the CHAAS against the state?

16   MS. MAGIDA:  We don't believe that will happen.  In

17   Catanzano in the '98 decision from the Western District the

18   court actually said that the state cannot be precluded from

19   commanding compliance from the CHAAS.  The CHAAS are, in fact,

20   perceived as state actors and the defendants have an obligation

21   and have the potential to ensure compliance from them.  And

22   there are many ways in which they can do it without a federal

23   injunction.  Like with all other kinds of home health care

24   providers, they can enter into contracts with the CHAAS.  There

25   is nothing in the regulation that prevents them from entering

1    into contracts.  They choose not to at this point.

2         Furthermore, they have the capacity to decertify CHAAS

3    who are unwilling to comply or certify CHAAS who are willing to

4    comply, and they can also use their own providers to monitor

5    the timeliness of the CHAAS or to provide services in cases in

6    which the CHAAS are not willing to comply.

7         And if there is one CHAA who is not willing to comply,

8    then the state has the obligation and the potential to find

9    another CHAA that will comply.

10        So the state defendants' contention that there are no

11   other ways except for demanding a federal injunction in order

12   to get the CHAAS to comply seems like an exaggeration and not

13   actually true.

14        THE COURT:  Alright.

15        Mr. Kraft, is there anything more you want to add?

16        MR. KRAFT:  No.  Thank you, your Honor.

17        THE COURT:  Thank you.

18        I am going to rule from the bench and I will dictate

19   into the record a brief oral opinion.

20        Defendants have moved to dismiss the claims of the

21   amended complaint as they relate to Certified Home Health

22   Agencies, or CHAAS, on two grounds:

23        First, that after the death of putative class

24   representative Willis, plaintiffs lack standing and there is no

25   longer a case or controversy involving CHAAS capable of

1  supporting the court's jurisdiction.

2       Second, even if a substitute plaintiff can be

3  identified, the CHAAS are necessary defendants because in their

4  absence the court cannot accord complete relief among existing

5  parties.  See Federal Rules of Civil Procedure 19(1)(A).

6       As the parties have explained in their remarks today,

7  CHAAS are privately owned vendors under contract with the New

8  York State Department of Health and they provide a higher, more

9  skilled level of care than may be provided by, for example, the

10  home care services program, which as I understand from the

11  plaintiffs' papers are the largest providers of personal care

12  services in the city.

13       With respect to defendants' standing motion, it is, as

14  I see it, principally directed at the fourth cause of action in

15  the amended complaint.  That cause of action alleges as

16  follows:

17       State defendants' custom and practice of failing to

18  properly oversee and supervise city defendants' customs and

19  practices concerning the provision of notice, aid-continuing

20  and implementation of fair hearing decisions in Medicaid home

21  health cases violates 42 U.S.C. Section 1396a(a)(5) and various

22  other provisions.

23       A corresponding provision in the complaint's prayer

24  for relief requests the court issue a declaration that the

25  state defendants' custom and practices violates this section 42

1    U.S.C. section 1396a(a)(5).

2        The cited provision, which is part of the Medicaid

3    statute, obligates a state to "provide for the establishment or

4    designation of a single state agency to administer or to

5    supervise the administration of the state's Medicaid plan."

6        The basic theory underlying the fourth cause of action

7    is thus the defendants'' policies and practices fail to comply

8    with Section 1396a(a)(5). The complaint does not allege a

9    separate cause of action for each way in which defendants

10   failed to comply with the statute depending on the identity of

11   the ultimate service provider, and at least at the pleading

12   stage would make no sense to do so. Fairly interpreted, the

13   theory of the fourth cause of action is that individualized

14   failures to comply with the law result from more general

15   supervisory failures at the level of the city and state

16   agencies.

17       Considering this, the court agrees with plaintiffs'

18   contention that defendants' motion impermissibly distinguishes

19   between types of services, all of which are governed by the

20   same statutory mandates and mechanisms, and finds that an

21   actual controversy continues to support the court's

22   jurisdiction. The claim of the complaint is that defendants

23   are in violation of the Medicaid statute and the remaining

24   plaintiffs easily satisfy the rule that at least one named

25   class representative must have Article III standing to raise

1   each class subclaim.  Murray v. Auslander, 244 F.3d 807, 810

2   (11th Cir. 2001).

3           Neither of the decisions cited by defendants, O'Shea

4   v. Littleton, 414 U.S. 488 (1974) and Lewis v. Casey, 518 U.S.

5   343 (1996), is at odds with this ruling.

6           O'Shea held that "if none of the named plaintiffs

7   purporting to represent a class establishes the requisite of a

8   case or controversy with the defendants, none may seek relief

9   on behalf of themselves or any other member of the class."

10  414 U.S. at 491.  As just noted, that is not the case here.

11          Lewis, on the other hand, is a case about remedies.

12  The district court issued a 25-page injunction mandating the

13  sweeping changes in Arizona's prison library system, after

14  having failed to identify anything more than an isolated

15  instance of actual injury.  518 U.S. 349.  The Supreme Court

16  held that the District Court's finding did not support the

17  injunction it ordered.  In particular, the court noted that the

18  two instances of actual harm the district court found "were a

19  patently inadequate basis for a conclusion of systemwide

20  violation and imposition of system wide relief."  Id. at 359.

21  Notably, however, the court stated that at the pleading

22  stage -- the stage that this case is still at -- "general

23  factual allegations of injuries resulting from the defendants'

24  conduct may suffice" to establish standing.  Id. at 358.

25          As the court has noted, this issue, however, may give

1    rise to a question as to the scope of any class certified and

2    should be addressed at the class certification motion stage

3    and, in addition, it's without prejudice to the state

4    defendants to raise the issue afresh at the close of discovery.

5         With respect to the necessary-party prong of the

6    motion, the court turns to Rule 19, which provides that a

7    person must be joined if "in that person's absence, the court

8    cannot accord complete relief among existing parties."

9         The general rule is that an absent party need not be

10   joined if meaningful relief can be granted without the

11   absentee."  4 Moore's Federal Practice, Civil Section 19.03.

12        In addition, the complete relief clause does not

13   contemplate other potential defendants, or other possible

14   remedies.  See, e.g., Giaguaro S.p.A. v. Amiglio, 257 F. Supp.

15   2d 529, 541 (E.D.N.Y. 2003).

16        The crux of defendants' Rule 19 argument is that

17   because defendants do not exercise direct control over the

18   CHAAS, the CHAAS must be joined if the court is going to grant

19   plaintiffs the relief they seek.

20        The court concludes that this argument is misplaced

21   for two reasons:

22        First, plaintiffs allege in their complaint that

23   defendants' inability to control the CHAAS is itself a

24   violation of the Medicaid statute.  See amended complaint

25   paragraph 127 wherein plaintiffs allege "Defendants, separately

1   and together, routinely fail to exercise their authority to

2   ensure that vendors under contract this with them actually

3   provide home health services to individuals provided to the

4   services."

5           Second, the court believes at this stage that it can

6   grant concurrent meaningful relief without joining the CHAAS.

7   For example, if plaintiffs prevail on the merits the court can

8   grant declaratory relief or order defendants to implement

9   improved management regulations and practices that presumably

10  would result in CHAAS providing superior care in the event

11  plaintiffs have established that they are not doing so.

12          Accordingly, the court rejects defendants' motion to

13  amend or, in the alternative, to dismiss under Rule 19.

14          The court also notes that such a ruling would at this

15  stage of the proceeding severely prejudice the plaintiffs and

16  that would require the reopening of discovery with respect to

17  new parties, which would seem to the court to be inequitable in

18  light of the time that has passed since this complaint was

19  filed.  So that is the ruling of the court on the pending

20  motion.

21          I would also like to now address the discovery issues

22  as they presently stand.  Perhaps plaintiffs can remind the

23  court of exactly where we are in the process.

24          I recall that back in a month or 6 weeks ago we had

25  taken some interim steps.

1    MS. MAGIDA: Your Honor, we discussed at the last

2    court hearing that we were still awaiting certain documents

3    from the city defendants that we had not yet received and we

4    sent to city defendant a list of what we still believed that we

5    needed from the 100 case files that we had requested briefly in

6    the litigation. The city defendant responded saying that they

7    needed additional time because it would take a while for them

8    to get together all of the documents that they needed and the

9    court ordered that the city defendant produce the files I

10   believe by the 13th of January.

11   THE COURT: Haven't we discussed interrogatories?

12   MS. MAGIDA: Yes, sorry. We also sent to them

13   additional interrogatories that went with the discovery

14   requests.

15   THE COURT: And those interrogatories have been

16   served?

17   MS. MAGIDA: They have been served. They were served

18   at the same time the discovery requests were served.

19   THE COURT: Mr. Kraft, do you know where the response

20   stands?

21   MS. CONWAY: Your Honor, we fully intend to comply

22   with the date set by the court.

23   THE COURT: And that date is?

24   MS. CONWAY: I believe it's January 13.

25   THE COURT: Alright.

1    MS. MAGIDA:  We also would like to discuss --

2    THE COURT:  Let me ask the city if they know now

3    whether by responding they intend to provide substantive

4    responses.

5    MS. CONWAY:  We will provide substantive responses and

6    we have found additional documents that were not previously

7    requested by the plaintiffs.  So there will be full responses.

8    MS. MAGIDA:  Your Honor, we also would like to discuss

9    at this time a future discovery schedule.  We are entering now

10   into expert discovery and so we would like to set a date to

11   finish expert discovery and also then a future date for class

12   certification motions that would be filed.

13   THE COURT:  Is there any reason a class certification

14   motion has to await the conclusion of expert discovery?

15   Why shouldn't we be addressing class motion issues

16   now?

17   MS. MAGIDA:  We could do that but we believe that the

18   expert report would support our motion for class certification

19   and we wanted to therefore wait until we had that report before

20   we filed for class certification.

21   THE COURT:  Did the defendants have review?

22   MS. CONWAY:  Your Honor, the the city's position is

23   that expert discovery is not necessary to address the issues

24   raised in the initial class certification issue which has

25   already been filed with the court.  It's the defendants' burden

1  to respond to that motion at this point.  Our deadline was

2  stayed pending fact discovery.  Fact discovery is now about to

3  conclude and we believe that we are able to respond after the

4  city responds to these special interrogatories that were

5  recently served.

6       THE COURT:  What is the nature of the expert discovery

7  that is proposed?

8       MS. MAGIDA:  Your Honor, our expert has been looking

9  at overall time periods that it has taken for the city and

10  state defendants to comply with decisions after fair hearings

11  and it has helped us to get a broader picture of the actual

12  numbers and the percentages of deliquency decisions.

13       THE COURT:  What schedule are you proposing?

14       MS. MAGIDA:  We believe that the state defendant

15  requested 90 days for expert discovery, so we were hoping that

16  expert discovery could be finished by April 1st -- I am sorry,

17  90 days after we get everything from from the city defendants.

18  So we were proposing, or we hope to propose April 1st for an

19  end to fact discovery and -- an end to expert discovery, and an

20  extra 6 weeks to file the renewed motion for class

21  certification.

22       THE COURT:  And when do you propose to provide an

23  expert report?

24       MS. MAGIDA:  We are waiting now for the remaining data

25  from --

1        THE COURT:  Let's assume you get it January 12.

2        MS. MAGIDA:  Our expert will probably need at least 30

3    days in order to put all the information together and write the

4    report.

5        THE COURT:  Are either of the defendants intending to

6    provide expert evidence?

7        MS. CONWAY:  With respect to the city, we can't

8    anticipate that until we see the nature of this purported

9    expert disclosure from the plaintiffs.

10        MR. KRAFT:  I don't believe the state will have expert

11    testimony.  We put forward our fact witnesses already.

12        THE COURT:  Alright.

13        Well, I will take the parties' views under advisement

14    and issue a schedule order with respect to class action and

15    expert discovery.

16        MS. MAGIDA:  Thank you, your Honor.

17        THE COURT:  Is there anything else we have to address

18    this morning?

19        Alright.

20        In the schedule order I will issue I will set a time

21    for a subsequent status conference as well.

22        Thank you.

23

24

25                                    - - -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BORIS SHAKHNES by his next friend ALLA SHAKHNES, MIKHAIL FELDMAN, FEI MOCK, and CHAIO ZHANG Individually and on behalf of all others similarly situated, | |
| Plaintiffs, | 06 Civ. 04778 (RJH) |
| and | |
| MAYRA VALLE, by her next friend, SHIRLEY CAMPOS-VALLE, individually and on behalf of all others similarly situated, | |
| Plaintiff-Intervenor | **DECLARATION OF SANDRA HAUSER IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION** |
| -against- | |
| VERNA EGGLESTON, as Commissioner of the New York City Human Resources Administration, ROBERT DOAR, as Commissioner of the New York State Office of Temporary and Disability Assistance; and ANTONIA C. NOVELLO, as Commissioner of the New York State Department of Health, | |
| Defendants. | |

SANDRA D. HAUSER declares under the penalty of perjury as follows:

1.      I am a partner of Sonnenschein Nath and Rosenthal LLP, and one of the counsel representing Plaintiffs in the above-captioned action.  I submit this Declaration in support of both: (a) Plaintiffs' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, and (b) Plaintiffs' Motion for Certification of a Class pursuant to Fed. R. Civ. P. 23, submitted simultaneously herewith.

**JA93**

2.      Attached hereto are true and correct copies of the following documents:

**Exhibit A** is a true and correct copy of the Court's Order dated May 15, 2007.

**Exhibit B** is a true and correct copy of the Court's Order dated January 31, 2008.

**Exhibit C** is a true and correct copy of a letter dated November 10, 2008 from Kimberly Conway, Corporate Counsel, to the Court.

**Exhibit D** is a true and correct copy of the Expert Report of Plaintiffs' Expert Richard Faust, dated March 6, 2009.

**Exhibit E** is a true and correct copy of the Second Expert Report of Plaintiffs' Expert Richard Faust, dated July 17, 2009.

**Exhibit F** is a true and correct copy of the Expert Report of State Defendants' Expert Karl Heiner, dated June 15, 2009.

**Exhibit G** is a true and correct copy of an electronic mail message from Kimberly Conway, Corporate Counsel, to Jane Stevens, Eva Lopez-Paredes, Sandra D. Hauser, and Deborah Hochhauser (Plaintiffs' Counsel) dated March 20, 1008, and Plaintiffs' Notice of Deposition of Defendant Eggleston Pursuant to Rule 30(b)(6), dated December 5, 2006.

**Exhibit H** is an HRA Memorandum dated March 8, 1994 regarding "Fair Hearing Compliance Procedure" (Bates-numbered C0668-C0688).

**Exhibit I** consists of true and correct copies of the cover page and cited excerpts from the official transcript of the Deposition of Mark Lacivita, Director of Administration for the

- 2 -

Office of Temporary Disability Assistance ("OTDA") in the Office of Administrative Hearings, and a 30(b)(6) witness for OTDA, the first part of which took place on March 27, 2008.

**Exhibit J** is a true and correct printout from the HRA Website titled "HRA Facts, August 2009," *available at* http://www.nyc.gov/html/hra/downloads/pdf/hrafacts_2009_08.pdf.

**Exhibit K** is a true and correct copy of the Declaration of Alla Shakhnes, next friend of Named Plaintiff Boris Shakhnes, dated June 15, 2006, previously submitted to the Court.

**Exhibit L** is a true and correct copy of the Declaration of Named Plaintiff Fei Mock dated June 15, 2006, previously submitted to the Court.

**Exhibit M** is a true and correct copy of the Declaration of Named Plaintiff Mikhail Feldman dated June 15, 2006, previously submitted to the Court.

**Exhibit N** is a true and correct copy of the Declaration of Chaio Zhang dated October 8, 2009.

**Exhibit O** is a true and correct copy of the Declaration of Shirley Campos-Valle, next friend of Proposed Plaintiff-Intervenor Mayra Valle dated June 23, 2009, previously submitted to the Court.

**Exhibit P** is a true and correct printout from the OTDA Website titled "What is a Fair Hearing," *available at* http://www.otda.state.ny.us/oah.

**Exhibit Q** is a true and correct copy of the Declaration of Robert Gifford dated March 5, 2008, and its Exhibits A-H, which accompanied the Expert Report of Plaintiffs' Expert Richard Faust.

- 3 -

**JA95**

**Exhibit R** consists of true and correct copies of the cover page and cited excerpts from the official transcript of the July 14, 2009 Deposition of Karl Heiner, State Defendants' expert witness.

**Exhibit S** is a Letter from George Alvarez, Counsel for State Defendants, to Plaintiffs' Counsel, dated October 27, 2006.

**Exhibit T** consists of true and correct copies of the cover page and cited excerpts from the official transcript of the April 3, 2008 Deposition of Sebastian Addamo, Principal Hearing Officer at OTDA and a 30(b)(6) witness for OTDA.

**Exhibit U** consists of true and correct copies of the cover page and cited excerpts from the official transcript of the August 1, 2008 Deposition of Annette Holm, Deputy Director of Field Operations of the Home Care Services Program at the New York City Human Resources Administration ("HRA") and a 30(b)(6) witness for HRA.

**Exhibit V** consists of true and correct copies of the cover page and cited excerpts from the official transcript of the September 9, 2008 Deposition of Frances Louth, Deputy Director of Field Operations of the Home Care Services Program at HRA and a 30(b)(6) witness for HRA.

**Exhibit W** consists of true and correct copies of the cover page and cited excerpts from the official transcript of the April 4, 2008 Deposition of Mary-Ann Maloney, Director of the Medical Insurance Community Services Administration ("MICSA") at HRA and a 30(b)(6) witness for HRA and a 30(b)(6) witness for HRA.

**Exhibit X** consists of true and correct copies of the cover page and cited excerpts from the official transcript of the August 5, 2008 deposition of Marie Brady, Deputy

- 4 -

**JA96**

Commissioner at HRA for the Medical Insurance Community Services Administration ("MICSA") and a 30(b)(6) witness for HRA.

**Exhibit Y** is a true and correct copy of the Transcript of the October 17, 2009 Hearing before this Court.

**Exhibit Z** consists of true and correct copies of the cover page and cited excerpts from the official transcript of the April 8, 2008 deposition of Doreen Sharp, Health Policy Associate for the New York State Department of Health's ("DOH's") Office of Long Term Care and a 30(b)(6) witness for DOH.

**Exhibit AA** consists of true and correct copies of the cover page and cited excerpts from the official transcript of the April 14, 2008 deposition of Deposition of Kathleen Sherry, Health Program Administrator for DOH's Office of Long Term Care and a 30(b)(6) witness for DOH.

**Exhibit BB** are true and correct copies of excerpts from Transcript of the December 4, 2008 Hearing before this Court.

**Exhibit CC** is a true and correct copy of the Declaration of Former Named Plaintiff Sha-Sha Willis dated June 15, 2006, previously submitted to the Court .

**Exhibit DD** are the biographies of class counsel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

Dated: October 9, 2009
New York, NY

_/s/ Sandra D. Hauser_____
SANDRA D. HAUSER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
BORIS SHAKHNES by his next friend ALLA
SHAKHNES, MIKHAIL FELDMAN, FEI MOCK,
SHA-SHA WILLIS, and CHAIO ZHANG
individually and on behalf of all others
similarly situated,

                       Plaintiffs,                      06 Civ. 04778 (RJH)

      -against-

VERNA EGGLESTON, as Commissioner        **EXPERT REPORT OF**
of the New York City Human Resources       **PLAINTIFFS' EXPERT**
Administration, ROBERT DOAR, as          **RICHARD FAUST**
Commissioner of the New York State Office
of Temporary and Disability Assistance;
and ANTONIA C. NOVELLO, as
Commissioner of the New York State
Department of Health,
                 Defendants.

---------------------------------------------------------x

     Richard Faust declares, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, as

follows:

     1.     I am an independent consultant involved in the design and implementation of

studies using social science data and in the analysis of such data. I submit this report to explain

my findings concerning data I evaluated for this case. The data consisted of information

produced in discovery in this case by New York State Office of Temporary and Disability

Assistance ("OTDA") and the New York State Department of Health ("DOH") regarding Fair

Hearings conducted for New York City residents in 2005-2006 and 2008 on issues of home

health care, as well as information produced in discovery by the New York City Human

Resources Administration ("HRA") regarding home care cases and specifically regarding the

- 1 -

**JA99**

implementation of Decisions After Fair Hearings ("DAFHs") for a sample set of those cases, as described below.

2.    I am familiar with this case insofar as I have read the Amended Class Action Complaint; the Defendants' Answers; the parties' responses to interrogatories served in the case; and, materials produced in discovery. (A list of the materials I reviewed in connection with preparing this report is attached as Exhibit C). I have also conferred with Plaintiffs' counsel, and have reviewed the federal and New York State statutes and regulations at 42 U.S.C. § 1396a(a)(3), 42 C.F.R. § 431.244(f) and 18 N.Y.C.R.R. § 358-6.4(a) (and surrounding sections/sub-sections), as well as the pertinent portions of the depositions of Mark Lacivita and Doreen Sharp concerning the data produced in this case and the meaning of certain codes and phrases as used by OTDA and HRA. *See* Exhibit C. I am generally familiar with the Fair Hearing process and the administration of Medicaid and other public benefit programs in New York City and New York State, based on several decades of work in this area, as described below and in the exhibits hereto.

3.    I understand that, under 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.244(f) and 18 N.Y.C.R.R. § 358-6.4(a), with respect to Medicaid-funded home care cases, the total time from the Fair Hearing request to implementation of the decision after Fair Hearing is supposed to be no more than 90 days. Further, I understand that as a result of the case *Cutler v. Bane and Sabol* ("*Cutler*"), and an HRA Memorandum dated March 8, 1994 (produced as part of the City's discovery) detailing the Fair Hearings Compliance Procedure, that the 90 day limit is divided into 60 days for the State to deliver the DAFH to the City and 30 days for the City take final action to comply with the DAFH.

4.    The data I have received for home health care Fair Hearings requested in 2005-2006 show that:

- 2 -

**JA100**

- In only 2% of home care cases, Fair Hearing decisions were implemented (i.e., final administrative action was achieved) within 90 days of the Fair Hearing request.

- The State issued a Fair Hearing decision within 60 days in only 3% of the cases

- The City implemented Fair Hearing decisions within 30 days in only 16% of cases in which implementation action was required.

5.      The data I reviewed for home health care Fair Hearings requested between January 1 and July 11, 2008 was incomplete. These incomplete 2008 data produced by the State show that the State issued a Fair Hearing decision within 60 days in only 40% of the cases.

## I.      QUALIFICATIONS

6.      I hold a Bachelor of Arts degree from the University of California at Los Angeles and two Masters Degrees in sociology from Columbia University.

7.      My area of expertise is statistical analysis of social science data and the design and execution of social surveys. My professional background includes extensive experience in the sampling of data from various sources.

8.      From 1962 to 1968, I was a Research Assistant and instructor at the Bureau of Applied Social Research of Columbia University, and from 1977 to 1979 I was an instructor in computer analysis of social science data at Columbia University School of Continuing Education. Between 1969 and 1975 I was an instructor in sociology at John Jay College of Criminal Justice of the City University of New York. From 1973 through 1974, I was a Senior Research Scientist with the New York State Department of Mental Hygiene. From 1975 through 1976, I was a Senior Research Associate with the Institute for Judicial Administration of New York University.

9.      From 1978 to 1993, I was employed as Research Director of Calculogic Corporation. Calculogic was a computer systems, research, and data processing company. As

- 3 -

Research Director, I both advised clients on the design for conducting different kinds of social science studies and actually conducted such studies for them. I also participated in designing computerized case management systems for clients, including systems for the Markham Company, Church World Service, Inc., and the American Zionist Youth Foundation.

10.     I have co-authored articles analyzing data concerning health-related issues and matters relating to the administration of justice and the court system. I have also testified as an expert witness in employment, housing and education discrimination cases in the United States District Courts for the Southern and Eastern Districts of New York including *Grant v. Bethlehem Steel*, 76 Civ. 847 (WK); *Rios v. Reed*, 75 Civ. 296 (JM); *Huertas v. East River Housing Co.*, 77 Civ. 4494 (RLC); *Jose P. v. Ambach*, 79 Civ. 270 (EHN); and *NOW v. Cuomo*, 93 Civ. 7146 (RLC).

11.     I have acted as an expert consultant in five cases relating to the New York welfare system, and was called upon to testify in two of those cases. In the past 4 years I have testified three times in deposition or trial. Altogether, I have testified at trial in seven cases in the Southern and Eastern Districts of New York, and have never been disqualified as an expert in any court.

12.     Annexed as Exhibit A is a copy of my curriculum vitae, which sets forth my education, work experience, publications and activities as an expert witness.

13.     Annexed as Exhibit B are the statistical tables upon which the conclusions of this report are based.

14.     My compensation in this action is $150.00 per hour.

- 4 -

**JA102**

## II.   BACKGROUND OF THE STUDY

15.     This class action case concerns New York City Medicaid-funded home health services applicants and recipients who have requested or will request Fair Hearings to challenge denials, discontinuances and/or reductions of such services. It alleges that members of the class have been or will be improperly denied timely and adequate notice of denials, discontinuances and/or reductions and/or "aid-continuing" benefits to current recipients pending Decisions After Fair Hearings ("DAFHs") and/or final administrative action within 90 days of the Fair Hearing requests to which they are entitled under law.

16.     Fair Hearings are conducted by OTDA on behalf of DOH and the resulting decisions must be implemented by HRA. The laws and regulations I have reviewed mandate that final administrative action must be taken within 90 days after a person requests a Fair Hearing. The testimony from the State in this case reflects that OTDA has an obligation to hold the hearing and issue a DAFH within 60 days of the request for the hearing and HRA is then supposed to take final action to comply with the DAFH within 30 days (*See* Deposition of Mark Lacivita, 7/31/2008, at 280:23-283:6; Deposition of Doreen Sharp, 4/4/08 at 156:19-157:12; *see also* 1994 HRA Memorandum at 10).

17.     The evidence in this case further reflects that in the overall Fair Hearing process there may be delays, or "tolling periods," in the State part of the process because of adjournments and rescheduling of the Fair Hearings, and in the City process because of the time taken from the date HRA requests documentation (the M11Q Medical Request for Home Care form) from appellants until the date the documentation is returned. (*See* Deposition of Mark Lacivita, 7/31/08, at 298:22-299:18; 1994 HRA Memorandum at 10). Defendants may argue that these delays should be excluded from the calculation of the time between the request and

- 5 -

final administrative action. I have thus analyzed the data both including and excluding (tolling) those days.

A.    New York State Data for 2005 - 2006

18.    Plaintiffs' counsel requested that New York State provide data on Fair Hearings conducted for New York City residents on home health care issues. (*See* Plaintiffs' Second Set of Interrogatories and Requests for Production of Documents, March 1, 2007 ("Plaintiffs' Interrogatories and Document Requests"); *see also* Declaration of Robert W. Gifford ("Gifford Declaration") at ¶2).

19.    In response to discovery requests, New York State provided to Plaintiffs' counsel data on thousands of cases in which DAFHs had been issued for New York City residents. *See* Plaintiffs' Interrogatories and Document Requests; April 13, 2007 Letter from Eva Lopez-Paredes to George Alvarez; April 18, 2007 Letter from George Alvarez to Eva Lopez-Paredes. I instructed Plaintiffs' counsel and staff to examine those files and to produce an Excel file with a subset of DAFHs which had been requested from May 1, 2005 to April 30, 2006 and were in regard to home health services. (*See* Gifford Declaration, ¶¶5-6, for the methods used to identify this subset). The subset consisted of 525 cases. Since two of these lacked the date of issuance of the DAFH, my analysis of the State data was conducted on 523 cases.

20.    I distinguished between cases considered "*Varshavsky*" cases and others. As described more fully in the Gifford Declaration, ¶¶14-18, *Varshavsky v. Perales* was a class action concerning Fair Hearings for home bound applicants for and recipients of public assistance, including home care. State Defendants here have claimed that members of the *Varshavsky* class are not appropriate class members in this action. Plaintiffs disagree. However, because of State Defendants' position, I have analyzed the data in this case in two ways, once including all members of the class here as defined by the Plaintiffs, and once separating those

- 6 -

class members into two groups: those who are also *Varshavsky* class members and those who are not also *Varshavsky* class members.

21.     At my request, Plaintiffs' counsel determined which cases should be considered *Varshavsky* cases for this purpose. The method used to classify these cases is more fully described in the Gifford Declaration, ¶¶17-18.

22.     The categories of "aid-continuing" cases and *Varshavsky* cases overlap in many cases. I found that the 523 State Fair Hearing cases divided into four groups as follows:

|  | No. | Percent |
|---|---|---|
| Not *Varshavsky*, not Aid-Continuing | 101 | 19 |
| *Varshavsky* case, not Aid-Continuing | 229 | 44 |
| Not *Varshavsky*, is Aid-Continuing | 28 | 5 |
| *Varshavsky* case, is Aid-Continuing | 165 | 32 |
| Totals | 523 | 100% |

### B.     New York City Data for 2005 - 2006

23.     HRA produced documents related to a sample of 100 cases in which DAFHs had been issued and there had been no aid-continuing. These 100 cases are a subset of the 525 produced by the State which were non-aid continuing and required some action by the City. The 100 cases were selected as described in the Gifford Declaration, ¶¶7-10. Paper documents were provided by the City about these cases because HRA represented that the relevant data are not fully computerized.

24.     Analysis of the New York City data on implementation of the Fair Hearing decisions was conducted on non-aid continuing cases, and also took into account whether they were or were not *Varshavsky* cases.

25.     At my instruction, Plaintiffs' counsel entered the City data into an Excel File. (*See* Gifford Declaration at ¶11). Examination of the 100 cases showed that many cases still had

- 7 -

**JA105**

incomplete data. There were many ways in which the data was incomplete. First, there were

eight cases in which there was no information on whether or when implementation had been

achieved. Second, the length of time taken to reach a decision meant that in some cases the

client had died or had been transferred to a nursing home or hospital. As a result, the

implementation process was never completed. A total of 36 of the 100 cases in the City sample

had to be eliminated for these and other reasons. The full list of reasons for removing cases is as

follows:

|  | No. | Percent |
|---|---|---|
| No date for implementation in the file | 8 | 8% |
| Found to be an aid-continuing case | 8 | 8 |
| Found not to be a home health care case | 2 | 2 |
| Client died | 6 | 6 |
| Client in hospital | 2 | 2 |
| Client in nursing home | 3 | 3 |
| Client already receiving the aid | 3 | 3 |
| Client no longer wanted the aid | 2 | 2 |
| Client moved out of the City | 1 | 1 |
| Client requested postponement of the aid | 1 | 1 |
| CASES excluded from the sample | 36 | 36 |
| CASES remaining in the sample | 64 | 64 |
| Totals | 100 | 100% |

The New York City dataset of 100 cases also included the date of the original Request for

Fair Hearing and the date of the DAFH. By use of the NYC dataset and information in the NYS

dataset, I was able to compute the full length of time for holding the Fair Hearing, issuing the

DAFH, and implementing its results for the 64 cases with complete data. I calculated overall

compliance time, from request to final administrative action, and also divided it into State

compliance time (60 days from the Fair Hearing request to the issuance of the DAFH), and City

compliance time (30 days from the DAFH to implementation).

- 8 -

26.     Of the 64 Fair Hearings remaining in the sample, 22 (34%) were not *Varshavsky* cases, and 42 (66%) were *Varshavsky* cases. This is close to the proportions among all Fair Hearings in the State data.

27.     The DAFH often consists of an order for the City to re-evaluate the case, which usually involves a medical examination of the client. Because of the length of time taken in the State phase, the City, as a result of its normal schedule, had already begun such re-evaluations in 5 cases before the decision was rendered. In these 5 cases, the time taken in the City phase of the process is still counted from the DAFH to full implementation, thus somewhat undercounting the actual time taken in the City's phase.

### C.     New York State Data for 2008

28.     New York State also provided to Plaintiffs a computer printout dated September 11, 2008 of data on Fair Hearings regarding home health care issues requested by New York City residents between January 1, 2008 and July 31, 2008. I requested that Plaintiffs' counsel enter these additional data into an Excel file and remove from the set all cases in which any party requested an adjournment, in which the client withdrew the request for the Fair Hearing, or in which there existed a default. I made this request because the time span of the data was short, so that for many of the cases in which adjournments were requested, it was impossible to determine the length of time to be tolled, or whether the State was in or out of compliance. (*See* Gifford Declaration at ¶¶ 22-23). After removing all adjourned, defaulted and withdrawn cases, there were 213 remaining cases requested as of July 11, 2008, including 157 requests with decisions as of September 11, 2008, and 56 cases in which no decision was issued. I performed the analysis on these 213 cases, and this sample thus may not be representative of all Fair Hearings requested during this time period.

- 9 -

### D.    Issues of Statistical Significance

29.    When data are analyzed from a sample, it is necessary to consider issues of statistical significance (probability of sampling error), since results from a sample cannot be guaranteed to be accurate even if the sample is selected by a perfect random process. The data on State compliance for 2005-2006 and 2008, however, were analyzed on the total group of New York State Fair Hearings with the appropriate issue codes and in the requested date range. Therefore, these Fair Hearings constitute the total population of Fair Hearings for those codes and dates, and issues of statistical significance do not arise.

30.    Because analyses of overall compliance and City compliance must include the City data, these analyses can only be done on the 64 cases for which we have both City and State data. These 64 cases do constitute a sample. For evaluating the reliability of a percentage figure from a sample, the customary procedure is to compute a margin of error. (*See* Hubert M. Blalock, Jr., *Social Statistics*, 1972, p. 211). The primary factor affecting the margin of error is sample size, where larger samples produce a smaller margin of error. A secondary factor affecting the margin of error is the sample percent to be evaluated, since it is used as the estimate of the entire population figure, which is unknown. The closer the sample percentage (*i.e.*, 2% of overall compliance) is to 0% or to 100% (*i.e.*, the further from 50%), the smaller is the margin of error.

31.    A principal finding of this study relevant to the 2005-2006 data is that 2% of all Fair Hearings were completed in 90 days, as shown in the City sample of 64 cases. Given the result of 2% and the sample size of 64, the margin of error is plus or minus 3%. Therefore, with 95% confidence, we can be assured that the true percent of Fair Hearings in overall compliance is somewhere between slightly over 0% and 5%. (The interval cannot go either to 0% or to 100%, since the sample already shows that some hearings, but not all, are in compliance).

- 10 -

**JA108**

### III.    SUMMARY OF RESULTS

#### A.    The 2005-2006 Data

32.    The analyses of overall compliance (90 days from Fair Hearing request to implementation) and City compliance (30 days from Fair Hearing decision to full implementation of the decision) were conducted on the sample of 64 out of the 523 Fair Hearings from 2005 - 2006 which were not aid-continuing, which required implementation by the City, and which had complete data.

33.    Overall compliance (Fair Hearing request to implementation in 90 days) is achieved in only 2% of cases. Excluding toll days does not change this figure.

34.    The analysis of State compliance (60 days from Fair Hearing request to Fair Hearing decision) was done on the total population of 523 Fair Hearing requests made from New York City in 2005 and 2006 which had codes for home health care issues.

35.    Only 3% of State Fair Hearings decisions were issued within 60 days from the date of request. When adjournment days were tolled, 4% of Fair Hearings were issued within 60 days. Thus, tolling adjournment days makes little difference.

36.    New York City is required to implement the results of the Fair Hearing decision within 30 days. Their performance of this task was examined within the City sample of 64 non-aid continuing cases which had complete data on the implementation process.

37.    City compliance (decision to implementation in 30 days) is achieved in 16% of Fair Hearings, and in 17% when days are tolled.

#### B.    The 2008 State Data

38.    The 213 cases in which New York State Fair Hearings were requested from January 1, 2008 through July 11, 2008, and which did not have any adjournments, defaults or withdrawals, included 157 cases in which a decision had been issued as of September 11, 2008,

- 11 -

**JA109**

and 56 cases in which no decision had been issued by that date. The group of cases with a decision had 45% out of compliance (*i.e.*, it took more than 60 days for the State to reach a decision), while the group without a decision had 100% out of compliance. The total group of 213 Fair Hearings in 2008 without adjournments or withdrawals was 60% out of compliance.

## IV.   STATISTICAL ANALYSES

### A.   Overall Compliance in 90 Days: 2005-2006

39.   Although the 2005-2006 data show that the City manages somewhat better compliance in its phase of the process than the State does, this is of little avail in achieving overall compliance within 90 days because of the time consumed in the State's part of the process.

40.   Overall, only 2% of cases went from request to implementation in 90 days. Thus, 98% of cases in 2005-2006 were out of compliance. Indeed, fully 91% took more than 150 days. The average number of days for the entire process was 326. When toll days are excluded, the percent in compliance does not increase, though the average number of days drops from 326 to 301. (Exhibit B, Table 1, Part A).

41.   Whether the case is a *Varshavsky* case has little effect on overall compliance. (Exhibit B, Table 1, Part B).

### B.   Compliance by New York State: 2005-2006

42.   Only 3% of New York State Fair Hearings had a decision issued within 60 days. Thus, 97% are out of compliance with the 60 day rule. Indeed, fully 77% took more than 150 days. (Exhibit B, Table 2, Part A).

43.   The mean average length of time to complete these Fair Hearings and issue decisions was 282 days, or nearly 10 months. This is over three times the number of days

- 12 -

allowed for the entire process, from Fair Hearing request to implementation. (Exhibit B, Table 2, Part A).

44.    Analysis of the data when adjournment days are tolled shows little difference, partly because only 30% of the Fair Hearings had any adjournments. Since Plaintiffs' counsel were unable to determine in many cases which party was responsible for the adjournment, I removed (tolled) all adjournment days for all Fair Hearings which had adjournments. The results show a one percent improvement, with the State rendering the decision within 60 days in 4% of the cases. The mean average number of days to the decision when adjournment days were excluded was reduced from 282 to 255. (Exhibit B, Table 2, Part A).

45.    State compliance is measured in two phases, from Fair Hearing request to holding the hearing, and from the date the hearing is held to the date of the decision. The first phase occupies most of this 60-day period. (Exhibit B, Table 2, Parts B and C).

46.    I further examined the time to Fair Hearing decisions in the four subgroups defined by whether the case has aid-continuing and is a *Varshavsky* case. There is little difference among these groups: 3-4% in each group get to a Fair Hearing decision in 60 days. (Exhibit B, Table 3, Part A).

47.    When adjournment days are excluded, the percent of Fair Hearings in which a decision is issued within 60 days rises slightly to 4%-6%, but only for non-aid-continuing cases. (Exhibit B, Table 3, Part B).

C.    Compliance by New York City: 2005-2006

48.    The City implements the Fair Hearing decision within 30 days in 16% of the cases, with a mean average of 79 days from the date of the DAFH. Excluding City toll days, this rises to 17% and the average number of days falls to 70. (Exhibit B, Table 4, Part A).

- 13 -

**JA111**

49.     Thirty day City compliance is better in non-*Varshavsky* cases (23%) than in

*Varshavsky* cases (12%).  Excluding toll days increases the compliance rate (from 23% to 27%)

for the non-*Varshavsky* cases only. (Exhibit B, Table 4, Part B.)

    D. State Compliance: 2008

50.     The data for 2008 that I received from Plaintiffs' counsel included 213 New York

State Fair Hearings requested from January 1 to July 11, 2008 and without adjournments,

defaults or withdrawals.  These 213 cases included 157 with a decision by September 11, 2008,

and 56 without a decision by that date.  Of the 157 hearings with a decision, 55% were in

compliance (decision within 60 days) and 45% were not.  Of the 56 cases without a decision

none was in compliance. For the total group, 40% were in compliance and 60% were not.

(Exhibit B, Table 5).

- 14 -

**JA112**

Dated:      New York, New York
               March 6, 2009

_____
RICHARD FAUST

- 15 -

**Curriculum Vitae**

**RICHARD FAUST**

274 Mott St., Apt. 5C, New York, NY 10012
(212) 925-8378          richfaust@aol.com

Statistical Analyst - Sociologist

## EDUCATION

M.Phil.      Columbia University, Sociology.

M.A.          Columbia University, Sociology.

B.A.          University of California, Los Angeles, Political Science and
                International Relations.

## RESEARCH EXPERIENCE

1994 -        Consulting Sociologist/Statistician, New York City.

1978 - 1993   Research Director, Calculogic Corporation, New York City.

1976 –1978    Consulting Sociologist/Statistician, New York City.

1975 – 1976   Senior Research Associate, Institute of Judicial Administration,
                New York University.

1973 – 1974   Senior Research Associate, N.Y. State Department of Mental Hygiene.

1962 – 1969   Research Associate or Project Director for various projects at the
                Bureau of Applied Social Research, Columbia University.

## TEACHING EXPERIENCE

1977 – 1979   Columbia University Continuing Education: courses in computer
                analysis of social science data.

1969 – 1975   Instructor in Sociology, John Jay College of Criminal Justice, City
                University of New York.

1962 –1969    Bureau of Applied Social Research, Columbia University: courses
                in computer analysis of social science data for graduate students.

**JA114**

**CURRICULUM VITAE: Richard Faust, page 2**

**PUBLICATIONS**

Faust, R., T. Rubenstein and L. Yackle, "The Great Writ in Action: Empirical Light on the Federal Habeas Corpus Debate." Review of Law and Social Change, vol. XVIII, no. 3. (1991), pp. 637-710.

Davis, A., R. Faust and M. Ordentlich, "Self-Help Smoking Cessation Programs," American Journal of Public Health, vol. 74 (November 1984), pp. 1212-1217.

Faust, R., and D. Holcomb, Making It On Their Own: From Refugee Sponsorship to Self-Sufficiency. Church World Service, Inc. New York: 1983.

Faust, R., B. Flicker and F. Tejera, "Voir Dire: the New York Experience." Trial, vol. 15, (December 1979), pp. 40-43.

Philip, C. and R. Faust, "Study of Malpractice Panels Notes Advantages, Problems, Gaps in Data." Hospitals, vol. 52 (1978), pp. 84-85.

Philip, C. and R. Faust, Medical Malpractice Panels in Four States. Institute of Judicial Administration. New York: 1977.

Kandel, D., D. Treiman, R. Faust and E. Single, "Adolescent Involvement in Legal and Illegal Drug Use: A Multiple Classification Analysis." Social Forces, vol. 55. (December 1976), pp. 438-458.

Kandel, D. and R. Faust, "Sequences and Stages in Patterns of Adolescent Drug Use," Archives of General Psychiatry, vol. 32. (July 1975), pp. 923-932.

Single, E., D. Kandel and R. Faust, "Patterns of Multiple Drug Use in High School." Journal of Health and Social Behavior, vol. 15. (December 1974), pp. 344-357.

Faust, R. and C. Kadushin, Shakespeare in the Neighborhood. Twentieth Century Fund. New York: 1965.

**EXPERIENCE AS EXPERT WITNESS**

(Testimony at trial, hearing, deposition or arbitration)

Mandal et al. v. City of New York, 02 Civ. 1234 (WHP), S.D.N.Y., 2007.

Allen et al., v. City of New York, 03 Civ. 2829 (KMW) (GWG), S.D.N.Y., 2005.

**CURRICULUM VITAE: Richard Faust, page 3**

Fleming v. City of New York,  01 CV 8885 (RCC), S.D.N.Y., 2004.

Meachem et al. v. Brian J. Wing, et al., 99 Civ. 4630 (PKC), E.D.N.Y., 2004.

Latino Officers Association City of New York, et al., v. The City of New York, et al.,
99 Civ. 9568 (LAK), E.D.N.Y., 2003.

Jenkins v. City of New York, New York City Police Department, et al., 00 Civ. 6713
(SHS) (KNF), E.D.N.Y., 2003.

Abdullah et al. v. Wood Wire & Metal Lathers, International Union, Local 46, et al.,
American Arbitration Association, Case No.13300 01081 99, 2000.

Reynolds v. Giuliani, 98 Civ. 8877, (WHP), S.D.N.Y., 1999.

NOW v. Pataki, 93 Civ. 7146, (RLC), S.D.N.Y., 1998.

Jose P. v. Ambach, 79 Civ. 270, EHN, E.D.N.Y., 1987.

Huertas v. East River Housing Corp., 77 Civ. 4494, (RLC), S.D.N.Y., 1981.

Bryan v. Koch, 70 Civ. 4274 (ADS) and D.C. 37 v. Koch, 79 Civ. 4329 (ADS),
S.D.N.Y., 1980.

Rios v. Read, 75 Civ. 296, JM, E.D.N.Y., 1978.

Tatum v. Rogers, 75 Civ. 2782, (CBM), S.D.N.Y., 1978.

Grant v. Bethlehem Steel, 76 Civ. 847, (WK), S.D.N.Y., 1978.

Johnson v. Durante, 73 Civ. 1159, EN, E.D.N.Y., 1976.

Table 1.

**Overall Compliance (90 Days from Fair Hearing Request to Implementation)
In the New York City Sample of 64 Non-Aid Continuing Cases in 2005 - 2006**

### A. Overall Compliance

|  | Including Toll Days | Excluding Toll Days |
|---|---|---|
| **In Compliance** | **2%** | **2%** |
| 1-30 days | 0 | 0 |
| 31-60 | 0 | 0 |
| 61-90 | 2 | 2 |
| **Out of Compliance** | **98%** | **98%** |
| 91-120 | 5 | 5 |
| 121-150 | 3 | 6 |
| 151+ | 91 | 88 |
| Total % | 100% | 100% |
| Total No. of Fair Hearings | 64 | 64 |
| Mean No. days | 326 | 301 |

### B. Overall Compliance by Whether the Case is a Varshavsky Case

|  | Varshavsky: No Toll Days: | | Varshavsky: Yes Toll Days: | |
|---|---|---|---|---|
|  | Included | Excluded | Included | Excluded |
| **In Compliance** | **0%** | **0%** | **2%** | **2%** |
| 1-30 days | 0 | 0 | 0 | 0 |
| 31-60 | 0 | 0 | 0 | 0 |
| 61-90 | 0 | 0 | 2 | 2 |
| **Out of Compliance** | **100%** | **100%** | **98%** | **98%** |
| 91-120 | 4 | 4 | 5 | 5 |
| 121-150 | 0 | 4 | 5 | 7 |
| 151+ | 96 | 91 | 88 | 86 |
| Total % | 100% | 100% | 100% | 100% |
| Total No. of Fair Hearings | 22 | 22 | 42 | 42 |
| Mean No. of days | 350 | 318 | 314 | 292 |

Table 2.

**State Compliance (60 Days from Fair Hearing Request to Decision)**
**In the New York State Population of 525 Home Health Care Cases in 2005 - 2006**

| | Including<br>Adjournment Days | Excluding<br>Adjournment Days |
|---|---|---|
| **A. State Compliance:  Days from Request to Decision** | | |
| **In Compliance** | **3%** | **4%** |
| 1-30 days | 1 | 1 |
| 31-60 | 2 | 3 |
| **Out of Compliance** | **97%** | **96%** |
| 61-90 | 7 | 9 |
| 91-120 | 7 | 8 |
| 121-150 | 6 | 9 |
| 151+ | 77 | 69 |
| | | |
| Total % | 100% | 100% |
| Total No. of Fair Hearings | 523 | 523 |
| Mean No. days to decision | 282 | 255 |
| **B. State Compliance, Phase 1:  Days from Request to Hearing** | | |
| 1-30 days | 6% | 9% |
| 31-60 | 7 | 10 |
| 61-90 | 10 | 13 |
| 91-120 | 7 | 7 |
| 121-150 | 9 | 7 |
| 151+ | 61 | 54 |
| | | |
| Total % | 100% | 100% |
| Total No. of Fair Hearings | 525 | 525 |
| Mean No. of days to decision | 226 | 199 |

**Table 5.**

**State Compliance in New York State Fair Hearings Requested January 1 - July 11, 2008 without Adjournments, Defaults or Withdrawals, and with data as of September 11, 2008**

|  | Fair Hearings with decisions by Sept. 11, 2008 | Fair Hearings without decisions by Sept. 11, 2008 | Total |
|---|---|---|---|
| **In Compliance** | **55%** | **0%** | **40%** |
| 1-30 days | 14 | 0 | 10 |
| 31-60 | 41 | 0 | 30 |
| **Out of Compliance** | **45%** | **100%** | **60%** |
| 61-90 | 18 | 39 | 24 |
| 91-120 | 13 | 21 | 15 |
| 121-150 | 10 | 25 | 14 |
| 151+ | 4 | 14 | 7 |
| Total % | 100% | 100% | 100% |
| Total No. of Fair Hearings | 157 | 56 | 213 |

10234390\V-4

**JA119**

**Table 2. (continued)**

**State Compliance (60 Days from Fair Hearing Request to Decision)**
**In the New York State Population of 525 Home Health Care Cases in 2005 - 2006**

**C. State Compliance, Phase 2:  Days from Hearing to Decision**
**(There are no adjournment days from Hearing to Decision)**

| | |
|---|---|
| 1-30 days | 41% |
| 31-60 | 23 |
| 61-90 | 12 |
| 91-120 | 12 |
| 121-150 | 7 |
| 151+ | 5 |
| | |
| Total % | 100% |
| Total No. of Fair Hearings | 523 |
| Mean No. of days to decision | 56 |

**JA120**

Table 3.

**State Compliance (60 Days from Fair Hearing Request to Fair Hearing Decision)
By Aid Continuing and Whether a Varshavsky Case
In the New York State Population of 525 Home Health Care Cases in 2005 - 2006**

| | Aid Continuing: No Varshavsky | | Aid Continuing: Yes Varshavsky | |
|---|---|---|---|---|
| | No | Yes | No | Yes |
| **A. State Compliance Including Adjournment Days** | | | | |
| **In Compliance** | 3% | 3% | 4% | 3% |
| 1-30 days | 2 | 1 | 0 | 1 |
| 31-60 | 1 | 2 | 4 | 2 |
| **Out of Compliance** | 97% | 97% | 96% | 97% |
| 61-90 | 5 | 7 | 14 | 7 |
| 91-120 | 9 | 8 | 0 | 5 |
| 121-150 | 9 | 8 | 7 | 3 |
| 151+ | 74 | 74 | 75 | 80 |
| Total % | 100% | 100% | 100% | 100% |
| Total No. of Fair Hearings | 101 | 229 | 28 | 165 |
| Mean No. days to decision | 262 | 247 | 315 | 338 |
| **B. State Compliance Excluding Adjournment Days** | | | | |
| **In Compliance** | 6% | 4% | 4% | 3% |
| 1-30 days | 2 | 1 | 0 | 1 |
| 31-60 | 4 | 3 | 4 | 2 |
| **Out of Compliance** | 94% | 96% | 96% | 97% |
| 61-90 | 6 | 10 | 14 | 7 |
| 91-120 | 6 | 12 | 0 | 5 |
| 121-150 | 9 | 11 | 7 | 3 |
| 151+ | 73 | 63 | 75 | 82 |
| Total % | 100% | 100% | 100% | 100% |
| Total No. of Fair Hearings | 101 | 229 | 28 | 165 |
| Mean No. of days to decision | 250 | 218 | 309 | 300 |

**Table 4.**

**City Compliance  (30 Days from Fair Hearing Decision to Implementation)
In the New York City Sample of 64 non-Aid Continuing Cases in 2005 - 2006**

**A.  City Compliance**

|  | Including Toll Days | Excluding Toll Days |
|---|---|---|
| **In Compliance** | 16% | 17% |
| 1-30 days | 16 | 17 |
| **Out of Compliance** | 84% | 83% |
| 31-60 | 14 | 27 |
| 61-90 | 36 | 30 |
| 91-120 | 22 | 17 |
| 121-150 | 6 | 5 |
| 151+ | 6 | 5 |
| Total % | 100% | 100% |
| Total No. of Fair Hearings | 64 | 64 |
| Mean No. days | 79 | 70 |

**B.  City Compliance by Whether the Case is a Varshavsky Case**

|  | Varshavsky: No Toll Days: | | Varshavsky: Yes Toll Days: | |
|---|---|---|---|---|
|  | Included | Excluded | Included | Excluded |
| **In Compliance** | 23% | 27% | 12% | 12% |
| 1-30 days | 23 | 27 | 12 | 12 |
| **Out of Compliance** | 77% | 73% | 88% | 88% |
| 31-60 | 14 | 23 | 14 | 29 |
| 61-90 | 32 | 27 | 38 | 31 |
| 91-120 | 18 | 9 | 24 | 21 |
| 121-150 | 14 | 14 | 2 | 0 |
| 151+ | 0 | 0 | 10 | 7 |
| Total % | 100% | 100% | 100% | 100% |
| Total No. of Fair Hearings | 22 | 22 | 42 | 42 |
| Mean No. of days | 71 | 62 | 83 | 74 |

**Exhibit C**

## MATERIALS REVIEWED TO CREATE THIS REPORT

1. Amended Class Action Complaint dated June 30, 2006

2. State Defendants' Answer to the Amended Complaint dated August 9, 2006

3. City Defendant's Answer dated September 6, 2006

4. 42 U.S.C. § 1396(a)(3)

5. 42 C.F.R. § 431.244(f)

6. 18 N.Y.C.R.R. § 358-6.4(a)

7. HRA Memorandum dated March 8, 1994 (Holm Exhibit 10, Bates Nos. C0668-C0688)

8. Deposition of Mark Lacivita, July 31, 2008 at 280:23-283:6 and at 298:22-299:18 (made available)

9. Deposition of Doreen Sharp April 8, 2008 at 156:19-157:12 (made available)

10. NOVELLO'S RESPONSE TO PLAINTIFFS' INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS dated September 21, 2006

11. DOAR'S RESPONSE TO PLAINTIFFS' INTERROGATORIES AND REQUEST FOR PRODUCTION dated September 22, 2006

12. CITY DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION AND INTERROGATORIES TO DEFENDANT EGGLESTON dated October 2, 2006

13. CITY DEFENDANT'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION AND INTERROGATORIES TO DEFENDANT EGGLESTON dated December 1, 2006

14. STATE OTDA COMMISSIONER'S RESPONSE TO PLAINTIFFS' REVISED INTERROGATORIES AND REQUEST FOR PRODUCTION dated January 17, 2007

15. DEFENDANT NOVELLO'S RESPONSES TO PLAINTIFF'S REVISED INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS dated January 17, 2007

16. Letter dated March 1, 2007 to George Alvarez, Esq. and Deborah Hohhauser, Esq. regarding deficiencies in OTDA's responses and document productions, and PLAINTIFFS' SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO STATE OTDA COMMISSIONER

17. Letter dated April 13, 2007 from Eva Lopez-Paredes, Esq. to George Alvarez, Esq. regarding Plaintiffs' outstanding discovery requests.

18. Letter dated April 19, 2007 from George Alvarez, Esq. to Eva Lopez-Paredes, Esq. responding to her letter of April 13, 2007

19. Letter dated May 2, 2007 from George Alvarez, Esq. to Eva Lopez-Paredes, Esq., enclosing a compact disc containing data, including the relevant fair hearing decisions for hearing request made during the period May 1, 2005 through April 30, 2006 and a WORD document explaining the data

20. Letter dated May 23, 2007 from George Alvarez, Esq. to Eva Lopez-Paredes, Esq., enclosing a compact disc containing fair hearing decisions regarding New York City home care denials for hearing requests made during the period of May 1, 2005 through April 30, 2006.

21. Letter dated June 6, 2007 from Robert Gifford, Esq. to Kimberly Conway, Esq., providing the names and Fair Hearing numbers of fifty individuals who were entitled to compliance from City Defendant as a result of a favorable Decision After Fair Hearing

22. Letter dated June 21, 2007 from Robert Gifford, Esq. to Kimberly Conway, Esq., making substitutions to the list provided on June 1, 2007

23. Letter dated July 23, 2007 from Kimberly Conway, Esq. to Deborah Berkman, Esq. providing information in response to plaintiffs' outstanding discovery requests

24. CITY DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS dated January 19, 2009

25. New York Sate computer printout dated September 11, 2008 of data on fair hearings on home health care issues requested by New York City residents from January to July 2008 (Bates Nos. OTDA-4959 -- OTDA-5000).

26. Declaration of Robert W. Gifford, March 5, 2009.

27. Chart of State Data (525 names): February 24, 2009 (doc id # 10232326)

28. Chart of City Data (100 names): February 16, 2009 (doc id # 10136667)

29. Chart of 2008 State Data (241 names): February 27, 2009 (doc id # 10233429)



Graph 1
New York State Fair Hearings on New York City Home Health Care Issues, 2005-2006

**Graph 2**
**State Compliance:  60 Days from Fair Hearing Request to Fair Hearing Decision**



☒ State Compliance Not Excluding Adjournment Days (A)   ■ State Compliance Excluding Adjournment Days (B)



Graph 3
City Compliance: 30 Days from Fair Hearing Decision to Implementation, 2005-2006

**Graph 4**
**Overall Compliance: 90 Days from Fair Hearing Request to Implementation, 2005-2006**



**Graph 5**
**Overall Compliance: 90 Days from Fair Hearing Request to Implementation:**
**January 1, 2008 through July 11, 2008 Request Dates**



☒ Fair Hearings with decisions by Sept. 11, 2008   ■ Fair Hearings without decisions by Sept. 11, 2008   ☐ Total

**JA129**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

BORIS SHAKHNES by his next friend ALLA
SHAKHNES, MIKHAIL FELDMAN, FEI MOCK,
SHA-SHA WILLIS, and CHAIO ZHANG
individually and on behalf of all others
similarly situated,

                         Plaintiffs,                            06 Civ. 04778 (RJH)

     -against-

VERNA EGGLESTON, as Commissioner        **SECOND REPORT OF**
of the New York City Human Resources      **PLAINTIFFS' EXPERT**
Administration, ROBERT DOAR, as           **RICHARD FAUST**
                                       **RESPONDING TO**
Commissioner of the New York State Office    **THE JUNE 15, 2009**
of Temporary and Disability Assistance;     **REPLY REPORT OF STATE**
and ANTONIA C. NOVELLO, as            **DEFENDANTS' EXPERT**
Commissioner of the New York State        **DR. KARL HEINER**
Department of Health,
                      Defendants.

-------------------------------------------------------------x

    Richard Faust declares, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, as

follows:

        1.     I am an independent consultant involved in the design and execution of studies

using social science data and in the analysis of such data. I was previously retained by plaintiffs'

counsel in this case to evaluate data provided by New York State and New York City on fair

hearings on home health care issues conducted by New York State for New York City

applicants for and recipients of Medicaid funded home health care services. I submitted my

Expert Report on those data on March 6, 2009. In brief, I found that in only 2% of those fair

hearings did the individual requesting the Fair Hearing receive final administrative action in

compliance with a Decision after Fair Hearing ("DAFH") as required by law.

1

**JA130**

2.      Defendants have now submitted a report by their expert, Dr. Karl Heiner, based on an expanded dataset which now includes additional Fair Hearings requested through December 2008. A copy of this second State dataset was provided to Plaintiffs' counsel and forwarded to me for analysis. I understand that plaintiffs' counsel had not received this second, expanded dataset until Dr. Heiner's report was served on June 15, 2009.

3.      I attended the July 14, 2009 deposition of Dr. Heiner.

4.      Plaintiffs' counsel have asked me in this Second Report to evaluate the degree to which Dr. Heiner's conclusions, based on this expanded dataset, are valid and relevant to the issues of this case.

5.      I have concluded that Dr. Heiner's report contains no relevant data pertaining to the issues of this case. There are four reasons for this, as described below.

6.      My qualifications and experience were discussed in my first report in this case, and my C.V. was attached to that report.

A.      Dr. Heiner Includes Irrelevant Fair Hearings in his Analyses.

7.      In my first report on this case I reported on statistical analyses of fair hearings which dealt with home health care issues. I was informed by plaintiffs' counsel that whether or not a particular fair hearing dealt with home health care issues could not be determined by any data item in the State's dataset. Instead, it was necessary to read the DAFH for the completed hearing to see if the Administrative Law Judge (ALJ) who wrote the decision discussed any home health care issues.

8.      Plaintiffs read all the DAFHs of all the completed cases in the time period they wished me to study (May 2005 to April 2006) and identified 525 fair hearings in which, in their opinion, there were home health care issues. (Gifford Declaration of March 5, 2009) Plaintiffs

2

**JA131**

further informed me that they found that the majority of fair hearings did not deal with home health care, but instead dealt with issues of Medicaid eligibility. I included this information in my first Report, which Dr. Heiner testified at deposition that he had read. Apparently the full data set is based on a code that State Defendants apply to all cases in which a Medicaid recipient receives or has received home care. However, many hearings requested by these individuals concern issues other than their eligibility for the home care itself, and many cases seem to be incorrectly coded. In fact the vast majority of the cases in the full data set are not home care cases at all. The proposed class in this case is defined to include only those individuals who request Fair Hearings specifically about their right to receive home care services.

9.      Dr. Heiner also testified at his deposition that he made no effort to determine which fair hearings actually dealt with home health care issues. In fact, neither the first nor the second State datasets included any information which would identify hearings dealing with these issues. Further, State defendants did not provide Dr. Heiner with copies of the DAFHs for the completed cases in the second dataset, whereas they had provided such DAFHs to plaintiffs' counsel for the fair hearings in the first dataset which plaintiffs' counsel wanted to study.

10.      Based on plaintiffs' counsel's experience with the first State dataset, in my opinion Dr. Heiner's results for the completed fair hearings (those with DAFH issue dates) in his report is fatally flawed. His results are likely based on groups in which a majority of fair hearings did not in fact deal with home health care issues at all.

11.      Plaintiffs' counsel reviewed two DAFHs from the second dataset with Dr. Heiner at his deposition, and Dr. Heiner agreed that there was no mention of home health care issues in those decisions.

3

**JA132**

B.    Dr. Heiner Presents no *Relevant* Data on 90 Day Legal Compliance.

12.    The statistical table on page 4 of Dr. Heiner's report presents statistical data on 12

subgroups of cases, and summarizes calculations with respect to each of those subgroups.

Groups 1, 4, 7 and 12 in this table consist of cases which were coded "HRD" in the State's

second dataset, meaning that they were heard in a completed hearing and a DAFH was issued for

them, as represented by the presence of an "Issue Date" in the dataset. The four groups differ in

that they represent four subgroups of "HRD" cases created by combining whether or not the case

was a Varshovsky case and whether or not it was an "aid-continuing" case. These four groups

represent the same four groups I analyzed in my report of March 6, 2009, except that Dr.

Heiner's analysis covered a much broader date range (Jan. 2004 to Dec. 2008).

13.    Dr Heiner's statistical table on page 4 states that between 29% (i.e., .29) and 88%

(.88) of cases in these four groups were "resolved" in "less than 90 days" by the issuance of a

DAFH. Dr. Heiner testified at deposition on July 14, 2009 that he believed this actually meant

"within 90 days," but further testified that he was unsure whether the term "less than 90 days" as

used in his report meant (i) 90 days or less, or (ii) 89 days.

14.    In any event, these statistical results are completely irrelevant to the issue of

whether the Defendants complied with the requirement that final administrative action be taken

within 90 days of a client's request for a fair hearing.   As Dr. Heiner testified at his deposition,

he knows that compliance with this 90-day mandate does not only require the issuance of a

DAFH by the State, but also requires implementation by New York City of the  mandates of the

DAFH within that 90-day period of time. Nonetheless, Dr. Heiner further testified that he knew

that the dataset he received from the State contained no data on actions taken by the City toward

4

implementation for these fair hearings. Without City date, Dr. Heiner could not possibly have properly calculated the frequency with which the Defendants comply with the 90-day rule.

15. For these reasons, the statistics in Dr. Heiner's table on page 4 are completely irrelevant to the issue of 90 day legal compliance. Further, I believe Dr. Heiner was aware of this fact, since he nowhere uses the phrase "90 day legal compliance" in his report. Instead, he uses the phrase "90 day resolution", which he defines to mean issuance of a DAFH by the State -- not implementation by the City.

C.     Dr. Heiner Presents *no Data at all* on 60 Day State Compliance.

16. Since the dataset which the State sent to Dr. Heiner contained no data at all on City actions, it could not be used to analyze either whether final administrative action was taken within the 90 day legal limit or whether the City had complied with DAFHs within 30 days. It could only be used for analyzing State Compliance in 60 days, in accord with the State's own policy that the DAFH should be issued within 60 days.

17. However, Dr. Heiner's table on page 4 contains no data at all on actions by the state within 60 days. Instead, it contains only data on state "resolution" within 90 days.

18. Dr. Heiner has no data at all on state compliance (issuance of the DAFH) within 60 days.

D.     Dr. Heiner Presents *False Data* on 90 day Resolution of Withdrawn, Defaulted, and RPDN Cases Because he Relied on a Misrepresentation by State Defendants' In-House Attorney Rather than Analyze the Data which were Available to Him.

19. In Dr. Heiner's statistical table on page 4, he presents data on the proportions of cases which were resolved in "less than 90 days" in the same four Varshovsky and Aid-continuing groups, but this time for fair hearings which had a final resolution of WITH

5

**JA134**

(withdrawn), DEF (default), and RPDN (Dr. Heiner testified at his deposition that he was unaware of the meaning of "RPDN").

20.     The first problem with these findings is that these fair hearings were resolved without a completed hearing and the issuance of a DAFH, and therefore no administrative actions of implementation were needed. These fair hearings are therefore outside the scope of this litigation.

21.     Dr. Heiner claims in his statistical table that 100% (1.0) of the cases in these four groups were resolved (came to their final disposition) within 90 days. At deposition, however, he testified that he based this claim on a statement made by Mr. David Amirian, an attorney for Defendant state agency OTDA, that this was true for all these cases.

22.     Dr. Heiner also stated that he did not himself analyze the relevant data which were available to him in the second State dataset to test the accuracy of this claim.

23.     In fact, the most casual observation of the fair hearings in the second State dataset reveals that there are numerous cases in these categories that did not reach their final disposition for more than 90 days. For example, the first 200 entries on the second State dataset show the following six cases which were ultimately withdrawn, but took more than 90 days to get to the hearing, much less the final disposition:

TABLE 1. Withdrawn Cases Taking More Than 90 Days to the First Hearing

| Line # | Fair Hearing # | Request Date | First Hearing Date | Days to 1st Hearing |
|--------|----------------|--------------|--------------------|--------------------|
| 24     | 4039738R       | 1/5/04       | 10/21/04           | 286                |
| 53     | 4041270J       | 1/7/04       | 7/1/04             | 174                |

6

**JA135**

| 98  | 4043109L | 1/9/04  | 7/12/04 | 183 |
| 134 | 4043878K | 1/7/04  | 7/1/04  | 174 |
| 144 | 4044424R | 1/12/04 | 7/12/04 | 180 |
| 147 | 4044573M | 1/12/04 | 7/12/04 | 180 |

Casual observation of the State's second dataset would have revealed these cases, without even running any statistical analyses.

24.     I consider it highly unusual and contrary to proper professional practice for a statistician to *accept a client's claim of statistical fact at face value* without making any effort to validate that claim, especially when the data to test the claim are readily available. I would never have accepted any such statement from plaintiffs' counsel and included it in my report as a statistical result without independently verifying it myself.

25.     In the first place, any claim that "100%" of a group has certain characteristics would normally seem implausible on the face of it. Any such claim requires independent verification.

26.     If plaintiffs' counsel had made such a claim to me I would certainly have run the necessary statistical tables to verify it. Having found the claim to be incorrect, I would have informed plaintiffs' counsel and told them that I would have to include the correct results in my Report. According to standard ethical practice, as I understand it, the only acceptable alternative would have been not to discuss this issue at all.

27.     If plaintiffs' counsel had made such a claim to me and I did not have the data to verify it, I still would not have included it as a "fact" or "result" in my report. Instead, I would

7

have stated in my report that "I am informed by plaintiffs' counsel that" [_____ is true], but I would also have made it clear that I had no data to support it.

28.     I am greatly surprised that Dr. Heiner was so incautious as to blindly accept an *implausible* statement by a client and to include it as a "result" in his report. It is especially hard to understand in this situation because he had the data available to determine whether or not the statement was true, and could easily have determined that it was not.

29.     For all these reasons, I conclude that Dr. Heiner's report contains no relevant data on 90 day legal compliance and no data at all on 60 day State compliance or 30 day City compliance. The report is based on a dataset of fair hearing requests in which a majority of the hearings most likely do not even deal with home health care issues. Those cases which had a final resolution of WITH (withdrawn), DEF (default), and RPDN are outside the scope of this litigation since no DAFH was issued and no administrative actions were required. For four subgroups of this group of WITH, DEF, and RPDN hearing requests, he reports "results" which are based on no data at all (although he had relevant data available for analysis), but rather on unsupported and false claims by an attorney representing the State Defendants.

July 17, 2009

*Richard Faust*

Richard Faust

8

**JA137**



# Analysis of Time until Resolution of Home Care Fair Hearing Request – 1/01/04 through 12/31/08

**Karl Heiner**

**For NYS OTDA**

**Karl Heiner Statistical Consulting, Ltd.**

**6/15/2009**

# 1   Analysis of time until Resolution of Home Care Fair Hearing Request – 1/01/04 through 12/31/08

In March 2009, the New York State Office of Temporary and Disability Assistance (NYS OTDA) asked me to analyze some data pertaining to the scheduling and conducting of Home Health Care fair hearings for New York City residents who had requested fair hearings from 2004 through 2008. NYS OTDA also asked me to review a report prepared by Richard Faust on behalf of the plaintiffs in the Shakhnes Home Health Care Case. I was subsequently provided with a spreadsheet file "Shakhnes Home Care Activity for 1-1-04 to 12-31-08.xls" that contained data on 22096 Fair Hearing Numbers associated with fair hearing requests. Many of the fair hearing request numbers had multiple records associated with them, apparently due to hearings being adjourned and rescheduled. (We estimated that the number of adjournments varied among the four groups formed by crossing Varshavsky or not with aid continuing or not, ranging from more than one on the average for Varshavsky aid continuing cases to about one quarter for non-Varshavsky aid continuing cases.) My primary task in analyzing these data was to describe the amount of time between the date a hearing was requested and the date when the issue of the hearing was resolved (hearing decision issued, hearing request withdrawn, etc.). For each hearing request, the file contained such information as request date, scheduled hearing date or dates when hearings were adjourned, hearing decision issuance date, as well as codes describing hearing disposition and outcome reasons. In addition, information was provided that categorized cases as to whether or not they fell under the jurisdiction of the Varshavsky litigation, and whether or not the recipient's aid continued while awaiting the results of the fair hearing.

An important variable in the proposed analysis was the amount of time due to the fair hearing process that a recipient would have to wait from when the hearing was requested until the case was resolved. For cases that were resolved by a hearing, this time might be obtained by counting the days between the request date and the issue date, i.e. the date that the hearing decision was issued. NYS OTDA told me that nearly all of the adjournments were at the request of or to the benefit of the recipient, thus the time from one scheduled hearing to the next was subtracted from the time between the request and issue dates. From an initial inspection of the data, it appeared as if waiting times for Varshavsky cases were larger than those for non-Varshavsky cases and that there was a difference between cases where aid continued and those where this was not so. Consequently, the graphical and statistical descriptions were developed for each of the four groups (Varshavsky aid continuing, Varshavsky non aid, non-Varshavsky aid continuing and non-Varshavsky non aid) of sizes 3259, 3760, 9098, and 5979, respectively. Mr. Faust constructed the same categories in his report. The diagram below illustrates the construction of the four groups. A single more sophisticated time-to-event analysis of all 22096 cases could be performed that would measure the individual effect of being in each of these groups as well as adjusting for censoring (i.e. times that can not be calculated because drop outs and issue resolution times occurring after the date of the data file).

These four groups were further subdivided to account for cases that were resolved by hearing or otherwise, and cases with no issue date (see second schematic below). The number of cases with no issue date is important in evaluating our analysis of time to event (resolution) by calendar quarter since for cases requesting hearings in late 2008, hearings may have been held beyond the creation date of data file from which we worked. As it turns out, the number of missing cases is relatively small apart from the fourth quarter 2008. This, apart from the 4th quarter of 2008, summary statistics in these analyses and observed trends by date are not biased by missing data.

Each section of our report corresponds to the twelve categories of cases depicted in the more detailed schematic. Detailed descriptions of time to resolution are presented in each section usually in both graphical and tabular form, but in summary, we note that the graphics and summary statistics show that Varshavsky litigation cases take longer to be resolved than other cases.

The proportion of cases resolved within 90 days (i.e., the percentile rank of 90) is an important statistic in this matter, so we have constructed a table below to show how this statistic varies among groups of cases. For example, 29% of the 1117 Varshavsky non-aid cases resolved by hearing are resolved within 90 days, while 88% of the 2857 non-Varshavsky aid-continuing cases resolved by hearing are resolved within 90 days. If we include the cases that are resolved without hearing (e.g., default, withdrawn, etc), approximately 88% of all cases are resolved within 90 days.

We find proportion of cases resolved in less than 90 days to be approximately 88% and 64% in aid continuing and non-aid cases, respectively, for non-Varshavsky cases. Correspondingly, figures for Varshavsky litigation cases would be 40% and 29% in aid continuing and non-aid cases, respectively. And in cases resolved by default or withdrawn between request date and hearing date, the majority of the cases, of course all cases are resolved within 90 days. Overall, approximately 88% of all fair hearing requests during the period from 2004 through 2008 were resolved within 90 days (92.6% for non-Varshavsky cases).

For 2008, we find proportion of cases resolved in less than 90 days to be approximately 59% and 66% in aid continuing and non-aid cases, respectively, for non-Varshavsky cases. Correspondingly, figures for Varshavsky litigation cases would be 74% and 80% in aid continuing and non-aid cases, respectively. And in cases resolved by default or withdrawn between request date and hearing date, the majority of the cases, all cases are resolved within 90 days. Overall in 2008, approximately 90.8% of all fair hearing requests were resolved within 90 days.

| group | Type of Case | Outcome | Cases | Proportion of Days Less than 90 |
|---|---|---|---|---|
| 1 | Varshavsky Litigation Aid Continuing | Resolved | 1348 | 0.46 |
| 2 | Varshavsky Litigation Aid Continuing | No Issue Date | 101 | |
| 3 | Varshavsky Litigation Aid Continuing | Cases WITH, DEF, RPDN | 1810 | 1.0 |
| 4 | Varshavsky Litigation Non Aid | Resolved | 1117 | 0.29 |
| 5 | Varshavsky Litigation Non Aid | No Issue Date | 57 | |
| 6 | Varshavsky Litigation Non Aid | Cases WITH, DEF, RPDN | 2586 | 1.00 |
| 7 | Non NYS-6 Aid Continuing | Resolved | 2857 | 0.88 |
| 8 | Non NYS-6 Aid Continuing | No Issue Date | 35 | |
| 9 | Non NYS-6 Aid Continuing | Cases WITH, DEF, RPDN | 6206 | 1.0 |
| 10 | Non NYS-6 non Aid | Resolved | 2124 | 0.64 |
| 11 | Non NYS-6 non Aid | No Issue Date | 31 | |
| 12 | Non NYS-6 non Aid | Cases WITH, DEF, RPDN | 3824 | 1.00 |
| | Overall | | | 0.88 |



# Home Care Fair Hearing Activity

1/1/04 – 12/31/08



## 1.1 *Varshavsky Aid Continuing Resolved by Hearing Cases*

1348 Fair Hearing Numbers (Cases)

Of the 3259 Varshavsky Aid Continuing cases, 1348 (41%) were resolved by fair hearing. Most of the rest, 59% were either withdrawn, resolved by default, were cases where reopening was denied. For the 1348 cases that were resolved by fair hearing three-quarters were resolved within 349 days, half were resolved within 179 days, while 25% of them were resolved within 77 days (see table below).

**Varshavsky Litigation Aid Continuing: Resolved Cases**

| *Proportion of Days to Issue less than or equal to 90* | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quarter of the Hearing Request Date | | | | |
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Grand Total |
| 2004 | 0.46 | 0.43 | 0.31 | 0.49 | 0.41 |
| 2005 | 0.46 | 0.39 | 0.38 | 0.33 | 0.39 |
| 2006 | 0.46 | 0.36 | 0.34 | 0.30 | 0.35 |
| 2007 | 0.57 | 0.68 | 0.64 | 0.70 | 0.64 |
| 2008 | 0.53 | 0.77 | 0.82 | 0.89 | 0.74 |



Varshavsky Aid Continuing Resolved Cases
Time from Request Date to Issue Date reduced for adjournments (Histogram)

| *** Summary Statistics *** | Total | Agency Affirmed: NO | Agency Affirmed: YES |
|---|---|---|---|
| Min: | 12.0000 | 19.0000 | 12.0000 |
| 1st Qu.: | 77.0000 | 83.0000 | 44.7500 |
| Mean: | 216.3479 | 224.7913 | 123.1696 |
| Median: | 179.0000 | 201.0000 | 70.0000 |
| 3rd Qu.: | 349.0000 | 356.2500 | 155.0000 |
| Max: | 1203.0000 | 1203.0000 | 462.0000 |
| Total N: | 1348.0000 | 1236.0000 | 112.0000 |
| NA's: | 0.0000 | 0.0000 | 0.0000 |
| Std Dev.: | 153.9227 | 154.3674 | 113.2518 |

The trellis graphic below depicts differences in waiting times for the 1348 Varshavsky Aid Continuing Resolved by hearing cases by calendar year. For cases where hearings were requested in 2008 and resolved by hearing, most waiting times were less than 90 days and some were more. 2007 and 2008 were an improvement over 2006.



### Varshavsky Aid Continuing Resolved Cases
Time from Request Date to Issue Date reduced for adjournments (Histogram)

| *** Summary Statistics *** | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Min: | 28.0000 | 27.0000 | 12.0000 | 22.00000 | 26.00000 |
| 1st Qu.: | 94.0000 | 124.0000 | 127.5000 | 46.00000 | 48.00000 |
| Mean: | 242.1451 | 302.4554 | 235.0256 | 103.71078 | 85.61589 |
| Median: | 259.0000 | 370.0000 | 244.0000 | 76.00000 | 70.00000 |
| 3rd Qu.: | 363.0000 | 428.0000 | 312.5000 | 133.25000 | 115.00000 |

Page 8 of 40

**JA145**

| | | | | | |
|---|---|---|---|---|---|
| **Max:** | 1203.0000 | 719.0000 | 807.0000 | 342.00000 | 238.00000 |
| **Total N:** | 317.0000 | 325.0000 | 351.0000 | 204.00000 | 151.00000 |
| **NA's :** | 0.0000 | 0.0000 | 0.0000 | 0.00000 | 0.00000 |
| **Std Dev.:** | 156.0481 | 169.5433 | 124.9347 | 76.18825 | 48.42174 |

Below are a series of box-plots depicting the trend in waiting times for the 1348 Varshavsky Aid Continuing resolved by hearing cases by quarter. Since the very bad third quarter, 2006, we notice a declining trend in both median waiting time and the range. (A box plot depicts a distribution by graphically displaying the location of the five summary statistics, minimum, 25th percentile, median, 75th percentile and maximum). The trellis display of histograms for the four quarters of 2008 give the same impression as the box plots, i.e. waiting times are smaller in the second half of 2008 than they were earlier in the year. Summary statistics by year are tabled below.



**JA146**



Varshavsky Aid Continuing Resolved Cases

Time from Request Date to Issue Date reduced for adjournments (Histogram)

| 2004 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Min: | 36.0000 | 28.0000 | 34.0000 | 31.0000 |
| 1st Qu.: | 90.0000 | 91.0000 | 104.2500 | 91.0000 |
| Mean: | 212.3871 | 246.5949 | 278.9800 | 213.9778 |
| Median: | 197.0000 | 294.0000 | 336.0000 | 151.0000 |
| 3rd Qu.: | 335.0000 | 359.5000 | 384.5000 | 360.0000 |
| Max: | 559.0000 | 1203.0000 | 546.0000 | 657.0000 |
| Total N: | 93.0000 | 79.0000 | 100.0000 | 45.0000 |
| NA's : | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| Std Dev.: | 129.4336 | 175.4334 | 152.3441 | 165.1499 |
| **2005** | **Q1** | **Q2** | **Q3** | **Q4** |
| Min: | 29.0000 | 27.0000 | 28.0000 | 34.0000 |
| 1st Qu.: | 83.0000 | 162.0000 | 122.5000 | 152.0000 |
| Mean: | 262.2346 | 313.7054 | 317.5690 | 318.7719 |
| Median: | 353.0000 | 379.0000 | 399.0000 | 404.0000 |
| 3rd Qu.: | 391.0000 | 438.0000 | 473.2500 | 435.0000 |
| Max: | 489.0000 | 630.0000 | 719.0000 | 603.0000 |
| Total N: | 81.0000 | 129.0000 | 58.0000 | 57.0000 |
| NA's : | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| Std Dev.: | 162.1744 | 161.2332 | 191.5708 | 169.7769 |
| **2006** | **Q1** | **Q2** | **Q3** | **Q4** |
| Min: | 35.0000 | 34.0000 | 12.0000 | 19.0000 |
| 1st Qu.: | 108.2500 | 153.5000 | 147.7500 | 106.5000 |

|  | | | |  |
|---|---|---|---|
| **Mean:** | 258.9375 | 250.6944 | 246.6159 | 172.6866 |
| **Median:** | 292.5000 | 267.5000 | 252.5000 | 191.0000 |
| **3rd Qu.:** | 381.5000 | 329.0000 | 313.5000 | 217.5000 |
| **Max:** | 512.0000 | 454.0000 | 807.0000 | 344.0000 |
| **Total N:** | 48.0000 | 72.0000 | 164.0000 | 67.0000 |
| **NA's :** | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| **Std Dev.:** | 141.4273 | 114.4204 | 133.1739 | 75.3831 |
| **2007** | **Q1** | **Q2** | **Q3** | **Q4** |
| **Min:** | 29.00000 | 24.00000 | 22.00000 | 30.00000 |
| **1st Qu.:** | 70.00000 | 37.00000 | 42.00000 | 44.25000 |
| **Mean:** | 125.91837 | 83.15789 | 107.46154 | 93.25000 |
| **Median:** | 101.00000 | 62.00000 | 73.50000 | 56.00000 |
| **3rd Qu.:** | 169.00000 | 116.00000 | 131.50000 | 124.50000 |
| **Max:** | 342.00000 | 216.00000 | 337.00000 | 276.00000 |
| **Total N:** | 49.00000 | 57.00000 | 78.00000 | 20.00000 |
| **NA's :** | 0.00000 | 0.00000 | 0.00000 | 0.00000 |
| **Std Dev.:** | 80.90319 | 53.63427 | 83.55474 | 77.45279 |
| **2008** | **Q1** | **Q2** | **Q3** | **Q4** |
| **Min:** | 31.00000 | 28.00000 | 26.00000 | 27.00000 |
| **1st Qu.:** | 49.25000 | 50.00000 | 46.50000 | 45.50000 |
| **Mean:** | 113.00000 | 83.98361 | 72.36842 | 67.38889 |
| **Median:** | 108.50000 | 72.00000 | 56.00000 | 61.00000 |
| **3rd Qu.:** | 153.75000 | 109.00000 | 89.50000 | 79.75000 |
| **Max:** | 238.00000 | 201.00000 | 182.00000 | 139.00000 |
| **Total N:** | 34.00000 | 61.00000 | 38.00000 | 18.00000 |
| **NA's :** | 0.00000 | 0.00000 | 0.00000 | 0.00000 |
| **Std Dev.:** | 63.25993 | 42.87132 | 38.15432 | 31.80111 |



Varshavsky Aid Continuing Resolved Cases
Time from Request Date to Issue Date reduced for adjournments (Histogram)

## 1.2   *Varshavsky Aid Continuing No Issue Date Cases*

101 Fair Hearing Numbers (Cases)

Of the 3259 Varshavsky Aid-continuing cases, 101 had no issue date. Presumably, in many of these cases, the hearing that would eventually resolve the case had not yet taken place when the data file was produced. These data are called censored data because we do not know the date of final resolution at the time when the file was produced. We have sophisticated techniques available for making adjustments to the results.

**Varshavsky Litigation Aid Continuing: No Issue Date Cases**

| *Count of Cases by Quarter of the Hearing Request Date* | | | | | |
|---|---|---|---|---|---|
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Grand Total |
| 2004 | | | 1 | 1 | 2 |
| 2005 | | 1 | | | 1 |
| 2006 | | | 1 | 1 | 2 |
| 2007 | 2 | 1 | 2 | 4 | 9 |
| 2008 | 1 | 10 | 13 | 63 | 87 |
| | 3 | 12 | 17 | 69 | 101 |

## 1.3   *Varshavsky Aid Continuing with Default, Withdrawn or Reopened Denied*

1810 Fair Hearing Numbers (Cases)

Of the 3259 Varshavsky Aid Continuing cases, 1810 (55.5%) ended in a default, were withdrawn, or were denied reopening. In as much as the resolution of the case took place without a hearing, client-waiting time could be set to zero or assumed to be some time between the request date and the scheduled hearing date.

**Varshavsky Litigation Aid Continuing: Default, Withdrawn or Reopened Denied Cases**

| *Count of Cases by Quarter of the Hearing Request Date* | | | | | |
|---|---|---|---|---|---|
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Grand Total |
| 2004 | 127 | 136 | 179 | 88 | 530 |
| 2005 | 111 | 186 | 90 | 95 | 482 |
| 2006 | 69 | 92 | 121 | 74 | 356 |
| 2007 | 61 | 57 | 59 | 52 | 229 |

**Varshavsky Litigation Aid Continuing: Default, Withdrawn or Reopened Denied Cases**

| Count of Cases by Quarter of the Hearing Request Date | | | | | |
|---|---|---|---|---|---|
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Grand Total |
| 2008 | 53 | 53 | 60 | 47 | 213 |
| | 421 | 524 | 509 | 356 | 1810 |

## 1.4 Varshavsky Non aid Resolved by Hearing Cases

1117 Fair Hearing Numbers (Cases)

Of the 3760 Varshavsky Non aid cases, 1117 (30%) were resolved by fair hearing. Most of the rest, 60% were either withdrawn, resolved by default, were cases where reopening was denied. For the 1117 cases that were resolved by fair hearing three-quarters were resolved within 242 days, half were resolved within 147 days, while 25% of them were resolved within 75 days (see table below).

**Varshavsky Litigation Non Aid: Resolved Cases**

| Proportion of Days to Issue less than or equal to 90 | | | | | |
|---|---|---|---|---|---|
| | Quarter of the Hearing Request Date | | | | |
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Grand Total |
| 2004 | 0.19 | 0.19 | 0.12 | 0.28 | 0.19 |
| 2005 | 0.22 | 0.24 | 0.14 | 0.10 | 0.19 |
| 2006 | 0.10 | 0.05 | 0.04 | 0.17 | 0.08 |
| 2007 | 0.45 | 0.68 | 0.54 | 0.56 | 0.56 |
| 2008 | 0.73 | 0.69 | 0.88 | 0.95 | 0.80 |



| *** Summary Statistics *** | Total | Agency Affirmed: NO | Agency Affirmed: YES |
|---|---|---|---|
| Min: | 22.0000 | 22.0000 | 28.0000 |
| 1st Qu.: | 75.0000 | 74.0000 | 80.0000 |
| Mean: | 174.7887 | 174.5666 | 177.6296 |
| Median: | 147.0000 | 146.0000 | 155.0000 |
| 3rd Qu.: | 242.0000 | 243.0000 | 230.0000 |
| Max: | 686.0000 | 686.0000 | 541.0000 |
| Total N: | 1117.0000 | 1036.0000 | 81.0000 |
| NA's : | 0.0000 | 0.0000 | 0.0000 |
| Std Dev.: | 121.4486 | 121.3134 | 123.8947 |

The trellis graphic below depicts differences in waiting times for the 1117 Varshavsky Non aid Resolved by hearing cases by calendar year. For cases where hearings were requested in 2008 and resolved by hearing, most waiting times were less than 90 days. 2007 and 2008 were an improvement over previous years.

| *** Summary Statistics *** | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Min: | 25.0000 | 27.0000 | 26.00000 | 22.00000 | 23.00000 |
| 1st Qu.: | 112.5000 | 99.2500 | 133.50000 | 38.50000 | 35.00000 |
| Mean: | 216.2324 | 220.6341 | 192.90708 | 93.52558 | 63.59223 |
| Median: | 211.0000 | 177.0000 | 179.50000 | 71.00000 | 46.00000 |
| 3rd Qu.: | 307.5000 | 353.7500 | 238.50000 | 134.00000 | 74.50000 |
| Max: | 541.0000 | 686.0000 | 554.00000 | 325.00000 | 245.00000 |
| Total N: | 327.0000 | 246.0000 | 226.00000 | 215.00000 | 103.00000 |
| NA's : | 0.0000 | 0.0000 | 0.00000 | 0.00000 | 0.00000 |
| Std Dev.: | 120.4961 | 142.0040 | 89.57309 | 66.54229 | 42.92342 |

Below are a series of box-plots depicting the trend in waiting times for the 1117 Varshavsky Non aid Resolved by hearing cases by quarter. Since the very bad first quarter, 2006, we notice a declining trend in both median waiting time and the range. (A box plot depicts a distribution by graphically displaying the location of the five summary statistics, minimum, 25th percentile, median, 75th percentile and maximum). The trellis display of histograms for the four quarters of 2008 give the same impression as the box plots, i.e. waiting times are smaller in the second half of 2008 than they were earlier in the year. Summary statistics by year are tabled below.





### 2004

|  | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Min: | 25.00000 | 30.0000 | 42.0000 | 27.0000 |
| 1st Qu.: | 119.00000 | 118.5000 | 128.2500 | 85.0000 |
| Mean: | 187.77660 | 219.2051 | 249.2447 | 205.4098 |
| Median: | 206.50000 | 254.5000 | 244.0000 | 155.0000 |
| 3rd Qu.: | 241.50000 | 314.5000 | 370.0000 | 284.0000 |
| Max: | 325.00000 | 391.0000 | 524.0000 | 541.0000 |
| Total N: | 94.00000 | 78.0000 | 94.0000 | 61.0000 |
| NA's : | 0.00000 | 0.0000 | 0.0000 | 0.0000 |
| Std Dev.: | 80.42898 | 110.9542 | 134.2723 | 148.3613 |

### 2005

|  | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Min: | 27.0000 | 27.0000 | 34.0000 | 57.0000 |
| 1st Qu.: | 91.7500 | 98.5000 | 117.0000 | 131.0000 |
| Mean: | 236.0921 | 192.1250 | 241.2449 | 217.9388 |
| Median: | 175.0000 | 137.0000 | 214.0000 | 200.0000 |
| 3rd Qu.: | 392.2500 | 252.2500 | 377.0000 | 316.0000 |
| Max: | 539.0000 | 686.0000 | 666.0000 | 437.0000 |
| Total N: | 76.0000 | 72.0000 | 49.0000 | 49.0000 |
| NA's : | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| Std Dev.: | 160.6553 | 137.3708 | 145.8582 | 106.6383 |

### 2006

|  | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Min: | 26.00000 | 63.00000 | 64.00000 | 50.0000 |
| 1st Qu.: | 143.00000 | 161.00000 | 132.00000 | 106.0000 |
| Mean: | 216.70588 | 214.92857 | 178.29114 | 174.6852 |
| Median: | 237.00000 | 194.50000 | 161.00000 | 170.0000 |
| 3rd Qu.: | 271.00000 | 234.50000 | 214.50000 | 219.7500 |
| Max: | 409.00000 | 495.00000 | 554.00000 | 480.0000 |
| Total N: | 51.00000 | 42.00000 | 79.00000 | 54.0000 |
| NA's : | 0.00000 | 0.00000 | 0.00000 | 0.0000 |
| Std Dev.: | 94.56623 | 97.03014 | 78.22324 | 88.0364 |

### 2007

|  | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Min: | 25.00000 | 24.00000 | 22.00000 | 23.00000 |
| 1st Qu.: | 53.00000 | 27.00000 | 38.00000 | 42.00000 |
| Mean: | 107.97872 | 74.98333 | 98.04348 | 96.64103 |
| Median: | 106.00000 | 53.50000 | 76.00000 | 81.00000 |
| 3rd Qu.: | 138.00000 | 104.25000 | 139.00000 | 138.00000 |
| Max: | 310.00000 | 325.00000 | 254.00000 | 288.00000 |
| Total N: | 47.00000 | 60.00000 | 69.00000 | 39.00000 |
| NA's : | 0.00000 | 0.00000 | 0.00000 | 0.00000 |
| Std Dev.: | 66.24181 | 64.29131 | 66.63563 | 66.42665 |

### 2008

|  | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Min: | 26.00000 | 23.00000 | 25.00000 | 30.00000 |
| 1st Qu.: | 38.25000 | 33.00000 | 33.75000 | 40.00000 |
| Mean: | 72.10000 | 67.96552 | 52.50000 | 57.80000 |
| Median: | 46.50000 | 50.00000 | 43.00000 | 56.00000 |
| 3rd Qu.: | 90.50000 | 102.00000 | 47.25000 | 71.75000 |
| Max: | 245.00000 | 206.00000 | 161.00000 | 120.00000 |
| Total N: | 30.00000 | 29.00000 | 24.00000 | 20.00000 |
| NA's : | 0.00000 | 0.00000 | 0.00000 | 0.00000 |
| Std Dev.: | 54.38899 | 47.12103 | 32.79581 | 21.62017 |

Page 16 of 40



### 1.5 Varshavsky Non aid No Issue Date Cases

57 Fair Hearing Numbers (Cases)

Of the 3760 Non-Varshavsky Non-Aid cases, 57 had no issue date. Presumably, in many of these cases, the hearing that would eventually resolve the case had not yet taken place when the data file was produced. These data are called censored data because we do not know the date of final resolution at the time when the file was produced. We have sophisticated techniques available for making adjustments to the results, but with only 57 of the 3760 cases missing the resolution data, there would be no appreciable change in the findings. That is, if one may safely assume that the missing times follow the same distribution as the 3703 known times, conclusions will be robust under violation of this assumption. We need only be cautious when interpreting our 4th quarter 2008 quarterly data.

**Varshavsky Litigation Non Aid: No Issue Date Cases**

| Count of Cases by Quarter of the Hearing Request Date | | | | | |
|---|---|---|---|---|---|
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Total |
| 2004 |  | 1 |  |  | 1 |
| 2005 | 1 | 2 |  | 1 | 4 |
| 2006 | 1 | 1 | 3 |  | 5 |
| 2007 |  | 2 | 1 | 3 | 6 |
| 2008 |  | 7 | 8 | 26 | 41 |
|  | 2 | 13 | 12 | 30 | 57 |

### 1.6 Varshavsky Non aid Cases with Default, Withdrawn or Reopen Denied

2586 Fair Hearing Numbers (Cases)

Page **17** of **40**

Of the 3760 Varshavsky Non-Aid cases, 2586 (69%) ended in a default, were withdrawn, or were denied reopening. In as much as the resolution of the case took place without a hearing, client-waiting time could be set to zero or assumed to be some time between the request date and the scheduled hearing date.

**Varshavsky Litigation Non Aid: Cases with DEF, WITH, RPDN**

| Count of Cases by Quarter of the Hearing Request Date | | | | | |
|---|---|---|---|---|---|
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Total |
| 2004 | 226 | 214 | 223 | 164 | 827 |
| 2005 | 188 | 232 | 155 | 124 | 699 |
| 2006 | 124 | 166 | 135 | 92 | 517 |
| 2007 | 82 | 89 | 88 | 73 | 332 |
| 2008 | 65 | 53 | 54 | 39 | 211 |
| | 685 | 754 | 655 | 492 | 2586 |

## 1.7  Non-Varshavsky Aid Continuing Resolved by Hearing Cases

2857 Fair Hearing Numbers (Cases)

Of the 9098 Non-Varshavsky Aid Continuing cases, 2857 (31%) were resolved by fair hearing. Most of the rest, were either withdrawn, resolved by default, were cases where reopening was denied. For the 2857 cases that were resolved by fair hearing three-quarters were resolved within 49 days, half were resolved within 39 days, while 25% of them were resolved within 34 days (see table below).

**Non Varshavsky  Litigation Aid Continuing: Resolved Cases**

| Proportion of Days to Issue less than or equal to 90 | | | | | |
|---|---|---|---|---|---|
| | Quarter of the Hearing Request Date | | | | |
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Total |
| 2004 | 0.94 | 0.96 | 0.93 | 0.96 | 0.95 |
| 2005 | 0.94 | 0.91 | 0.92 | 0.87 | 0.92 |
| 2006 | 0.44 | 0.20 | 0.09 | 0.12 | 0.32 |
| 2007 | 0.18 | 0.36 | 0.63 | 0.28 | 0.40 |
| 2008 | 0.45 | 0.59 | 0.75 | 0.80 | 0.59 |



| *** Summary Statistics *** | Total | Agency Affirmed: NO | Agency Affirmed: YES |
|---|---|---|---|
| Min: | 22.00000 | 22.00000 | 25.00000 |
| 1st Qu.: | 34.00000 | 35.00000 | 34.00000 |
| Mean: | 63.74169 | 83.65337 | 47.02254 |
| Median: | 39.00000 | 41.00000 | 38.00000 |
| 3rd Qu.: | 49.00000 | 72.00000 | 46.00000 |
| Max: | 880.00000 | 837.00000 | 880.00000 |
| Total N: | 2857.00000 | 1304.00000 | 1553.00000 |
| NA's : | 0.00000 | 0.00000 | 0.00000 |
| Std Dev.: | 78.53905 | 103.41557 | 41.94445 |

The trellis graphic below depicts differences in waiting times for the 2857 Non-Varshavsky Aid Continuing Resolved cases by calendar year. We note that waiting times in 2004 and 2005 were mostly within 90 days. For cases where hearings were requested in 2008 and resolved by hearing, most waiting times were less than 90 days. Years 2007 and 2008 were an improvement over 2006.



| *** Summary Statistics *** | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Min: | 25.00000 | 25.00000 | 26.00000 | 22.00000 | 24.00000 |
| 1st Qu.: | 35.00000 | 32.00000 | 84.00000 | 55.25000 | 49.75000 |
| Mean: | 51.00520 | 62.45561 | 150.97872 | 132.11111 | 101.87500 |
| Median: | 39.00000 | 37.00000 | 113.00000 | 117.50000 | 72.00000 |
| 3rd Qu.: | 43.00000 | 51.00000 | 204.00000 | 181.00000 | 145.00000 |
| Max: | 533.00000 | 880.00000 | 443.00000 | 386.00000 | 337.00000 |
| Total N: | 1537.00000 | 1025.00000 | 141.00000 | 90.00000 | 64.00000 |
| NA's : | 0.00000 | 0.00000 | 0.00000 | 0.00000 | 0.00000 |
| Std Dev.: | 56.27912 | 92.13354 | 92.05297 | 90.53504 | 69.68102 |

Below are a series of box-plots depicting the trend in waiting times for the 2857 Non-Varshavsky Aid
Continuing Resolved by hearing cases by quarter. Again we see that in the 2004 and 2005 quarters,
most waiting times were less than 90 days with a small number of extreme exceptions. Since the very
bad third quarter, 2006, we notice a declining trend in both median waiting time and the range. (A box
plot depicts a distribution by graphically displaying the location of the five summary statistics, minimum,
25th percentile, median, 75th percentile and maximum). The trellis display of histograms for the four
quarters of 2008 give the same impression as the box plots, i.e. waiting times are smaller in the second
half of 2008 than they were earlier in the year. Summary statistics by year are tabled below.





*** Summary Statistics ***

| 2004 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Min: | 34.00000 | 29.00000 | 25.00000 | 27.00000 |
| 1st Qu.: | 41.00000 | 35.00000 | 31.00000 | 33.00000 |
| Mean: | 56.64516 | 50.09627 | 50.52025 | 47.43989 |
| Median: | 42.00000 | 41.00000 | 35.00000 | 36.00000 |
| 3rd Qu.: | 46.00000 | 43.00000 | 38.00000 | 40.00000 |
| Max: | 404.00000 | 378.00000 | 526.00000 | 533.00000 |
| Total N: | 341.00000 | 509.00000 | 321.00000 | 366.00000 |
| NA's: | 0.00000 | 0.00000 | 0.00000 | 0.00000 |
| Std Dev: | 53.39008 | 49.83773 | 65.47299 | 58.43508 |
| 2005 | Q1 | Q2 | Q3 | Q4 |
| Min: | 26.00000 | 25.00000 | 25.00000 | 29.00000 |

JA158

| | | | | |
|---|---|---|---|---|
| 1st Qu.: | 34.00000 | 30.00000 | 32.00000 | 38.00000 |
| Mean: | 53.40517 | 69.34848 | 63.22545 | 70.55797 |
| Median: | 35.00000 | 35.00000 | 40.00000 | 49.00000 |
| 3rd Qu.: | 41.00000 | 47.00000 | 61.50000 | 63.00000 |
| Max: | 498.00000 | 880.00000 | 580.00000 | 619.00000 |
| Total N: | 348.00000 | 264.00000 | 275.00000 | 138.00000 |
| NA's : | 0.00000 | 0.00000 | 0.00000 | 0.00000 |
| Std Dev.: | 73.59907 | 119.88600 | 84.75301 | 86.04183 |
| **2006** | **Q1** | **Q2** | **Q3** | **Q4** |
| Min: | 30.00000 | 26.0000 | 34.0000 | 32.00000 |
| 1st Qu.: | 79.00000 | 162.5000 | 231.7500 | 122.00000 |
| Mean: | 106.66667 | 218.0000 | 261.9545 | 175.00000 |
| Median: | 95.00000 | 204.0000 | 269.5000 | 173.00000 |
| 3rd Qu.: | 114.00000 | 287.5000 | 293.5000 | 224.00000 |
| Max: | 380.00000 | 404.0000 | 443.0000 | 361.00000 |
| Total N: | 87.00000 | 15.0000 | 22.0000 | 17.00000 |
| NA's : | 0.00000 | 0.0000 | 0.0000 | 0.00000 |
| Std Dev.: | 50.41102 | 105.9858 | 92.4819 | 83.64434 |
| **2007** | **Q1** | **Q2** | **Q3** | **Q4** |
| Min: | 43.00000 | 28.0000 | 22.00000 | 27.00000 |
| 1st Qu.: | 99.00000 | 76.0000 | 36.25000 | 88.50000 |
| Mean: | 142.88235 | 162.8800 | 87.40000 | 153.72222 |
| Median: | 118.00000 | 137.0000 | 59.50000 | 150.00000 |
| 3rd Qu.: | 164.00000 | 240.0000 | 145.25000 | 214.00000 |
| Max: | 371.00000 | 386.0000 | 249.00000 | 272.00000 |
| Total N: | 17.00000 | 25.0000 | 30.00000 | 18.00000 |
| NA's : | 0.00000 | 0.0000 | 0.00000 | 0.00000 |
| Std Dev.: | 81.49301 | 111.9302 | 65.20715 | 78.67716 |
| **2008** | **Q1** | **Q2** | **Q3** | **Q4** |
| Min: | 28.00000 | 29.00000 | 38.00000 | 24.00000 |
| 1st Qu.: | 58.75000 | 54.50000 | 44.50000 | 43.00000 |
| Mean: | 131.10000 | 98.33333 | 78.58333 | 60.00000 |
| Median: | 124.00000 | 71.00000 | 60.50000 | 56.00000 |
| 3rd Qu.: | 170.75000 | 133.50000 | 85.75000 | 57.00000 |
| Max: | 337.00000 | 239.00000 | 199.00000 | 120.00000 |
| Total N: | 20.00000 | 27.00000 | 12.00000 | 5.00000 |
| NA's : | 0.00000 | 0.00000 | 0.00000 | 0.00000 |
| Std Dev.: | 86.15158 | 61.67907 | 50.50015 | 36.09016 |



## 1.8  Non-Varshavsky Aid Continuing No Issue Date Cases

35 Fair Hearing Numbers (Cases)

Of the 9098 Non-Varshavsky Aid-continuing cases, 35 had no issue date.  Presumably, in many of these cases, the hearing that would eventually resolve the case had not yet taken place when the data file was produced.  These data are called censored data because we do not know the date of final resolution at the time when the file was produced.  We have sophisticated techniques available for making adjustments to the results.  That is, if one may safely assume that the missing times follow the same distribution as the 9063 known times, conclusions will be robust under violation of this assumption.

### Non Varshavsky Aid Continuing: No Issue Date Cases

| Count of Cases by Quarter of the Hearing Request Date | | | | | |
|---|---|---|---|---|---|
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Total |
| 2004 | | | | | |
| 2005 | | | | | |
| 2006 | | | | | |
| 2007 | | | 2 | 5 | 7 |
| 2008 | 7 | 5 | 7 | 9 | 28 |
| | 7 | 5 | 9 | 14 | 35 |

## 1.9  Non-Varshavsky Aid Continuing with Default, Withdrawn or Reopened Denied

6206 Fair Hearing Numbers (Cases)

Of the 9098 Non-Varshavsky Aid Continuing cases, 6206 (68%) ended in a default, were withdrawn, or were denied reopening. In as much as the resolution of the case took place without a hearing, client-waiting time could be set to zero or assumed to be some time between the request date and the scheduled hearing date.

**Non Varshavsky Aid Continuing: Default, Withdrawn or Reopened Denied Cases**

| Count of Cases by Quarter of the Hearing Request Date | | | | | |
|---|---|---|---|---|---|
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Total |
| 2004 | 712 | 969 | 629 | 617 | 2927 |
| 2005 | 660 | 573 | 472 | 518 | 2223 |
| 2006 | 701 | 55 | 40 | 40 | 836 |
| 2007 | 38 | 26 | 29 | 31 | 124 |
| 2008 | 41 | 30 | 11 | 14 | 96 |
| | 2152 | 1653 | 1181 | 1220 | 6206 |

## 1.10 Non-Varshavsky Non aid Resolved by Hearing Cases

2124 Fair Hearing Numbers (Cases)

Of the 5979 Non-Varshavsky Non Aid cases, 2124 (35.5%) were resolved by fair hearing. Most of the rest, 64% were either withdrawn, resolved by default, were cases where reopening was denied. For the 2124 cases that were resolved by fair hearing three-quarters were resolved within 146 days, half were resolved within 49 days, while 25% of them were resolved within 35 days (see table below).

**Non Varshavsky  Litigation Non Aid: Resolved Cases**

| Proportion of Days to Issue less than or equal to 90 | | | | | |
|---|---|---|---|---|---|
| | Quarter of the Hearing Request Date | | | | |
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Total |
| 2004 | 0.72 | 0.76 | 0.76 | 0.62 | 0.72 |
| 2005 | 0.74 | 0.74 | 0.70 | 0.74 | 0.72 |
| 2006 | 0.14 | 0.32 | 0.17 | 0.04 | 0.12 |
| 2007 | 0.55 | 0.60 | 0.68 | 0.52 | 0.58 |
| 2008 | 0.49 | 0.56 | 0.79 | 0.81 | 0.66 |



| *** Summary Statistics *** | Total | Agency Affirmed: NO | Agency Affirmed: YES |
|---|---|---|---|
| Min: | 21.0000 | 21.0000 | 22.00000 |
| 1st Qu.: | 35.0000 | 38.5000 | 34.00000 |
| Mean: | 108.3639 | 133.4604 | 68.84848 |
| Median: | 49.0000 | 85.0000 | 40.00000 |
| 3rd Qu.: | 146.0000 | 193.0000 | 57.00000 |
| Max: | 632.0000 | 632.0000 | 463.00000 |
| Total N: | 2124.0000 | 1299.0000 | 825.00000 |
| NA's : | 0.0000 | 0.0000 | 0.00000 |
| Std Dev.: | 109.6442 | 119.5201 | 76.90937 |

The trellis graphic below depicts differences in waiting times for the 2124 Non-Varshavsky Non aid cases by calendar year. We note that waiting times in 2004 and 2005 were mostly within 90 days, some cases took much longer, i.e. the range of waiting times is large. For cases where hearings were requested in 2008 and resolved by hearing, most waiting times were less than 90 days and some were more. Years 2007 and 2008 were an improvement over 2006, but despite the range of waiting times being smaller than 2004, 2005 and 2006, the proportion of cases resolved within 90 days was less than in 2004 and 2005.

Page 25 of 40

**JA162**



**Non-Varshavsky Non Aid Resolved Cases**

Time from Request Date to Issue Date reduced for adjournments (Relative Frequency Histogram)

| *** Summary Statistics *** | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Min: | 25.00000 | 22.00000 | 27.00000 | 21.00000 | 23.00000 |
| 1st Qu.: | 35.00000 | 34.0000 | 116.00000 | 35.00000 | 37.75000 |
| Mean: | 98.28177 | 107.6153 | 188.29187 | 102.55708 | 77.20745 |
| Median: | 42.00000 | 42.0000 | 181.00000 | 72.00000 | 62.00000 |
| 3rd Qu.: | 118.00000 | 110.0000 | 255.00000 | 147.00000 | 113.00000 |
| Max: | 539.00000 | 632.0000 | 441.00000 | 392.00000 | 261.00000 |
| Total N: | 905.00000 | 603.0000 | 209.00000 | 219.00000 | 188.00000 |
| NA's : | 0.00000 | 0.0000 | 0.00000 | 0.00000 | 0.00000 |
| Std Dev.: | 107.79050 | 128.1755 | 86.76004 | 83.98411 | 46.71251 |

Below are a series of box-plots depicting the trend in waiting times for the 2124 Non-Varshavsky Non aid cases by quarter. Again we see that in the 2004 and 2005 quarters, most waiting times were less than 90 days with a small number of extreme exceptions. Since the very bad third quarter, 2006, we notice a declining trend in both median waiting time and the range. (A box plot depicts a distribution by graphically displaying the location of the five summary statistics, minimum, 25th percentile, median, 75th

**Page 26 of 40**

**JA163**

percentile and maximum). The trellis display of histograms for the four quarters of 2008 give the same impression as the box plots, i.e. waiting times are smaller in the second half of 2008 than they were earlier in the year. Summary statistics by year are tabled below.





| 2004 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Min: | 27.00000 | 28.00000 | 25.00000 | 26.0000 |
| 1st Qu.: | 42.00000 | 37.00000 | 32.00000 | 35.0000 |
| Mean: | 104.78500 | 97.52239 | 91.40244 | 101.3979 |

Page **27** of **40**

JA164

| | | | | |
|---|---|---|---|---|
| **Median:** | 48.50000 | 43.00000 | 36.00000 | 39.0000 |
| **3rd Qu.:** | 172.25000 | 117.25000 | 87.25000 | 99.0000 |
| **Max:** | 406.00000 | 413.00000 | 505.00000 | 539.0000 |
| **Total N:** | 200.00000 | 268.00000 | 246.00000 | 191.0000 |
| **NA's:** | 0.00000 | 0.00000 | 0.00000 | 0.0000 |
| **Std Dev.:** | 90.24361 | 100.40978 | 112.43805 | 127.1416 |
| **2005** | **Q1** | **Q2** | **Q3** | **Q4** |
| **Min:** | 27.00000 | 24.0000 | 22.0000 | 22.0000 |
| **1st Qu.:** | 34.00000 | 32.0000 | 32.0000 | 48.5000 |
| **Mean:** | 98.42162 | 106.4824 | 104.3554 | 137.3049 |
| **Median:** | 37.00000 | 40.0000 | 47.5000 | 77.5000 |
| **3rd Qu.:** | 63.00000 | 99.2500 | 92.5000 | 215.0000 |
| **Max:** | 632.00000 | 512.0000 | 504.0000 | 463.0000 |
| **Total N:** | 185.00000 | 170.0000 | 166.0000 | 82.0000 |
| **NA's:** | 0.00000 | 0.0000 | 0.0000 | 0.0000 |
| **Std Dev.:** | 135.35660 | 128.0186 | 124.1114 | 117.4784 |
| **2006** | **Q1** | **Q2** | **Q3** | **Q4** |
| **Min:** | 27.0000 | 27.00000 | 66.00000 | 27.00000 |
| **1st Qu.:** | 99.0000 | 177.25000 | 130.00000 | 103.50000 |
| **Mean:** | 189.4310 | 214.43548 | 181.97674 | 157.52174 |
| **Median:** | 158.0000 | 203.50000 | 174.00000 | 142.50000 |
| **3rd Qu.:** | 280.5000 | 284.25000 | 242.50000 | 202.25000 |
| **Max:** | 386.0000 | 406.00000 | 356.00000 | 441.00000 |
| **Total N:** | 58.0000 | 62.00000 | 43.00000 | 46.00000 |
| **NA's:** | 0.0000 | 0.00000 | 0.00000 | 0.00000 |
| **Std Dev.:** | 101.5907 | 84.88481 | 70.02261 | 73.66855 |
| **2007** | **Q1** | **Q2** | **Q3** | **Q4** |
| **Min:** | 21.0000 | 22.00000 | 21.00000 | 24.00000 |
| **1st Qu.:** | 40.0000 | 33.00000 | 34.00000 | 52.00000 |
| **Mean:** | 115.6735 | 89.10204 | 88.88235 | 120.41509 |
| **Median:** | 70.0000 | 59.00000 | 78.00000 | 97.00000 |
| **3rd Qu.:** | 167.0000 | 117.00000 | 133.25000 | 160.00000 |
| **Max:** | 392.0000 | 321.00000 | 246.00000 | 348.00000 |
| **Total N:** | 49.0000 | 49.00000 | 68.00000 | 53.00000 |
| **NA's:** | 0.0000 | 0.00000 | 0.00000 | 0.00000 |
| **Std Dev.:** | 110.7735 | 78.09563 | 57.93165 | 85.94552 |
| **2008** | **Q1** | **Q2** | **Q3** | **Q4** |
| **Min:** | 25.00000 | 23.00000 | 27.00000 | 29.00000 |
| **1st Qu.:** | 43.00000 | 33.00000 | 34.50000 | 49.50000 |
| **Mean:** | 92.96364 | 76.90476 | 61.64103 | 69.45161 |
| **Median:** | 93.00000 | 58.00000 | 49.00000 | 63.00000 |
| **3rd Qu.:** | 132.00000 | 128.50000 | 74.00000 | 85.50000 |
| **Max:** | 204.00000 | 261.00000 | 145.00000 | 154.00000 |
| **Total N:** | 55.00000 | 63.00000 | 39.00000 | 31.00000 |
| **NA's:** | 0.00000 | 0.00000 | 0.00000 | 0.00000 |
| **Std Dev.:** | 51.94725 | 52.08018 | 34.24255 | 28.65175 |



## 1.11 Non-Varshavsky Non aid No Issue Date Cases

31 Fair Hearing Numbers (Cases)

Of the 5979 Non-Varshavsky Non aid cases, 31 had no issue date. Presumably, in many of these cases, the hearing that would eventually resolve the case had not yet taken place when the data file was produced. These data are called censored data because we do not know the data of final resolution at the time when the file was produced. We have sophisticated techniques available for making adjustments to the results, but with only 31 of the 5979 cases missing the resolution data, there would be no appreciable change in the findings. That is, if one may safely assume that the missing times follow the same distribution as the 5848 known times, conclusions will be robust under violation of this assumption.

### Non Varshavsky Non Aid Continuing: No Issue Date Cases

| Count of Cases by Quarter of the Hearing Request Date | | | | | |
|---|---|---|---|---|---|
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Total |
| 2004 | 0 | 0 | 0 | 0 | 0 |
| 2005 | 0 | 0 | 0 | 0 | 0 |
| 2006 | 0 | 0 | 0 | 1 | 1 |
| 2007 | 2 | 0 | 1 | 2 | 5 |
| 2008 | 3 | 3 | 2 | 17 | 25 |
| | 5 | 3 | 3 | 20 | 31 |

Page 29 of 40

**JA166**

## 1.12 Non-Varshavsky Non Aid Cases with Default, Withdrawn or Reopened Denied

3824 Fair Hearing Numbers (Cases)

Of the 5979 Non-Varshavsky Non aid cases, 3824 (64%) ended in a default, were withdrawn, or were denied reopening. In as much as the resolution of the case took place without a hearing, client-waiting time could be set to zero or assumed to be some time between the request data and the scheduled hearing data.

**Non Varshavsky Non Aid: Cases with DEF, WITH, RPDN**

| Count of Cases by Quarter of the Hearing Request Date | | | | | |
|---|---|---|---|---|---|
| Year of the Hearing Request Date | Q1 | Q2 | Q3 | Q4 | Total |
| 2004 | 366 | 490 | 457 | 349 | 1662 |
| 2005 | 372 | 317 | 334 | 278 | 1301 |
| 2006 | 343 | 73 | 43 | 51 | 510 |
| 2007 | 52 | 38 | 54 | 59 | 203 |
| 2008 | 59 | 40 | 24 | 25 | 148 |
| | 1192 | 958 | 912 | 762 | 3824 |

# 2 Discussion of Dr. Faust's Analysis

I have reviewed the report by Richard Faust of March 2009. Mr. Faust's report is based on data that he obtained from a variety of sources. As described above I obtained a spreadsheet of 22,096 Home Health Care fair hearing cases from NYS OTDA. The cases in this file had fair hearing request dates in calendar years 2004 through 2008. Some of the data analyzed by Mr. Faust is a subset of the data provided to me. Mr. Faust had available to him fair hearing requests in calendar years 2004-2006 and the first seven months of 2008.

In as much as the data from which I worked was not the same as the data from which Mr. Faust worked, one would expect the results to differ somewhat. However, the impression that I get from my analyses is that my conclusions differ considerably from Mr. Faust's impression. This difference is due in part and most likely in large part, to the way we have conditioned our analyses. The statistics that I developed are

conditioned on a client having requested a Home Health Care fair hearing, while it appears that Mr. Faust's analysis is conditioned on a hearing being held and a finding issued, and in some instances on cases without adjournments and cases in which the agency was not affirmed. One way in which my analysis differs from that of Mr. Faust is that I have developed separate analyses for twelve different categories of resolution (see schematic in section 1), thus allowing conclusions to be drawn about each category of cases and for the weighted combing of the results to yield results over all categories of cases. This ability to develop conclusions for the entire population of fair hearing requests and for the specific subgroups is not available in Mr. Faust's approach.

In one of Mr. Faust's analyses, he begins with the fair hearing requests in the years 2004-2006, but apparently confines his analysis to the period of one year beginning in May 2005 and focuses on 525 cases from that period. By limiting the analysis to a specific time period, one may not draw conclusions to dates outside of the considered range. We note from my analysis, that performance in processing fair hearing requests is easily the worst in 2006, thus any inferences made to dates outside this period would be biased in favor of the plaintiffs' claim. Then apparently, despite being Home Health Care fair hearing requests, cases involving Medicaid eligibility and cases where decisions affirmed the agency were also removed from consideration. These cases were then matched with a sample (although there is no evidence that this was a random sample or any type of probability sample) of 100 cases for analysis. Thirty-six of these 100 cases were eliminated for various reasons (e.g., the case was aid-continuing, withdrawn, etc.) leaving 64 cases upon which a confidence interval was constructed in paragraph 31, apparently using the Wald method, well known in the statistical literature to be an unreliable method. Even if the method was reliable and the sample was random, inference could only be drawn to cases brought in mid 2005 and mid 2006 that did not involve issues of Medicaid eligibility; and were heard; and the agency was not affirmed.

In contrast to Mr. Faust's impression, we find proportion of cases resolved by hearing in less than 90 days to be approximately 88% and 64% in aid continuing and non-aid cases, respectively, for non-Varshavsky cases. Correspondingly, figures for Varshavsky litigation cases would be 40% and 29% in aid continuing and non-aid cases, respectively. And in cases resolved by default or withdrawn between request date and hearing date, the majority of the cases, all cases are of course resolved within 90 days. Overall, approximately 88% of all fair hearing requests during the period from 2004 through 2008 were resolved within 90 days (92.6% for non-Varshavsky cases).

For 2008, we find proportion of cases resolved by hearing in less than 90 days to be approximately 59% and 66% in aid continuing and non-aid cases, respectively, for non-Varshavsky cases. Correspondingly, figures for Varshavsky litigation cases would be 74% and 80% in aid continuing and non-aid cases, respectively. And in cases resolved by default or withdrawn between request date and hearing date, the majority of the cases, are resolved within 90 days. Overall for 2008, approximately 90.8% of all fair hearing requests were resolved within 90 days.

# 3 Credentials

## 3.1 Recent relevant testimony or expert reports

NYS DOH Fair Hearing in February 2009

Testimony before the grand jury in the Medicaid fraud case of Dr. Rosen in June 2007

Expert report in Meachem litigation 2004

## 3.2 Education

| | |
|---|---|
| **1977** | *Doctor of Education in College Teaching of Statistics, Teachers College, Columbia University, New York, NY* |
| **1974** | *Master of Science in Applied Statistics, Columbia University, New York, NY* |
| **1969** | *Master of Science in Educational and Psychological Research, Florida State University, Tallahassee, FL* |
| **1965** | *Bachelor of Science in Mathematics, Bucknell University, Lewisburg, PA* |

## 3.3 Professional and Related Experience

**1984-present    Associate Professor of Statistics, SUNY New Paltz, New Paltz, NY**

*Teaching of introductory statistics and management science, linear models and design of experiments.*

**1977-1984  Assistant Professor of Statistics, Rensselaer Polytechnic Institute, Troy, NY**

*Teaching of undergraduate and graduate courses in statistics and statistical computing, including: Statistical Methods for Engineers and Scientists, Statistical Analysis for Management Systems I & II, Statistical Methods in Management, Statistical Computing, Sampling Techniques, Linear Models, and Generalized Linear Models.*

**1973-1977 Instructor, Program in Statistics at Columbia University Teachers'**

**College, New York, NY**

*Teaching statistics and intermediate level statistics to graduate students, primarily in the behavioral sciences; advising doctoral students and faculty on questions of experimental design, measurement, data analysis and computing.*

**1972-1973 Lecturer, University of California Medical Center, San Francisco, CA**

*Teaching biostatistics.*

**Director of Research and Evaluation, Kellogg Health Science Project**

*Design of curricula and evaluation criteria; design, collection ad analysis of survey data; design and implementation of instructional management information system.*

**1970-1972 Instructor, Program in Statistics at Columbia University Teachers'**

**College, New York, NY**

**1969-1970 Graduate Assistant, Program in Statistics at Columbia University**

**Teachers' College, New York, NY**

**1969-1969 Assistant to the Director of Institutional Research, Florida State University, Tallahassee, FL.**

*Design of evaluations systems, data analysis; computer programming.*

**1968-1969 Trainee, Computer Instruction Institute, Florida State University, Tallahassee, FL.**

*Documentation of software programs designed to interface teletype equipment with microcomputers (PDP-8) with central processing unit (IBM 1600); design of experiments; designing and programming of instructional units.*

**1967-1968 Data Communications Officer, U. S. Army, Viet Nam.**

Page **33** of **40**

*Participation in the implementation of a worldwide network of computers and minicomputers for communications of data; management of three stations in the computer network. Bronze Star for Meritorious Service.*

**1966-1967 Data Communications Officer, U.S. Army, Pentagon.**

*Managing a section in the operations division of data processing organization.*

**1965-1966 Systems Engineer, IBM, Harrisburg, PA.**

*Design and implementation of data processing systems on small computers, minicomputers, and unit record equipment for business and government; programming.*

## *3.4 Research*

### 3.4.1 Publications

Heiner, K., Kennedy, M.C. and O'Hagan, A. (2009) "Sequential Multi-location Auditing and the New York Food Stamps Program", Handbook of Applied Bayesian Analysis, edited by A. O'Hagan and M. West, Oxford University Press, 2009.

Heiner, K.W. and Hinde, J., (2007) "Generalized Linear Models for Assessing Performance" *Proceedings of the 22th International Workshop on Statistical Modelling.*

Rothman, J., Rudnick, D., Slifer, M., Agins, B., Heiner,K., and Birkhead,G. (2007), "Co-located Substance Use Treatment and HIV Prevention and Primary Care Services, New York State, 1990–2002: A Model for Effective Service Delivery to a High-Risk Population", *Journal of Urban Health.*

Heiner, K.W. and Hinde, J., (2006) "Exponential family mixtures in total quality health care monitoring", *Proceedings of the 21th International Workshop on Statistical Modelling.*

Heiner, K.W., O'Hagan, A. and Laws, D.J. (2003), "Bayesian Statistical Models for Financial Audits", *Challenging the Boundaries of Symbolic Computation* (Ed: P. Mitic), Imperial College Press, London.

Backhaus, K.B., Stone, B.A. and Heiner, K.W., (2002), "Exploring the Relationship Between Corporate Social Performance and Employer Attractiveness", *Business and Society*, 41.

Heiner, K.W. and Walshaw, D., (2001), "Inferences on Healthcare Indicators for the Treatment of HIV/AIDS", *Eurostat,* 213-222.

Heiner, K.W., Laws, D., and Walshaw, D., (2000), "Simulation in Models of Health Care Quality", *Computing Science and Statistics*, 32.

Heiner, K.W., (2000), "Issues in Statistical Auditing and Some Bayesian Solutions", *1999 Proceedings of the American Statistical Association, Business and Economic Statistics*, 18-24.

Birkhead, G.S., et. al., (2000), *Clinical Management of HIV Infection*, NYS Department of Health, Albany, NY.

Heiner, K. W. and Laws, D., (1999), "Simulation Based Inference in Auditing." *Computing Science and Statistics*, **31**.

Heiner, K. W. and Wagon, S., (1999), "Statistics in the Classroom and the Courtroom", *Mathematica in Education and Research*, **8**, No. 1, Winter, pp. 49-57.

Heiner, K. W., (1995), "Computerized Interactive Stratification in Statistical Audits:, *Mathematics with Vision*, Computational Mechanics Publications, Southampton, UK, pp. 199-206.

Heiner, K. S. and Heiner, K. W., (1995), "Tree Rings in the Northern Shawangunks", *Chance*, **8**, No. 1, Winter, pp. 30-37.

Heiner, K.W., (1994), "Likelihood Functions Using Mathematica", *Proceedings of the Sixth Annual International Conference on Technology in Collegiate Mathematics*, Addison-Wesley Publishing Company.

Heiner, K.W., and Bagley, A.M., (1993), "Conveying Statistical Concepts Through Electronic Notebooks", *Proceedings of the Fifth Annual International Conference on Technology in Collegiate Mathematics*, Addison-Wesley Publishing Company.

Heiner, K.W., (1993), "Child Support Collection Goals", *Proceedings of the American Statistical Association*.

Heiner, K.W. and Bagley, A.M., (1993), "Modeling the Cost of Child Care", *Proceedings of the American Statistical Association*.

Heiner, K.S. and Heiner, K.W., (1993), "Modeling the Impact of Environmental Variables on Trees in Stressed Habitats", *Proceedings of the American Statistical Association*.

Heiner, K.W.; and Roohan, P.J., (1988), "An iterative Procedure for Prescribed Variance Univariate Stratification Applied to Statistical Auditing", *Proceedings of the American Statistical Association*.

Heiner, K.W.; Rocus, M., and Bagley, A.M., (1984), "In Process Reliability Assessment System", *Proceedings of the Annual IBM Statistical Quality Control Conference,* IBM, Austin, TX.

Heiner, K.W.; Bagley, A.M.; Roohan, P.J.; and Tarr, C.T., (1984), "Statistical Analysis of Process Capabilities with Respect to Solder Specifications*", Proceedings of the 11th Annual IBM Design Of Experiments Conference*, IBM, Lexington, KY.

Heiner, K. W., Fried, A., and Wagner, N., (1984), "Successfully Using Statistics to Determine Damages in Fiscal Audits", *Jurimetrics*, **24**, No. 3, Spring.

Heiner, K.W.; Sacher, R.S.; and Wilkinson, J.W. (eds.), *Computer Science and Statistics: Fourteenth Symposium on the Interface*, Spring-Verlag, New York, 1983.

Heiner, K. W., Ecker, J. G. and Kupfetschmid, M., (1983), "Maximizing Restitution for Erroneous Medical Payments When Auditing Sample from More than One Provider", *Interfaces*, **13**, No. 5, pp. 12-17.

Heiner, K. W., Wallace, W. A. and Young, K., (1981), "Resource Allocation and Evaluation Model for Providing Services for the Mentally Retarded", *Management Science*, **27**, No. 7, pp. 769-784.

Heiner, K. W. and Whitby, O., (1980), "Maximizing Restitution for Erroneous Medical Payments when Auditing Samples", *Interfaces*, **10**, No. 4, pp. 45-54.

Cullen, F. T., Heiner, K. W. and Sullo, P., (1980), "Child Support Collection: A Carrot-and-Stick Approach", *Social Work*, **25**, No. 5, pp. 397-402.

Cullen, F. T., and Heiner, K. W., (1978) "Provider Medicaid Fraud: A Note on White Coat Crime", *Southern Journal of Criminal Justice*.

Heiner, K.W.; Read, S.A.; and Whitby, O., (1978), "A Quality Control System that Integrates AFDC, Food Stamps, and Medicaid", (invited paper), *Proceedings of the American Statistical Association*.

*Sourcebook for Programmable Calculators*, Learning Center, Texas Instruments, 1978, (Contributing Author).

### 3.4.2 Presentations

Invited presentation for National Association for Program Information and Performance Measurement Annual Meeting, Philadelphia, Aug. 26, 2008, "Extended Analysis of QC Data"

6th International Conference on Health Policy Research, Boston, MA, October 28-30, 2005, "Fixed and Random Effects Sequential Models for Monitoring Quality of Care"

New York State Bar Association Health Law Section Fall Meeting, Bolton Landing, NY, October 28, 2005, "Statistics 101 for the Health Care Lawyer"

Invited presentation for National Association for Program Information and Performance Measurement Annual Meeting, Philadelphia, Aug. 28, 2005, "County QC Error Rates"

Practical Bayesian Statistics 5, Milton Keynes, UK, July 28-31, 2003, "Sequential Multicentre Audits"

5th International Mathematica Symposium, London, July 7-11, 2003, "Bayesian Statistical Models for Financial Audits"

American Statistical Association, Albany Chapter, Invited presentation, April 2003, Albany, NY, Heiner, K.W., "Non-Linear Mixed Effects Models".

Invited presentation for the Office of the Special Prosecutor, New York State Department of Law, May 3, 2002, "The Use of Statistics in the Prosecution of Medicaid Fraud".

International Biometric Conference, Frieberg, Germany, July 2002, "Describing Response to HAART in a Public Health Care Setting".

Seventh Valencia International Meeting on Bayesian Statistics, Canary Islands, Spain, June 2-9, 2002, "Inferences on Healthcare Indicators for the Treatment of HIV/AIDS".

American Statistical Association, Albany Chapter, Invited presentation, October 2001, Albany, NY, Heiner, K.W., "Bugs, Trees, Trellises, and Time Warps in Health Care Quality".

International Society for Bayesian Analysis, Heraklion, Crete, May 28-June1, 2000, Heiner, K.W. and Walshaw, D., "Inferences on Health Care Indicators for the Treatment of HIV/AIDS".

International Conference on Health Policy Research, Washington, DC, 1998, Heiner, K.W., "A Bayesian Approach to Updating Quality of Care Indicators Using Discounted Priors".

American Statistical Association, Albany Chapter, Annual Conference, General Electric Corporate Research and Development, Schenectady, NY 1998, Heiner, K.W., "Applications of a General Urn Model".

Valencia International Meetings on Bayesian Statistics, Alcossebre, Spain, 1998, Heiner, K.W., "Monitoring Health Care Quality Indicators".

American Statistical Association, Albany Chapter, 1998, Heiner K.W., "Introduction to Bayesian Data Analysis with Applications to Statistical Auditing", (invited presentation).

Statistics Education for Management and Technology Conference in Honor of John Wilkinson's 65th Birthday, November 6, 1993, Rensselaer Polytechnic Institute, Troy, New York, Heiner, K. W. and Bagley, A. M., "Symbolic Computation for Explaining Influence Diagnostics".

ORSA/TIMS Joint National Meeting, 1983, Heiner, K.W.; and Paulson, A.S., "Some New Methods for Setting Confidence Limits for Auditing Accounting Populations".

ORSA/TIMS Joint National Meeting, 1983, Bagley, A.M.; Heiner, K.W.; and Paulson, A.S., "Potential Value of Statistical Estimators in Auditing Accounting Populations".

ORSA/TIMS Joint National Meeting, 1981, Ecker, J.G.; Heiner, K.W.; and Kupferchmid, M., "Maximizing Restitution for Erroneous Medical Payments When Auditing Samples from More than One Provider".

American Statistical Association, 1978 (invited Paper), Heiner, K.W.; Read, S.A.; and Whitby, O., "Designing a Quality Control System that Integrates AFDC, Food Stamps and Medicaid".

Psychometric Society, 1973, Heiner, K.W.; Whitby, O.; and Blinn, T.P., "A Statistical Analysis of Branching Hierarchies".

## 3.5  Professional Membership

*American Association for the Advancement of Science*
*American Statistical Association*
*Biometric Society*
*Institute of Mathematical Statistics*
*International Chinese Statistical Association*
*International Society for Bayesian Analysis*
*Mathematical Association of America*
*New York Academy of Science*
*Royal Statistical Society, (Fellow)*

## 3.6  Recent Continuing Education

- *Intermediate programming in Mathematica, Rocky Mountain Mathematica, Frisco, CO, July 14-18, 2008*
- *American Statistical Assn Continuing Education, Multiple Imputation of Missing Data, Aug 5, 2008 Denver CO*
- *Short Course offered by the Statistical Modelling Society, Generalized additive models for location, scale and shape, July 6, 2008, Utrecht, The Netherlands*
- *Survival and Time to Event Analysis, American Statistical Association, Boston Chapter, December 2, 2006*
- *Bayesian Approaches to Evidence Synthesis and Decision Modeling, Varenna, Italy, 5-9 June 2005*
- *Generalized Linear Latent and Mixed Modeling, 19th International Workshop on Statistcal Monitoring, Florance, July 2004*
- *Document Preparation in Mathematica, 5th International Mathematica Symposium, Imperial College, London, July 6, 2003*
- *Numerics and Programming in Mathematica, 5th International Mathematica Symposium, Imperial College, London, July 6, 2003*
- *Web Mathematica, 5th International Mathematica Symposium, Imperial College, London, July 6, 2003*
- *Smoothing for Smarties, International Biometric Society Eastern North America Meeting, Tampa, Florida, March 29, 2003*
- *Analysis of Repeated Categorical Measurement Data, Joint statistical Meetings, New York, New York, August 12, 2002*
- *Statistical Methods for the Analysis of Ordered Categorical Data, Joint statistical Meetings, New York, New York, August 12, 2002*
- *Using WinBUGS for Bayesian Analysis of Industrial and Physical Sciences Data, Joint statistical Meetings, New York, New York, August 10, 2002*
- *Statistical Graphics for Exploring Data, Presenting Information, and Understanding Statistical Models, Splus Users Conference, October 17, 2001*
- *Multiple Adaptive Regression Splines, American Statistical Association, Atlanta, Georgia, August 8, 2001*
- *Data Mining with Decision Trees, American Statistical Association, Atlanta, Georgia, August 7, 2001*
- *A Graphical Introduction to Latent Class Analysis, American Statistical Association, Atlanta, Georgia, August 6, 2001*
- *Smoothing Techniques and Software, International Biometric Society Eastern North America Meeting, Charlotte, North Carolina, March 26, 2001*
- *Using SAS and WinBUGS to fit Hierarchical Models, International Biometric Society Eastern North America Meeting, Charlotte, North Carolina, March 26, 2001*
- *Statistical Data Mining, International Biometric Society Eastern North America Meeting, Charlotte, North Carolina, March 25, 2001*
- *Building and Fitting Random Effects Models, New Orleans, LA, Interface 2000, 32nd Symposium on the Interface: Computing Science and Statistics, April 5, 2000*

- *An Introduction to Model Building with Reproducing Kernel Hilbert Spaces, New Orleans, LA, Interface 2000, 32nd Symposium on the Interface: Computing Science and Statistics, April 5, 2000*
- *Mixed Models in S, Washington, DC, MathSoft, July 20-21, 2000*
- *Financial Risk Management, New York City, MathSoft, December 6-8, 2000*
- *Fitting Nonlinear and Generalized Mixed Models with PROC NLMIXED, Indianapolis, IN, American Statistical Association, August 15, 2000*
- *Hierarchical Models in Health Services Outcomes Research, Indianapolis, IN, American Statistical Association, August 14, 2000*
- *Model Binary Response Data with an Emphasis on Logistic Regression Models, Indianapolis, Indiana, American Statistical Association, August 13, 2000*
- *Financial Risk Management, New York City, MathSoft, September 27-28, 1999*
- *Statistical Modeling with Parametric Quantile Distributions, Baltimore, MD, American Statistical Association 0.6 CEU, August 9, 1999*
- *Tree Based Methods for Statistical Modeling, Baltimore, MD, American Statistical Association 0.6 CEU, August 8, 1999*
- *Bayesian Methods in Biostatistics, Atlanta, GA, International Biometric Society, ENAR American Statistical Association 1.2 CEU, March 28, 1999*
- *Bayesian Analysis of Binary and Ordinal Regression Models, Dallas, TX, American Statistical Association 0.6 CEU, August 12, 1998*
- *Advanced Bayesian Hierarchical Modeling, Dallas, TX, American Statistical Association 0.6 CEU, August 11, 1998*
- *Bayesian Hierarchical Modeling, Dallas, TX, American Statistical Association 0.6 CEU, August 10, 1998*
- *Capture Recapture Models, International Biometric Society Spring Meeting, Pittsburgh, PA, March 29-April 1, 1998*
- *Statistical Models in S-Plus, New York, NY, 2.8 CEU, February 4-6, 1998*
- *Sampling-Based Methods for Bayesian and Likelihood Inference, Anaheim, CA, American Statistical Association 0.6 CEU, August 13, 1997*
- *Bayesian Data Analysis, Anaheim, CA, American Statistical Association 0.6 CEU, August 11, 1997*
- *Trellis Graphics, Marriot Financial Center, New York, NY, June 12-13, 1997*
- *Longitudinal Data Analysis Using Generalized Linear Models, Chinese Statistical Association, New Brunswick, NJ, May 30, 1997*

## *3.7 Fellowships, Awards, and Grants*

- *Sloan Foundation Grant to participate as a course developer for the distance learning projects, July 1994-July 1995.*
- *NSF Faculty Enhancement Grant to support attendance at the Interactive Mathematics Text Project (IMTP) workshop, July 25-31, 1993.*
- *Mathematica software package award for participation in the IMTP workshop.*
- *MIS for MR Services; $70,000, State of Minnesota, St. Paul, Minnesota.*

- *Probability and Statistics Using Integrated Computer Graphics; $40,000. National Science Foundation, Washington, DC.*
- *Rate Setting Model for NR Services (with D. Schneider); $45,000, OMRDD State of New York, Albany, NY.*
- *Modeling the Cost of Services in Long Term Care, (with D. Schneider), New York State Department of Health, Albany, NY.*
- *Evaluation of Long Distance Communication Alternatives; $25,000, Sun Life of Canada, Wellesley, MA.*
- *Forecasting Policy Loans, $25,000, Sun Life of Canada, Wellesley, MA.*
- *Statistical Production Control, (with A. Paulson, P. Sullo and H. Wilkinson); $830,000, IBM, East Fishkill, NY.*

Respectfully submitted,

Karl W. Heiner

June 15, 2009

Page 40 of 40

FORM W4
REV. 12/88

# MEMORANDUM

THE CITY OF NEW YORK
HUMAN RESOURCES ADMINISTRATION

**DATE:** March 8, 1994

**TO:** List

**FROM:** Lenore Schlossberg, Acting Director
HCSP/Field Operations

**SUBJECT:** Fair Hearings Compliance Procedure

Please review the attached draft procedure, "Fair Hearing Compliance."
This procedure has been revised and redrafted.  It corresponds to
Part II of the Fair Hearing procedure originally issued in March, 1993.

Your pertinent comments are essential to ensure that all aspects of
the process are addressed.  Return hand written comments on the draft
by March 22, 1994 to:

> Darlene Richardson
> 109 East 16th Street
> Room 818

## List

| | | | |
|---|---|---|---|
| J. Turley | L. Perlman | P. Manoli | V. Beale |
| M. Pelliccione | W. Cooper | M. Ascherman | |
| J. Rodriguez | E. Warshaw | A. Mennis | |
| H. Karasik | T. Hargrove | M. Sklar | |
| L. Rosen | J. Carter | J. Saunders | |
| L. Stonehill | T. Charity | E. Lewis | |
| R. Conboy | V. Chiarchiaro | M. Southern | |
| E. Gross | M. Whetstone | W. Mason | |
| M. Fleischmann | A. Ellis | T. Harlacher | |
| M. Simms | J. Hunt | N. Orenbuch | |
| | K. Klug | A. Taylor | |

C0668

-10-

PART II.  FAIR HEARING COMPLIANCE

<u>Introduction</u>

I.  <u>Purpose</u>

     The purpose of this part of the procedures manual is to provide
step-by-step instructions for compliance with Fair Hearing
decisions within established timeframes.

II.  <u>General Information</u>

     In 1988, an action was initiated in Federal Court seeking to compel
timely compliance with Fair Hearing decisions.  This case is <u>Cutler
v. Bane and Sabol</u>.  It is often referred to, simply, as the "Cutler"
case.  A settlement was negotiated between the parties and was placed
in effect on 4/1/93.

III.  <u>Timeframes</u>

     Federal law requires that compliance with a Fair Hearing decision must
occur within <u>90 days of the appellant's (i.e. client's) request for a
Fair Hearing</u>.

     The State has <u>60 days in which it must deliver a Fair Hearing decision
to the City</u> (in this case, the Home Care Services Program (HCSP).  HCSP
has <u>30 (calendar) days in which it must take final action to comply with
the Decision After Fair Hearing.</u>

     Built into the timeframes is a "tolling period."  This is a period not
calculated in the amount of time it takes HCSP to comply with a Fair
Hearing decision.  The "tolling period" for HCSP runs from the date
that HCSP requests documentation from the client (appellant) until the
date the client provides the requested documentation.  Requested
documentation must include all items requested and all items must be
complete.  The tolling period will therefore, run until all completed
documents are received by HCSP.

     (Similarly, the State has a "tolling period" for adjournment and
rescheduling of Fair Hearings.)

IV.  <u>Controls</u>

     The CASA Fair Hearing Liaisons, Service Teams, and Medicaid Eligibility
Units must control the processing of Fair Hearing "Compliances" in
accordance with the requirements of "Cutler."

     The Cutler settlement requires HRA to provide monthly statistical reports
to the plaintiffs in the case.  In order to do this, HCSP must keep track
of the dates on which it takes certain actions in the Fair Hearing
compliance process (e.g. the date on which CASA sends a request for
documentation to the client and the date on which the client provides the
documentation).



-11-

---

| SECTION 1 |
| --- |
| CONTROL AND ASSIGNMENT OF DECISION AFTER FAIR HEARING BY FAIR HEARING LIAISON |

Responsibility:                                              Action:

FAIR HEARING LIAISON

1.  Receives the Decision After Fair Hearing (DAFH) and the Fair Hearing Compliance Tracking Form from Home Care Fair Hearing Unit (HCFHU) at 109 E. 16th St.

2.  Enters date received by CASA on Tracking Form.

3.  Reviews the DAFH.

4.  Calls HCFHU if there is a problem or need for clarification.

5.  Ensures that case record is pulled.

6.  Photocopies Fair Hearing Compliance Tracking Form.

7.  Attaches DAFH and Tracking Form to case record.

8.  Retains copy of Tracking Sheet in Compliance 'tickler' file.

9.  Controls case for status report as indicated below:

NOTE: If status report due date would fall on a weekend or holiday, make it the next workday.

   a.  10 calendar days, if the DAFH indicates that CASA is to restore/continue/provide services/medicaid.

   b.  25 calendar days, if DAFH indicates that CASA is to reassess service/medicaid.

10. Assigns case to appropriate Service Team

C0670

**JA180**

-12-

---

| SECTION 2 |
| CONTROL AND ASSIGNMENT OF <u>DECISION AFTER FAIR HEARING</u> BY SERVICE TEAM SUPERVISOR |

<u>Responsibility:</u>                                          <u>Action:</u>

SERVICE TEAM SUPERVISOR          1.      Receives case from F.H. Liaison.

2.      Reviews Case record, DAFH, and Fair Hearing Compliance Tracking Form.

3.      Discusses case with F.H. Liaison, if there is a problem or need for clarification.

4.      Controls case for status report as indicated below:

   a.      5 calendar days, if the DAFH indicates that CASA is to restore/continue/provide services/medicaid.

   b.      10 calendar days, if DAFH indicates that CASA is to reassess service/medicaid.

5.      Assigns to appropriate Case Manager and controls to ensure that action is processed and returned to F.H. Liaison.

C0671

-13-

---

**SECTION 2(a)**

---

**CONTROL AND ASSIGNMENT OF DECISION AFTER FAIR HEARING BY MEDICAL REVIEW TEAM SUPERVISOR**

---

Responsibility                     Action

MRT SUPERVISOR            1.  Receives case from service team
                                                supervisor.

                                        2.  Reviews case record, DAFH, and
                                                Fair Hearing Compliance Tracking
                                                Sheet.

                                        3.  Discusses case with F.H. Liaison,
                                                if there is a problem or need
                                                for clarification.

                                        4.  Controls case for status report as
                                                indicated below:

                                                10 calendar days, if the DAFH
                                                indicates that CASA is to
                                                reassess services/medicaid.

                                        5.  Assigns case to MRT nurse/MSW and
                                                controls to ensure that action is
                                                processed and returned to F.H.
                                                Liaison.

                                        6.  Gives explanation of any delays in
                                                processing case, on the Compliance
                                                Tracking Form, ie.,

                                                - pending decision from LMD.



C0672

**JA182**

-14-

```
┌─────────────────────────────────────────┐
│  SECTION 2(b)                            │
│  ─────────────────────────────────────   │
│  CONTROL AND ASSIGNMENT OF DECISION AFTER FAIR │
│  HEARING BY VENDOR ASSIGNMENT UNIT SUPERVISOR  │
└─────────────────────────────────────────┘
```

Responsibility                              Action

VAU SUPERVISOR              1.  Receives case from MRT
                               supervisor.

                           2.  Reviews case record, DAFH, and
                               Fair Hearing Compliance Tracking
                               Sheet.

                           3.  Discusses case with F.H. Liaison,
                               if there is a problem or need
                               for clarification.

                           4.  Controls case for status report as
                               indicated below:

                               a.  3 calendar days, if the DAFH
                                   indicates that CASA is to
                                   restore/continue/provide
                                   services/medicaid.

                               b.  3 calendar days, if DAFH
                                   indicates that CASA is to
                                   reassess service/medicaid.

                           5.  Assigns case to VAU worker and
                               controls to ensure that action
                               is processed and returned to
                               F.H. Liaison.

                           6.  Gives explanation of any delays in
                               processing case, on Compliance
                               Tracking Sheet, ie.,

                               - client deferral or refusal
                                 of services, (indicate date
                                 services offered and available
                                 to client),
                               - vendor deferral,
                               - hospitalization,
                               - other

NOTE:  Do not hold Compliance Tracking Sheet.  Forward to F.H. Liaison with explanation
       and indicate compliance completed annotating the date that service became
       available to the client.

       The date that service is available to the client represents the date of compliance.

C0673

**JA183**

-15-

| SECTION 3 |
| --- |
| ACTION TAKEN WHEN CASA IS ALREADY IN COMPLIANCE WITH <u>DECISION</u> <u>AFTER FAIR HEARING</u> - RE: SERVICES |

<u>Responsibility:</u>                                          <u>Action:</u>

SUPERVISOR

1.  Sets controls in compliance with established deadlines and the Fair Hearing Liaisons prescribed due date.

CASE MANAGER 

2.  Completes <u>HCSP 3000E, Fair Hearing Compliance Notice,</u> in triplicate, indicating the decision and explaining that the CASA has already taken the action (give action and effective date), with copy in record.

3.  Enters on Tracking Form:

    a.  Date HCSP 3000E sent to client.

    b.  Actual date of compliance.

4.  Gives case record to Service Team Supervisor.

SERVICE TEAM SUPERVISOR

5.  Reviews case record for proper documentation and signs the HCSP 3000E. Mails original to client and decontrols case.

6.  Sends case record and annotated <u>Fair Hearing Compliance Tracking Form</u> to F.H. Liaison.

FAIR HEARING LIAISON

7.  Reviews case.

8.  Annotates 'tickler' copy of <u>Fair Hearing Compliance Tracking Form</u> with dates of all actions taken.

9.  Forwards 'tickler' copy of Tracking Form to HCFHU at 109 E. 16th St., along with copies of M-11a, HCSP 3000E and any other notice to client of action taken.

10. Ensures return of case record to file.

NOTE:  The service authorization is to accommodate up to at least 4 months until the next reauthorization period and is not to be extended if the authorization that is already in place accommodates the 4 months.

C0674

**JA184**

-16-

---

| SECTION 4 |
| --- |
| **ACTION TAKEN WHEN DECISION AFTER FAIR HEARING REQUIRES REASSESSMENT: CLIENT RETURNS M-11q** |

**Responsibility:**                                        **Action:**

SUPERVISOR                          1.   Sets controls in compliance with
                                             established deadlines and the
                                             F.H. Liaison's due date.

CASE MANAGER                        2.   Completes Fair Hearing Compliance Notice
                                             HCSP 3000E, in triplicate, indicating
                                             that the decision is to reassess the
                                             services needs and giving the due date
                                             (21 calendar days) for the client to
                                             provide completed M-11q from his/her
                                             physician.

                                             3.   Annotates a blank M-11q, Medical Request
                                             for Home Care at the top with his/her
                                             caseload and "Fair Hearing Compliance."

                                             4.   Mails the client the HCSP 3000E and
                                             M-11q, along with a return envelope.

                                             5.   Controls the case for 21 calendar days.

                                             6.   Enters on Tracking Form:

                                                  a.   Date HCSP 3000E sent to client.

                                                  b.   21-day due date.

CENTRAL PROCESSING UNIT             7.   Receives M-11q from client, date stamps
(or whichever staff                      M-11q, and forwards M-11q to Intake.
receives mail in the
CASA office).

INTAKE UNIT                         8.   Photocopies M-11q.

                                             9.   Refers case to CHHA for nursing assessment.

                                             10.  Forwards original of M-11q to Service Team.

CASE MANAGER                        11.  Enters on Tracking Form:

                                                  a.   Date of client response
                                                         (complete)
                                                              or
                                                  b.   Date of client response
                                                         (incomplete)

                                             IF CLIENT'S RESPONSE IS INCOMPLETE:

                                             12.  Sends client a request for additional
                                             information, with notation on Tracking
                                             Form showing revised due date, (See
                                             note regarding extension).

                                             IF CLIENT REQUESTS EXTENSION:

                                             13.  Notes revised due date on Tracking Form.
                                             (See note regarding extension).

NOTE

The client may request a reasonable extension of due date (up to 10 calendar days) to
return documentation. This is not calculated in the amount of time it takes HCSP to
comply with the Fair Hearing decision. This also applies when client has provided
incomplete documentation and CASA requests additional information.



C0675

-17-

| CASE MANAGER | 14. | Makes home visit within 3 days of receipt of F.H. decision and completes M-11s, Social Assessment and M-11a, Home Care Service Request and Authorization, (annotate all forms, "Fair Hearing Compliance.") |
| | 15. | Receives M-27r, Nursing Assessment. |
| | 16. | Submits case record with M-11q, M-11s, M-11a and M-27r to Service Team Supervisor. |
| SERVICE TEAM SUPERVISOR | 17. | Reviews case and forwards case to Medical Review Team. |
| MEDICAL REVIEW TEAM | 18. | Reviews and consults with LMD if there are any discrepancies between the M-11q, M-11s, M-27r, and/or MRT review. |
| NOTE: MRT does not refer the case to Affiliation in a Fair Hearing Compliance situation. | 19. | Makes a decision regarding type of service, service tasks to be performed, hours of service and completes M-28a, Home Care Reviewer's Form. |
| | 20. | Completes MRT portion of M-11a (whether there is a change in service or not); also making the notation, "Fair Hearing Compliance" on the form, if not already done by service team. |
|  | 21. | Completes MRT portion of HCSP 3000F, Notice of Decision to Change Home Care Services, if there is a change. |
| NOTE: Forms HCSP 3000A and HCSP 3000F must contain this additional language, "This re-evaluation was held in compliance with a Fair Hearing decision." (See sample in the appendices.") | 22. | Completes appropriate sections of HCSP 3000A, Notice of Decision of Reauthorization of Home Care Services, if there is no change (i.e., all sections except notice date, effective date, MA Case Number, MA Surplus, and CIN, which VAU completes.) |
| | 23. | Forwards case record to Vendor Assignment Unit (VAU). |
| VENDOR ASSIGNMENT UNIT (VAU) | 24. | Reviews case record, completes VAU portion of M-11a, and completes VAU portion of HCSP 3000F or HCSP 3000A. |
| | 25. | Mails HCSP 3000F or 3000A to client. |
| | 26. | Telephones vendor to notify of effective date of change of service. |

C0676

JA186

-18-

VENDOR ASSIGNMENT UNIT (VAU)

27. Forwards copy of M-11a to Home Care Computer Operations.

28. Returns case record to Fair Hearing Liaison.

FAIR HEARING LIAISON

29. Reviews case, annotates "Date of Actual Compliance" on Fair Hearing Compliance Tracking sheet and decontrols case.

30. Annotates "tickler" copy of Fair Hearing Compliance Tracking Form with dates of all action taken.

31. Forwards 'tickler' copy of tracking sheet to HCFHU at 109 E. 16th St., along with copies of M-11a, HCSP 3000E and any other notice to client of action taken.

32. Ensures that case record is returned to file.

C0677

JA187

-19-

---

SECTION 5

ACTION TAKEN WHEN DECISION AFTER FAIR HEARING REQUIRES
REASSESSMENT. CLIENT DOES NOT RETURN M-11Q.

---

<u>Responsibility:</u>                                    <u>Action:</u>

CASE MANAGER                  1.   <u>Completes Form HCSP 3000E, Fair Hearing Compliance
                                   Notice,</u> in triplicate, indicating that the decision
                                   is to reassess the services needs and giving the due
                                   date (21 calendar days) for the client to provide
                                   completed M-11q from his/her physician.

                              2.   Annotates a blank <u>M-11q, Physician's Request for
                                   Home Care Services</u> at the top with his/her
                                   caseload and "Fair Hearing Compliance".

                              3.   Mails the client the HCSP 3000E and the M-11q along
                                   with a return envelope.

                              4.   Controls the case for 21 calendar days.

                              5.   Enters on Tracking Form:

                                   a.  Date HCSP 3000E sent to client.
                                   b.  21-day due date

                              CLIENT DOES NOT RETURN M-11Q WITHIN 21 CALENDAR DAYS:

NOTE: The client may request   6.   Completes <u>Final Notice - Fair Hearing Compliance</u>
a reasonable extension              in duplicate, (including signature and date)
of due date (up to 10               mails original to client and files copy in case
calendar days) to return            record.
documentation. This is
not calculated in the          7.   Annotates <u>Fair Hearing Compliance Tracking Form,</u>
amount of time it takes             with date of <u>Final Notice</u> sent to client.
HCSP to comply with the
Fair Hearing decision.         8.   Submits case record to Service Team Supervisor.
This also applies when
client has provided
incomplete documentation
and CASA requests
additional information.

SERVICE TEAM SUPERVISOR        9.   Reviews case record and decontrols case.

          10.   Sends case record with "date of actual
                                    compliance" noted on the <u>Fair Hearing
                                    Compliance</u> tracking sheet to F.H. Liaison.
                                    (*Note:   "Date of Actual Compliance" is
                                              the date form HCSP 3000E was sent.)

FAIR HEARING LIAISON          11.   Reviews case and annotates "tickler" copy
                                    of <u>Fair Hearing Compliance Tracking Sheet</u>
                                    with dates of action taken.

NOTE: If client submits       12.   Forwards "tickler" copy of Tracking Sheet
M-11q <u>after</u> Final              along and <u>Final Notice</u> to HCFHU at
Notice, has been                    109 E. 16 St. and ensures return of case
mailed, Service                     record to file.
Team processes it
in accordance with
current "pending,"
"reauth," or "change"
procedure, whichever
is applicable.

C0678

-20-

---

**SECTION 6**

**ACTION TAKEN WHEN DECISION AFTER FAIR HEARING REQUIRES CASA TO RESTORE/CONTINUE/PROVIDE SERVICES.**

---

<u>Responsibility:</u>                                    <u>Action:</u>

F.H. LIAISON                   1.  Completes and signs appropriate portion
                                   of M-11a.

                                   (This includes effective date of action).

                               2.  Completes and signs Home Care Reviewer's
                                   portion of M-11a in accordance with the
                                   DAFH, also making the notation "Fair
                                   Hearing Compliance" on the form.

                               3.  Forwards case record with M-11a to VAU.
                                   (If there is no change, <u>DO NOT</u> forward
                                   case record to VAU.  However, M-11a must
                                   be forwarded to Computer Operations if
                                   there is a change in the authorization
                                   period.

VENDOR ASSIGNMENT UNIT         4.  Reviews case record.

                               5.  Completes VAU portion of M-11a, authorizing
                                   service for four months.

                               6.  Telephones vendor to notify of effective date
                                   of change of service, or that auth. is
                                   extended if there is no change.

                               7.  Forwards copy of M-11a to Home Care Computer
                                   Operations.

                               8.  Returns case record to F.H. Liaison.

F.H. LIAISON                   9.  Completes HCSP 3000E, in triplicate, indicating
                                   that the decision is to restore/continue/provide
                                   services and the effective date of the action
                                   and sends the original to the client.

                                   (See item 3 on the Form HCSP 3000E)

                              10.  Annotates "Date of Actual Compliance" of <u>Fair
                                   Hearing Compliance Tracking Form</u> and decontrols
                                   case.

                              11.  Annotates "tickler" copy of <u>Fair Hearing
                                   Compliance Tracking Form</u> with date sent
                                   to HCFHU.

                              12.  Forwards "tickler" copy of tracking sheet to
                                   HCFHU at 109 E. 16th St., along with copies
                                   of M-11a, HCSP 3000E and any other notice to
                                   client of action taken.



                              13.  Makes a case entry in the case record and
                                   includes a copy of Form M-11a and Form
                                   HCSP 3000E, highlighted, with the phrase,
                                   "Fair Hearing Compliance," in the case
                                   record.

                              14.  Ensures the return of the case record to the
                                   Service Team files.

C0679

-21-

---

| SECTION 7 |
| ACTION TAKEN WHEN DECISION IS TO RESTORE/CONTINUE/PROVIDE SERVICES AND TO REASSESS. |

---

**Responsibility:**                                **Action:**

1.  IF CASA ALREADY IN COMPLIANCE WITH DAFH:

CASE MANAGER, SERVICE TEAM          Follow instructions outlined in Section 3
SUPERVISOR, FAIR HEARING            and submit the F.H. compliance documents
LIAISON                             to the Home Care Fair Hearing Unit (HCFHU).
                                    (See note #1 below.)

                                    Then reassess the case.

2.  IF CLIENT RETURNS COMPLETED M-11Q:

CASE MANAGER, CPU, INTAKE,          Follow instructions outlined in Sections 4
SERVICE TEAM SUPV., VAU,            and 6 then submit the F.H. compliance
F.H. LIAISON                        documents to HCFHU. Once service is in place,
                                    and documents have been submitted to the F.H.
                                    Liaison, reassess the case.

3.  IF CLIENT DOES NOT RETURN M-11Q:

CASE MANAGER, SERVICE TEAM SUPV.,   Follow instructions outlined in Section 5.
F.H. LIAISON                        Reassessment is to be completed on the case
                                    when and if the client submits the M-11q.

---

**NOTE:**

1.  IF SERVICES HAVE BEEN RESTORED/CONTINUED/PROVIDED DO NOT HOLD COMPLIANCE
    TRACKING SHEET UNTIL REASSESSMENT IS COMPLETE. PROCESS COMPLIANCE ON
    RESTORAL OF SERVICES AND FORWARD ORIGINAL TRACKING SHEET TO HCFHU. USE
    THE DUPLICATE COPY OF THE TRACKING SHEET WHEN THE REASSESSMENT IS
    COMPLETED.

2.  WHERE THE DECISION AFTER FAIR HEARING INVOLVES BOTH HOME CARE SERVICES
    AND MEDICAID SERVICES, IT WILL BE NECESSARY FOR THE FAIR HEARING
    LIAISON TO COORDINATE THE COMPLIANCE ON BOTH SERVICE AND MEDICAID AND
    ENSURE THAT APPROPRIATE STAFF ARE AWARE OF THE ACTIONS TAKEN!

    IT WILL BE NECESSARY FOR THE FAIR HEARING LIAISON TO COMPLETE AND MAIL
    FORM HCSP 300DE AND THE FINAL NOTICE TO THE CLIENT, (WHERE APPROPRIATE).
    SEE SECTION #14.



C0680

-22-

---

| SECTION 8 |
| --- |
| CONTROL AND ASSIGNMENT OF DAFH BY MEU SUPERVISOR |

**Responsibility:**                                             **Action:**

MEU Supervisor

1. Receives case from F.H. Liaison.

2. Reviews case record, DAFH and Fair Hearing Compliance Tracking Sheet.

3. Discusses case with F.H. Liaison, if there is a problem or need for clarification.

   If DAFH requires evaluation of MA eligibility:

4. Controls case for 25 calendar days.

   If DAFH requires restoration/ continuation/provision:

5. Controls case for 10 calendar days.

6. Assigns case to appropriate Eligibility Specialist.

NOTE: DESCRIPTION OF DELAYS: A written description of delays in processing "the compliance" must be prepared when the Medicaid Eligibility Unit (MEU) anticipates that the due date will not be met or is not met.

The MEU supervisor is to complete the Fair Hearing Compliance Tracking Sheet indicating any reason for the delay in processing the case, ie.,

- incomplete documents
- non-receipt of documents
- client's states documents inaccessible
- Tape Match issues:  client's inability to explain bank account withdrawals or deposits

C0681

**JA191**

-23-

| SECTION 9 |
| ACTION TAKEN WHEN CASA IS ALREADY IN COMPLIANCE WITH DAFH RE: MEDICAID |

**Responsibility:**                                    **Action:**

ELIGIBILITY SPECIALIST          1.   Completes in triplicate and mails
                                     to client HCSP 3000E, Fair Hearing,
                                     Compliance Notice indicating the
                                     decision and explaining that the
                                     CASA had already taken the action
                                     (give action and effective date),
                                     with copy in record.

                                2.   Enters on Tracking Form:

                                     a.  Date HCSP 3000E sent to client.

                                     b.  Actual date of compliance

                                3.   Gives case record to MEU Supervisor.

MEU SUPERVISOR                  4.   Reviews case record for proper documentation
                                     and decontrols case.

                                5.   Sends annotated Fair Hearing Compliance
                                     Tracking Form to F.H. Liaison, along
                                     with HCSP 3000E, other appropriate
                                     notices to client, and/or MAP 2074,
                                     Statement of Medicaid Authorization.

F.H. LIAISON                    6.   Reviews case.

                                7.   Annotates 'tickler' copy of Fair Hearing
                                     Compliance Tracking Form with dates of
                                     all actions.

                                8.   Forwards "tickler" copy of Tracking Form
                                     with copies of HCSP 3000E, other
                                     appropriate notices to client and/or
                                     MAP 2074 to HCFHU.

C0682

-24-

```
┌─────────────────────────────────────────────┐
│ SECTION 10                                   │
├─────────────────────────────────────────────┤
│ ACTION TAKEN WHEN DAFH REQUIRES EVALUATION OF│
│ MA ELIGIBILITY: CLIENT PROVIDES DOCUMENTATION│
└─────────────────────────────────────────────┘
```

**Responsibility:**                              **Action:**

ELIGIBILITY SPECIALIST                1.  Completes HCSP 3000E indicating
                                          that the decision is to evaluate
NOTE: The client may request a            eligibility, what documentation
      reasonable extension of due date    the client must provide, and the
      (up to 10 calendar days) to         due date for the client to do
      return documentation. This is not   this (21 calendar days).
      calculated in the amount of
      time it takes HCSP to comply   2.  Completes MAP 2016H or 2025D with
      with the Fair Hearing             specific instructions as to what
      decision. This also applies       documentation is needed.
      when the client has provided
      incomplete documentation and CASA  3.  Mails client HCSP 3000E and MAP 2016H
      requests additional information.    2016H or 2025D, along with a return
                                          envelope (with appropriate supervisory
                                          "sign-off".)

                                      4.  Forwards copy of MAP 2016H or 2025D
                                          to Service Team.

                                      5.  Controls case for 21 calendar days.

                                      6.  Enters on Tracking Form.

                                          a.  Date HCSP 3000E sent to
                                              client.
                                          b.  21-day due date.

CENTRAL PROCESSING UNIT (or other     7.  Receives MA documentation from
staff receiving mail) or Case Mgr.        client, date stamps documentation
                                          and forwards to MEU.

MEU CLERK                             8.  Records receipt of documentation.

                                      9.  Gives documentation to Eligibility
                                          Specialist.

ELIGIBILITY SPECIALIST                10. Enters on Tracking Form:

                                          a.  Date of client response
                                              (complete)
                                          b.  Date of client response
                                              (incomplete)

                                      IF CLIENT'S RESPONSE IS INCOMPLETE:

                                      11. Sends client a request for
                                          additional information, with
                                          notation on Tracking Form
                                          showing revised due date.
                                          (See note regarding
                                          'extension').

                                      IF CLIENT REQUESTS EXTENSION:

                                      12. Notes revised due date on
                                          Tracking Form (see note
                                          regarding 'extension').

C0683

-25-

IF CLIENT RESPONSE IS COMPLETE:

ELIGIBILITY SPECIALIST

13. Evaluates case in accordance with current Medicaid procedure.

14. Completes appropriate notices to client and/or MAP 2074 per current MA procedure.

15. Submits case to MEU supervisor for "sign off".

MEU SUPERVISOR

16. Processes case in accordance with current MA procedure.

17. Annotates 'Date of Actual Compliance' on Tracking Form.

18. Decontrols case and forwards Tracking Form, copies of HCSP 3000E, other notices to client and/or MAP 2074 to F.H. Liaison.

F.H. LIAISON

19. Reviews case and annotates "tickler" copy of <u>Fair Hearing Compliance Form</u> with dates of actions taken.

20. Forwards "tickler" copy of Tracking Form to HCFHU along with copies of HCSP 3000E, other notices to client and/or MAP 2074.

C0684

-26-

| SECTION 11 |
|---|
| ACTION TAKEN WHEN DAFH REQUIRES EVALUATION OF MA ELIGIBILITY: CLIENT FAILS TO PROVIDE DOCUMENTATION |

Responsibility:                                    Action:

ELIGIBILITY SPECIALIST          1.   Completes HCSP 3000E indicating that the
                                     decision is to evaluate eligibility, what
                                     documentation the client must provide,
                                     and the due date for the client to do this
                                     (21 calendar days).

                                2.   Completes MAP 2016H or 2025D with specific
                                     instructions as to what documentation is
                                     needed.

                                3.   Mails client HCSP 3000E and MAP 2016H or
                                     2025D, along with a return envelope (with
                                     appropriate supervisory "sign-off").

                                4.   Forwards copy of MAP 2016H or 2025D to
                                     Service Team.

                                5.   Controls the case for 21 calendar days.

                                6.   Enters on Tracking Form:

                                     a.  Date HCSP 3000E sent to client.

                                     b.  21-day due date.

NOTE:  The client may request     CLIENT DOES NOT RETURN DOCUMENTATION WITHIN 21
       a reasonable extension      CALENDAR DAYS, AND DOES NOT REQUEST AN
       of due date (up to 10       EXTENSION:
       calendar days) to
       return documentation.     7.   Completes Final Notice - Fair Hearing
       This is not calculated          Compliance, in duplicate, (including
       in the amount of time            signature and date).
       it takes HCSP to comply
       with the fair hearing     8.   Mails original to client and retains copy
       decision.  This also            in case record.
       applies when client has
       provided incomplete       9.   Annotates Tracking Form with date of Final
       documentation and CASA         Notice sent to client and submits case
       requests additional            record to MEU Supervisor.
       information.

MEU SUPERVISOR                   10.  Reviews case record for proper documentation
                                      and decontrols case.

                                 11.  Sends annotated Fair Hearing Compliance
                                      Tracking Sheet to F.H. Liaison, along
                                      with copies of HCSP 3000E and Final Notice.

FAIR HEARING LIAISON             12.  Reviews case and annotates "tickler" copy of
                                      Fair Hearing Compliance Tracking Sheet with
                                      date to HCFHU.

                                 13.  Forwards "tickler" copy of Tracking Sheet along
                                      with copies of HCSP 3000E and Final Notice to
                                      HCFHU at 109 E. St.

NOTE: If client submits
      documentation after
      the Final Notice has
      been mailed, MEU
      processes it in
      accordance with
      current MA procedure.

---

SECTION 12

ACTION TAKEN WHEN DAFH REQUIRES CASA TO RESTORE MEDICAID

---

**Responsibility:**                         **Action:**

ELIGIBILITY SPECIALIST      1.  Processes case according to current
                                MA procedure with appropriate notices
                                to client and/or MAP 2074.

                            2.  Completes HCSP 3000E, in triplicate,
                                indicating that the decision is to
                                restore MA and the effective date of
                                the action.  (see item 4 on the form).

                            3.  Submits case record to MEU Supervisor.

MEU SUPERVISOR              4.  Processes case in accordance with current
                                MA procedure and signs HCSP 3000E.

                            5.  Annotates 'Date of Actual Compliance' on
                                Tracking Form.

                            6.  Decontrols case and forwards record with
                                copies of HCSP 3000E, notices to client
                                and/or MAP 2074 to F.H. Liaison.

F.H. LIAISON               7.  Reviews case and annotates "tickler" copy
                                of Fair Hearing Compliance Tracking Form
                                with date.

                            8.  Forwards "tickler" copy of Tracking Form to
                                HCFHU along with copies of HCSP 3000E,
                                notices to client and/or MAP 2074.

C0686

-28-

```
┌─────────────────────────────────────────────────────┐
│ SECTION 13                                           │
├─────────────────────────────────────────────────────┤
│ ACTION TAKEN WHEN DECISION IS TO EVALUATE AND RESTORE MEDICAID │
└─────────────────────────────────────────────────────┘
```

**Responsibility:**

ELIGIBILITY SPECIALIST,
MEU SUPERVISOR, F.H.
LIAISON

**Action:**

IF CASA ALREADY IN COMPLIANCE WITH DAFH:

1.   Same as Section 9.

IF CLIENT PROVIDES DOCUMENTATION:

2.   Same as Section 10.

IF CLIENT FAILS TO PROVIDE DOCUMENTATION:

3.   Same as Section 11.

FOR ACTION TO RESTORE MEDICAID SERVICES:

4.   Same as Section 12.


**NOTE:**

WHERE THE DECISION AFTER FAIR HEARING INVOLVES BOTH HOME CARE SERVICES AND MEDICAID
SERVICES, IT WILL BE NECESSARY FOR THE FAIR HEARING LIAISON TO COMPLETE AND MAIL TO THE
CLIENT THE HCSP 3000E AND THE FINAL NOTICE (WHERE APPROPRIATE).  SEE SECTION 14.

C0687

**JA197**

-29-

| SECTION 14 |
| --- |
| ACTION TAKEN WHEN DAFH INVOLVES BOTH HOME CARE SERVICE AND MEDICAID |

**Responsibility:**                                          **Action:**

FAIR HEARING LIAISON            1.   Processes the case as described in
                                    Section 1.

                               In Addition:

                               2.   Completes HCSP 3000E indicating both
                                    HC and MA decisions.

                               3.   Photocopies 3000E.  Original to client:

                                         - copy to MEU
                                         - copy to Service Team
                                         - copy retained in compliance
                                           'tickler' file.

                               4.   Enters on Tracking Form,

                                    "HCSP 3000E sent to client."

SERVICE TEAM/MEU               5.   Refers to the appropriate section(s) in
                                    this procedure to process the case.

                                    * See note on pg. 21, section #7,
                                      regarding submission of Fair
                                      Hearing Tracking Form.

                               IF THE CLIENT FAILS TO PROVIDE DOCUMENTATION:

                               6.   Makes cases record entry indicating
                                    client's failure to provide documentation.

                               7.   Forwards case record to F.H. Liaison.

F.H. LIAISON                   8.   Completes Final Notice, making clear
                                    reference  to the matter for which the
                                    client failed to provide documentation
                                    (i.e., Home Care Service and/or Medicaid).

                               9.   Photocopies Final Notice:

                                         - original to client
                                         - copy in case record
                                         - copy for HCFHU.

                               10.  Annotates 'tickler' copy of Tracking Form
                                    with date of Final Notice sent to client
                                    and date sent to HCFHU.

                               11.  Forwards 'tickler' copy of tracking sheet
                                    to HCFHU at 109 E. 16 St., along with copy
                                    of HCSP 3000E, Final Notice (if appropriate)
                                    and other appropriate forms as described
                                    previously in this manual.

                               12.  Ensures case record(s) to file(s).


                                    **NOTE:**

WHERE THE DECISION AFTER FAIR HEARING INVOLVES BOTH HOME CARE SERVICES
AND MEDICAID SERVICES, IT WILL BE NECESSARY FOR THE FAIR HEARING
LIAISON TO COORDINATE THE COMPLIANCE ON BOTH SERVICE AND MEDICAID AND
ENSURE THAT APPROPRIATE STAFF ARE AWARE OF THE ACTIONS TAKEN!

IT WILL BE NECESSARY FOR THE FAIR HEARING LIAISON TO COMPLETE AND MAIL
FORM HCSP 3000E AND THE FINAL NOTICE TO THE CLIENT, (WHERE APPROPRIATE).
SEE SECTION #14.

C0688

COPY

1

1

2     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
3     _____
4     BORIS SHAKHNES by his next friend ALLA
      SHAKHNES, MIKHAIL FELDMAN, FEI MOCK
5     SHA-SHA WILLIS, and CHIAO ZHANG,
      individually and on behalf of others
6     similarly situated,
7                         Plaintiffs,
8             -against-
9     VERNA EGGLESTON, as Commissioner of the
      New York City Human Resources
10    Administration, ROBERT DOAR, as
      Commissioner of the New York State Office
11    of Temporary and Disability Assistance;
      and ANTONIA C. NOVELLO, as Commissioner of
12    the New York State Department of Health,
13                        Defendants.
14    06 Civ. 04778 (RJH)(RLE)

15    _____
16                        March 27, 2008
                          11:01 a.m.
17
18
19            DEPOSITION of MARK G. LACIVITA,
20    taken by Plaintiffs, pursuant to Notice,
21    held at the offices of SONNENSCHEIN NATH &
22    ROSENTHAL, LLP, 1221 Avenue of the
23    Americas, New York, New York before Wayne
24    Hock, a Notary Public of the State of New
25    York.

13

M. Lacivita

1
2 a program-specific issue, there are times
3 when I may speak to somebody in one of the
4 OTDA program divisions to find out
5 specific information.
6     Q.    And the OTDA program divisions
7 that you mentioned, are these the food
8 stamp, child support, disability?
9     A.    They have many different names
10 that change frequently.
11     Q.    What's the latest iterations of
12 the name; do you know?
13     A.    No, I don't.  I have certain
14 contacts.  I call them and if they tell me
15 I don't do that any more, I find out who
16 does it.  So I deal with people, I don't
17 deal with the, you know, the program
18 division per se.  I deal with the
19 individuals who are responsible.
20     Q.    What division is in charge of
21 the Medicaid program?
22     A.    Medicaid is supervised by the
23 Department of Health, the New York State
24 Department of Health.
25     Q.    So what are OTDA's duties with

14

M. Lacivita

1

2   respect to Medicaid or responsibilities,

3   if any?

4      A.    I can tell you what the hearings

5   are.  I'm not involved in the interaction

6   with the Department of Health so I don't

7   know.

8      Q.    So with respect to the hearings.

9      A.    There's a memorandum of

10   understanding and we hold the hearings for

11   the Department of Health and issue the

12   decisions under the signature of the

13   commissioner of the Department of Health.

14         MS. LOPEZ-PAREDES: Let me

15      backtrack for a second, so we're going

16      to go with the notice to the

17      deposition.

18         Mark this as Lacivita Exhibit 1.

19         (Whereupon, a document entitled

20      Notice of Deposition was marked

21      Lacivita Exhibit 1 for identification.)

22      Q.    Have you seen this document

23   before?

24      A.    Yes.

25      Q.    When did you see it?

24

M. Lacivita

Lacivita Exhibit 3 for identification.)

Q.    I have given you what's been
marked as Lacivita Exhibit 3, I believe.

A.    Yes.

Q.    Have you seen this before?

A.    Yes.

Q.    What is this?

A.    I refer to this as the
memorandum of understanding between OTDA
and the Department of Health as the basis
for, at least in part, the holding
Medicaid and other related hearings for
the Department of Health.

Q.    The basis for holding Medicaid
hearings, do you mean the basis for OTDA
to be responsible for those hearings?

A.    Yes, that's my understanding.

Q.    Is this the memorandum of
understanding that you referred to before
that we were talking about?

A.    Yes.

Q.    Has this memorandum of
understanding changed since -- I believe
it's signed 1996.

25

1          M. Lacivita

2          Do you know if it has --

3     A.     I would not know.

4     Q.     In addition to holding the

5  hearings, what other responsibilities did

6  OTDA assume concerning Medicaid by virtue

7  of this memorandum of understanding?

8     A.     I would only know those parts

9  related to the Office of Administrative

10 Hearings.

11    Q.     And those parts are holding the

12 hearings?

13    A.     It's my understanding that the

14 administrative hearings is responsible for

15 the hearing process for Medicaid-related

16 hearings and that's what this document

17 assigns to us, us meaning OTDA, OAH.  I

18 don't know what OTDA's responsibilities

19 are other than the hearings

20 responsibilities.

21    Q.     What does the hearing process

22 entail?

23    A.     Taking requests from, you know,

24 clients or representatives or whoever on

25 behalf of a client makes the request,

26

1                     M. Lacivita

2    processing the request which would mean

3    that we have to review the request, enter

4    it into the computer system, make

5    notification that the request has been

6    made, schedule the hearing, deal with any

7    of those responsibilities in the

8    scheduling process, and conduct a hearing,

9    issue a decision, and respond to a

10   compliance -- a noncompliance complaint.

11        Q.     Respond to a noncompliance

12   complaint?

13        A.     Correct.

14        Q.     Is ensuring compliance with the

15   decision part of the OTDA responsibilities

16   in the absence of a noncompliance

17   complaint?

18        A.     Administrative hearings does not

19   only react -- administrative hearing only

20   reacts to a noncompliance complaint.

21        Q.     Does the administrative -- the

22   administrative hearing then does not

23   ensure compliance with decisions after

24   fair hearing?

25        A.     Only by way of a complaint.

27

1          M. Lacivita

2     Q.    So only if an applicant

3 complains that there's no compliance?

4     A.    The agency is directed to comply

5 as part of the transmittal of a decision,

6 the agency doesn't comply, we receive a

7 complaint, then we react to it.

8     Q.    So if the agency doesn't comply

9 but you don't receive a complaint, does

10 OTDA react to it?

11     A.    Administrative hearings is not

12 aware that there's no compliance.  What

13 the agency does problematically I would

14 not be involved in.

15     Q.    When you say the agency, do you

16 mean OTDA?

17     A.    OTDA or the health department,

18 whoever has the responsibility for dealing

19 with complying with decisions.

20     Q.    So that's not a responsibility

21 of the hearing -- of your unit; is that

22 correct?

23     A.    Without a complaint, hearings

24 would have no way of knowing that there's

25 noncompliance.

61

M. Lacivita

most instances, we get resolution to
everybody's satisfaction in that manner.
Sometimes we don't and then it gets pushed
up to the next step.

    Q.    Has it ever come to your
attention that there are frequent or
repeated complaints regarding compliance
with fair hearing decisions with respect
to one local district?

    A.    Yes.

    Q.    Is that the kind of thing that
will come to your attention?

    A.    Yes.

    Q.    Again, I'm talking specifically
about home health services.

    Is that something that comes to
your attention?

    A.    Yes.

    Q.    Has is it ever come to your
attention that there are repeated
complaints of fair hearing noncompliance
for home health services with respect to
HRA?

    A.    Yes.

62

M. Lacivita

Q.    When was the last time that such

a -- that you were aware of --

A.    Within the last month.

Q.    What do you do at that point?

A.    We discuss it.  We try and come

up with a -- identify the problem, what

needs to be done, and who can best handle

it.  If our solution doesn't work, as I

said before, then it goes up to the next

level.  But there are a couple of

different levels so we have to decide and

I have to decide in most cases where we're

going next.

Q.    When you're made aware that

there is an issue of noncompliance with

fair hearing decisions with HRA, do you

seek to find a system-wide solution or is

it a very specific solution to the

specific cases of noncompliance that are

before you?

MS. CONWAY: Objection to the

form.

Q.    Do you understand the question?

A.    Yes.

71

1                    M.  Lacivita

2    generally I would go directly to Mr. Hanks

3    and we would discuss it.

4        Q.    What was Mr. Pedicone's title?

5        A.    He was the principle hearing

6    officer in charge of the litigation unit.

7        Q.    Who has replaced him?

8        A.    No.

9        Q.    Is that office vacant?

10       A.    Yes.

11       Q.    Is OTDA planning on replacing

12   him?

13       A.    I'm not aware of their plans.

14       Q.    Who has assumed Mr. Pedicone's

15   responsibilities?

16       A.    David Amarian, A M A R I A N.

17       Q.    You also mentioned before that

18   sometimes, when there are issues brought

19   to your attention, you try to go through

20   the cooperative way to secure compliance.

21       A.    Yes.

22       Q.    Is that the general OTDA policy?

23       A.    I'm not aware that there's an

24   OTDA policy with regard to that.

25       Q.    You said that you do that as

72

                    M. Lacivita

1

2    opposed to requesting or requiring

3    compliance.

4               MS. HOCHHAUSER: Objection to

5         form.  I'm not sure --

6               MS. LOPEZ-PAREDES: Let me get

7         specifically what he said.

8         Q.    Does OTDA have the authority to

9    demand compliance?

10        A.    Yes.

11        Q.    Who at OTDA has the authority to

12   demand compliance?

13        A.    Well, it's delegated to the

14   compliance coordinators and up the chain

15   of command.

16        Q.    In an issue -- let's put a

17   hypothetical.

18               If an issue was brought to your

19   attention where an individual was not

20   receiving let's say home health services

21   as directed by a decision after fair

22   hearing in the amount of seven hours,

23   seven days and there's been noncompliance

24   with the decision for over six weeks,

25   would you demand compliance in that?

81

M. Lacivita

1

2    A.    There's an internal review

3    process, but I'm not involved in that.

4    Q.    Are you talking about the

5    internal review process before the

6    decision is issued or is that a --

7    A.    I'm not involved in that or a

8    review after the decision -- the decision

9    after fair hearing has been issued.

10   Q.    Who's involved in that?

11   A.    The principle hearing officer.

12        MS. LOPEZ-PAREDES: I think this

13        is about the right time for a break.

14        (Whereupon a break was taken)

15   Q.    I want to ask you -- we're going

16   to move on from where we were before the

17   break.  If you don't mind, I'm going to

18   start on a different topic altogether.

19   A.    Okay.

20   Q.    Who's -- what is your

21   understanding of who is entitled to a fair

22   hearing in the home health services area?

23   A.    Anyone who contacts the Office

24   of Administrative Hearings and makes a

25   request.

82

M. Lacivita

Q.      Does there need to be -- does
that person need to have any reason to
make a request of fair hearing?

A.      Yes.

Q.      And what would those reasons be?

A.      Pretty much whatever they say.

Q.      Are there any requirements for
those individuals to make a request for a
fair hearing?

A.      No.

Q.      Do those individuals need to be
eligible for Medicaid?

A.      To make a hearing request?

Q.      For the home health services.

A.      No.

Q.      So somebody who's not eligible
for Medicaid -- what issues would someone
who's not eligible for Medicaid home
health care services raise at a hearing?

A.      It's an applicant for or a
recipient of, fill in the blank, is
entitled to request a fair hearing.

Q.      So when -- so the applicant
makes a request?

112

1                    M. Lacivita

2        A.    Pardon?

3        Q.    Of what year?

4        A.    Oh, last year, I'm sorry.

5        Q.    '07?

6        A.    '07, yes.

7        Q.    You were authorized to hire more

8    staff?

9        A.    Correct.

10        Q.    Who authorized it?

11        A.    The agency.  There's a process

12    to request and have staff approved and the

13    process was undertaken and we were able to

14    hire a certain number, I don't recall

15    exactly, of additional supervisors and

16    hearing officers statewide.

17        Q.    Was that as a result of a

18    request, the authorization to hire more

19    individuals?

20        A.    Yes, the Office of

21    Administrative Hearings requested

22    additional staff.

23        Q.    Were you involved in that

24    request for additional staff?

25        A.    Yes.

113

1                    M. Lacivita

2       Q.    Do you know how many more staff

3  members you requested?

4       A.    I don't recall the exact number.

5  I'd be guessing.  It's something that is a

6  fixed number, I just don't know it off the

7  top of my head.

8       Q.    Did you get approval for all of

9  the staff that you requested?

10      A.    No.

11      Q.    Most of it?

12      A.    Yes.

13      Q.    Did you make that request as a

14  result of --

15            MS. LOPEZ-PAREDES: Let me back

16      up.  Strike that.

17      Q.    Were the staff increase that you

18  requested, was it all to work at the fair

19  hearing unit?

20      A.    Yes.

21      Q.    Was it specific to any unit, any

22  subsection?  You said it was statewide?

23      A.    Correct.

24      Q.    In addition to hearing officers,

25  what other staff did you request?

114

M. Lacivita

A.     Supervising hearing officers,
hearing officers, legal affair specialist
ones, and agency services reps.

Q.     What does a legal affairs
specialist one do?

A.     Generally take requests.

Q.     Requests for a fair hearing?

A.     Yes.

Q.     So a legal affairs specialist
one would go to the intake unit?

A.     Primarily, yeah, they're
assigned in a variety of different places
and jobs throughout the office, but that's
where the bulk of any staff titled that
way would go.

Q.     What do agency service reps do?

A.     They can take requests at a
lower level.  Primarily they're assigned
to the operational areas at Boerum Place
and 34th Street to handle the calendar
activity.

Q.     Just for 34th Street?

A.     34th Street and 14 Boerum Place.

Q.     Was the request for an increased

115

1                           M.  Lacivita

2     staff  related  to  the  litigation,  this

3     litigation?

4          A.      Not  specifically.

5          Q.      Was  it  related  to  any  issues

6     that  were  raised  in  this  litigation?

7          A.      Indirectly.

8          Q.      Was  it  related  to  any  delays  in

9     scheduling  fair  hearings?

10         A.      Yes.

11         Q.      Was  it  related  to  any  delays  in

12    issuing  decisions  at  the  fair  hearing?

13         A.      Yes.

14         Q.      Was  it  related  in  any  way  to

15    securing  compliance  with  fair  hearing

16    decisions?

17         A.      No.

18         Q.      You  said  that  you  did  not

19    receive  authorization  for  every  one  that

20    you  requested.

21         A.      Correct.

22         Q.      Is  there  still  a  need  for  more

23    staff?

24         A.      Yes.

25         Q.      How  many?

116

M. Lacivita

1

2     A.     Off the top of my head, I

3    couldn't tell you what the latest request

4    was for staff.

5     Q.     When did you make that last

6    request?

7            MS. HOCHHAUSER: Objection to

8        form.

9     Q.     What was the date of that latest

10   request?

11    A.     Within the month.

12    Q.     Was the request for LAS-1s?  Did

13   you make a request to hire LAS-1s?

14    A.     In the current request?

15    Q.     In the current request.

16    A.     Yes.

17    Q.     Did you make a request to hire

18   agency service representatives?

19    A.     Yes.

20    Q.     Did you make a request to hire

21   hearing officer supervisors?

22    A.     No supervisors, no.

23    Q.     Do you know approximately more

24   staff you requested authorization for, if

25   you know?

117

M. Lacivita

 1  

 2      A.    I just don't know the exact

 3  number. I know parts of it but no, I

 4  don't know the number off the top of my

 5  head.

 6      Q.    Is that request still pending?

 7      A.    Yes.

 8      Q.    In the last five years, how many

 9  requests for additional staff have you

10  made?

11      A.    Numerous.

12      Q.    Have they always been granted?

13      A.    No.

14      Q.    Have you had any requests for

15  additional staff denied?

16      A.    Parts of requests, yes.

17      Q.    How did you determine that you

18  needed additional staff in the prior

19  request, the one that was granted sometime

20  in I believe you said August or fall of

21  2007?

22      A.    It's a function of our

23  management responsibilities to monitor

24  workload, monitor backlogs at all the

25  various parts of the process that we're

118

1                    M. Lacivita

2    capable of monitoring, and make requests

3    of different staff based on current level

4    of activity.

5        Q.    Did you analyze those monitoring

6    reports?

7              MS. LOPEZ-PAREDES: Let me back

8        up.

9        Q.    Were the monitoring reports

10   created for the purposes of assessing

11   whether there was a need for additional

12   staff?

13       A.    Not specifically for this

14   request.   There are just reports that

15   exist for that purpose.

16       Q.    Who identifies a need for

17   additional staff?

18       A.    The senior management of

19   administrative hearings has that

20   responsibility.

21       Q.    Did you make a written request

22   for additional staff?

23       A.    Yes.

24       Q.    Did you have to submit

25   supporting documentation?

123

<pre>
 1                    M. Lacivita

 2    regarding this issue?

 3         A.    Did I?

 4         Q.    Yes.

 5         A.    No.

 6         Q.    Did anyone at the Office of

 7    Administrative Hearings write a memo to

 8    the general counsel advising him of this

 9    need?

10         A.    They could have.  I wouldn't

11    know.

12         Q.    Did you have any conversations

13    with the general counsel regarding the

14    need for additional staff?

15              MS. HOCHHAUSER: Objection.

16         A.    Deputy general counsel.

17              MS. LOPEZ-PAREDES: Withdrawn.

18         Q.    With respect to scheduling fair

19    hearings -- actually, we talked before

20    about receiving requests for a fair

21    hearing and you discussed that any

22    individual can make a request for a fair

23    hearing.

24              Can those requests come through

25    the phone?
</pre>

124

                         M. Lacivita

1

2      A.     Yes.

3      Q.     Can they come via mail?

4      A.     Yes.

5      Q.     And fax?

6      A.     Yes.

7      Q.     If it comes either via mail or

8  fax, who receives that correspondence?

9      A.     The intake unit.

10     Q.     Are those requests processed as

11  soon as they're received?

12     A.     Yes.

13     Q.     Are you aware of any delays

14  between the time a request is received via

15  fax or mail and the time where their

16  request is processed or inputted into the

17  FHIS?

18     A.     Yes.

19     Q.     Is a delay, could it be a day?

20     A.     Yes.

21     Q.     Could it be a week?

22     A.     Yes.

23     Q.     Could it be more than a week?

24     A.     Yes.

25     Q.     What is the longest delay that

125

1          M. Lacivita

2   you are aware between the day a request

3   for a fair hearing was received and the

4   day it was inputted into FHIS?

5       A.    That I'm aware of today?

6       Q.    As you sit here today, which one

7   -- what is the longest delay that you

8   recall?

9       A.    There may be some requests as

10  old as thirty days.

11      Q.    And when that information is

12  finally submitted in the FHIS, what does

13  the date of request -- what is the date of

14  request noted in FHIS?

15      A.    The postmark date or the fax

16  date or the e-mail date.

17      Q.    They can make requests by

18  e-mail, too?

19      A.    Yes.

20      Q.    The memo that was drafted, who

21  drafted the memo for the request for

22  increased staff?

23      A.    Russell Hanks.

24          MS. HOCHHAUSER: Excuse me for

25      one second.

126

M. Lacivita

2        (Discussion held off the record)

3     Q.    So when a request is received by

4 mail or fax or e-mail, do you know any

5 reason why it would take up to thirty

6 days?

7     A.    Staffing.  Volume and staffing.

8     Q.    Was that one of the issues

9 raised in the request for additional

10 staff?

11    A.    Yes.

12    Q.    Does the Office of

13 Administrative Hearings receive -- are the

14 majority of requests received via mail?

15    A.    No.

16    Q.    What is the form where the

17 majority of requests come from?

18    A.    Approximately forty percent of

19 the activity is requested by telephone.

20 That can vary dramatically.

21    Q.    I understand.

22    A.    Then the remainder are walk-ins,

23 faxes, e-mails, and they're about evenly

24 split.  E-mails is an increasing

25 percentage of the request activity and

144

1              M. Lacivita

2  and it's all part of the management

3  responsibility of the office and we have a

4  goal to schedule hearings and issue

5  decisions.  If something is consistent or

6  inconsistent with that goal, then we have

7  to act appropriately.  Requests are made

8  all the time for many things.

9              I don't know how to answer that

10  other than to say that.  We can't control

11  the requests we receive.

12      Q.    You said that you have a goal to

13  schedule hearings and issue decisions.

14              Does that goal include

15  scheduling hearings and issuing decisions

16  within a certain time frame?

17      A.    Absolutely.

18      Q.    What's that time frame?

19      A.    The statutory requirement is

20  sixty days for food stamps, ninety days

21  for public assistance, Medicaid, and the

22  other programs, and as soon as possible

23  for emergency hearings and there's

24  litigation out there that splits that

25  time.  There's litigation out there that

145

M. Lacivita

bifurcates that time frame to city and
state responsibility.

Q.    Let me make sure -- what is the
time frame -- what is OTDA's understanding
of the time frame between within which
they have to schedule and hold a fair
hearing, so from date of request to date
of fair hearing?

A.    There is no statutory time frame
for that period.

Q.    What is the statutory time
frame?  So the statutory time frame that
you were referring to, what does that
include?

A.    From date of request to
substantial compliance.

Q.    What do you consider substantial
compliance?

A.    That the agency has complied
with the decision and the benefits have
been received by the client.

Q.    If a decision asks the agency to
re-evaluate the client, what does OTDA
consider to be substantial compliance?

                    M.  Lacivita

1

2       A.      That's based on the specific

3    wording of a decision and the compliance

4    coordinator's action.  But I guess

5    generically if they're asked to do

6    something in a decision and they do that,

7    then they've complied, whatever the

8    direction is.

9       Q.      For home health services, what

10   is that time frame?

11           MS. HOCHHAUSER: Objection to

12       form.

13       Q.      Between date of request until

14   substantial compliance.

15       A.      The total time frame is ninety

16   days.

17       Q.      You mentioned, as a result of

18   litigation, there was a bifurcation of

19   responsibilities?

20           MS. HOCHHAUSER: Objection to

21       form.

22           THE WITNESS:  What?

23           MS. HOCHHAUSER: I'm just

24       objecting to the form of the question.

25           You can answer it if you

176

1                    M. Lacivita

2    thousand cases that we handle that that

3    happened.

4            MS. LOPEZ-PAREDES: Can we go off

5        the record.

6            (Whereupon a break was taken)

7        Q.    In New York City, if HRA shows

8    up at the hearing and requests an

9    adjournment right then to the hearing

10   officer, is the adjournment made to a date

11   specific or is it kicked back to the

12   calendar?

13           MS. CONWAY: Objection to form.

14       A.    I don't know.  It could be

15   either.

16       Q.    So the hearing officer has the

17   discretion to adjourn it to a date

18   specific in New York?

19       A.    Yes, yes, to the extent that I'm

20   aware.

21       Q.    Does the period -- for the

22   purposes of the ninety-day time frame,

23   does that period get tolled if the request

24   to adjourn is made by HRA?

25       A.    Yes.

177

M. Lacivita

1

2     Q.     And is it tolled from the date

3  of the request until --

4     A.     Until the date it's scheduled

5  for.

6     Q.     So if the request for an

7  adjournment is made by HRA at the hearing,

8  the ninety-day period is tolled?

9          MS. CONWAY: Objection to form.

10     A.     Yeah, to the extent that an

11  adjournment is granted.

12     Q.     Do you know what priority

13  hearings are?

14     A.     Yeah.

15     Q.     What are they?

16     A.     A priority hearing is a

17  situation where a client brings to our

18  attention some external event that creates

19  an operative date that we're required to

20  attempt to react to.

21     Q.     How do you react to it?

22     A.     A client indicates there's a

23  shutoff notice, there's a pending

24  eviction, if there's some type of similar

25  related event, they can get priority

184

1                M. Lacivita

2   responsible for.

3        Q.    Are you aware of any instances

4   where hearings are rescheduled for failure

5   -- for HRA's failure to bring the evidence

6   packet?

7             MS. CONWAY: Objection.

8        A.    Let me just -- I just want to

9   phrase my answer right.

10            I know there are instances where

11  the agency does not bring packets.  What

12  happens at the hearing is an action that's

13  a decision by the hearing officer.

14  Therefore I'm not responsible for that so

15  I --

16       Q.    I understand that.

17            I just asked you if you are

18  aware of any instances outside of whether

19  that's something that happens or not, if

20  you're aware of any instances where a

21  hearing has been --

22       A.    Adjourned?

23       Q.    Adjourned.

24       A.    Yes.

25       Q.    Would the time frame for

185

1                           M. Lacivita

2    compliance be tolled in those instances,

3    if you know?

4              MS. CONWAY: Objection to form.

5         A.     It's considered an adjournment.

6         Q.     It's considered an adjournment.

7              And you indicated that any

8    adjournment tolls the ninety-day

9    compliance period?

10             MS. HOCHHAUSER: Objection to

11        form.

12        Q.     Is it the case that every

13   adjournment tolls the period?

14        A.     Yes.

15        Q.     When a fair hearing is

16   scheduled, does it take into account --

17             MS. LOPEZ-PAREDES: Never mind.

18        Strike that.

19        Q.     Does the scheduling supervisor

20   take into account the ninety-day period

21   within which compliance has to be --

22   substantial compliance needs to be

23   achieved when they schedule fair hearings

24   for home health services?

25        A.     Not directly, no.

1              M. Lacivita

2        understand.

3        A.     Well, the litigation has said in

4     certain program areas the state has X

5     number of days and the City of New York

6     has Y number of days.  In food stamps,

7     it's split evenly thirty and thirty.  We

8     have thirty days to issue a decision and

9     transmit it to the agency.  The agency has

10    thirty days to comply.

11        Q.     What other programs?

12        A.     In public assistance, it's sixty

13    and thirty.  And we attempt to hold the

14    same standard in other program areas as

15    well.

16        Q.     Do you know what litigation this

17    is?

18        A.     It's either Moore or Perrone.

19    Moore was the initial lawsuit, but I would

20    not be the definitive answer on that.

21        Q.     Were home health services the

22    subject of this litigation?

23        A.     I'm not sure if they were or

24    not.

25        Q.     How many hearing officers are

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BORIS SHAKHNES, individually and on behalf of all others similarly situated,<br><br>                           Plaintiffs,<br><br>              – v. –<br><br>VERNA EGGLESTON, as Commissioner of the New York City Human Resources Administration, ROBERT DOAR, as Commissioner of the New York State Office of Temporary and Disability Assistance, and ANTONIA C. NOVELLO, as Commissioner of the New York State Department of Health<br><br>                        Defendants. | Case No. 06-CV-04778 (RJH)<br><br>**DECLARATION OF**<br>**ROBERT W. GIFFORD** |

ROBERT W. GIFFORD, under penalty of perjury pursuant to 28 U.S.C. § 1746, declares as follows:

    1.     I am associated with Sonnenschein Nath and Rosenthal LLP, co-counsel with the New York Legal Assistance Group for Plaintiffs in the above-captioned litigation. I make this Declaration in support of the report of Plaintiffs' expert witness, Richard Faust. Specifically, I submit this Declaration to describe the searches and analyses of data that Plaintiffs' counsel performed at Mr. Faust's direction. I make this Declaration based on personal knowledge and my review of the business records of Plaintiffs' counsel.

    2.     On March 1, 2007, Plaintiffs served the New York State Office of Temporary and Disability Assistance (OTDA) ("State Defendant") with a Second Set of Interrogatories and Requests for Production of Documents ("Plaintiffs' Interrogatories and Document Requests"), requesting, *inter alia*, that State Defendant provide Plaintiffs with certain information "for each New York City applicant for, or recipient of, Home Health Services who between May 1, 2005

**JA231**

and April 30, 2006 requested a Fair Hearing relating to an Adverse Action taken with regard to

Home Health Services." (Exhibit A: Plaintiffs' Interrogatories and Document Requests,

Interrogatory 1). Plaintiffs also requested, *inter alia*, the Decisions After Fair Hearing

("DAFH") and the "printouts of all pages of all files from the Fair Hearing Information System

("FHIS")" for all "New York City applicants for, or recipients of, Home Health Services, who

between May 1, 2005 and April 30, 2006 requested a Fair Hearing concerning an Adverse

Action taken with regard to his or her Home Health Services." (*Id.*, Document Requests 1 and 2).

3.      On or about May 2, 2007, State Defendant produced to Plaintiffs several charts

that State Defendant represented contained the information requested in Plaintiffs' Interrogatory

1. Additionally, on that same date, Plaintiff received from State Defendant electronic images of

the Decisions After Fair Hearing ("DAFHs") for those clients who had requested a fair hearing

between May 1, 2005 and April 30, 2006.

4.      Plaintiffs and State Defendants had agreed to the May 1, 2005 through April 30,

2006 time frame. (Exhibit B: April 13, 2007 Letter from Eva Lopez-Paredes to George Alvarez;

Exhibit C: April 19, 2007 Letter from George Alvarez to Eva Lopez-Paredes).

5.      State Defendant's May 2, 2007 production of information was over-inclusive in

that it included information about all applicants for and recipients of *Medicaid* who had

requested fair hearings between January 2004 and December 2006. The production was not

limited to individuals whose fair hearing requests concerned the provision of home health care

services. For example, State Defendants included information regarding many individuals who

had requested fair hearings regarding Medicaid recertification or other issues not relating to the

provision of home health care services. In order to narrow the State Defendant's DAFH

production to include only documents related to class members, Plaintiffs' expert, Mr. Faust,

requested that Plaintiffs' counsel review the DAFHs and provide him with information for only

- 2 -

10232075

those individuals who had requested a fair hearing relating to home health care. Accordingly,

Plaintiffs' counsel reviewed all of the DAFHs produced by State Defendant, and later provided

to Mr. Faust a chart containing data for the 525 individuals who had requested a fair hearing

relating to home health care services between May 1, 2005 and April 30, 2006 (the "State Data

Chart"). That data included for each individual, to the extent that it was provided by the State

Defendant, the following information:

- the individual's unique Fair Hearing number;

- the individual's first and last name;

- whether he or she was identified as a *Varshavsky* class member by the state (*see* Paragraph 17, *infra*);

- whether he or she was identified as a *Varshavksy* class member by Plaintiffs' counsel (*see* Paragraph 18, *infra*);

- the date the individual requested a fair hearing;

- whether or not the individual received aid-continuing;

- the date the City was notified that a hearing had been requested;

- the date of any aid-continuing redirects;

- the originally scheduled hearing date;

- any subsequent scheduled hearing dates, and whether they were heard or adjourned;

- the State Defendant's disposition code;

- the State Defendant's code indicating the reason for any adjournment; and

- the date the DAFH was issued.

    6.    At Mr. Faust's request, Plaintiffs' counsel also mechanically calculated, for each

of the 525 individuals, the following:

- the total number of days elapsed from request date to the date the DAFH was issued;

- the total period of adjournment, if any;

- 3 -

- the total elapsed days minus any adjournment period (*see* Paragraph 19, *infra*);

- the elapsed days from the date of request to the date of the fair hearing; and

- the elapsed days from the date of the fair hearing to the date the DAFH was issued.

7.      By order of the Court, Plaintiffs were required to give the New York City Human Resources Administration (HRA) ("City Defendant") fifty names of class members from the set of 525 class members identified from the State data, and City Defendant was required to provide Plaintiffs with all of its records for these individuals. (Exhibit D: May 15, 2007 Discovery Order).

8.      To generate the list of fifty individuals, Plaintiffs first excluded all recipients of aid-continuing, and all individuals who had their requests for home health services denied at their fair hearings, based on information contained in the State Data Chart.

9.      Plaintiffs' counsel then used a random number generator to randomly select fifty names from this list of 525 individuals, and on June 6, 2007, requested that the City Defendant provide information for those fifty individuals. (Exhibit E: June 6, 2007 letter from Robert Gifford to Kimberly Conway).

10.     Pursuant to a subsequent Order by this Court, Plaintiffs' counsel used a random number generator to randomly select an additional fifty names from the list of 525 names. On December 24, 2007, Plaintiffs' counsel requested that the City Defendant provide information for those individuals as well. (Exhibit F: February 7, 2008 Discovery Order).

11.     To the extent that City Defendant complied with Plaintiffs' requests for this information, Mr. Faust requested that Plaintiffs' counsel provide him with a chart organizing certain types of data provided by the City Defendant for these one hundred individuals (the "City

- 4 -

10232075

**JA234**

Data Chart"), to the extent it was provided, and Plaintiffs' counsel complied. The City Data

Chart contains the following information:

- the first and last name of each individual;

- the date his or her DAFH was issued;

- the date the Form 3000-E was sent to the individual (if provided by City Defendant);

- the date the Form M-11q was received by City Defendant (if provided by City Defendant);

- the date the City achieved compliance with the DAFH (*see* Paragraph 13, *infra*);

- whether or not a re-evaluation order was issued by the State; and

- whether or not a compliance complaint was made by the appellant to the State.

     12.    At Mr. Faust's request, Plaintiffs' counsel also mechanically calculated, for each

of the 100 individuals, the following:

- the total elapsed days from the date of the DAFH issuance to the date services were authorized by the City;

- the tolling period (*see* Paragraph 20 *infra*);

- the total elapsed days minus the tolled period.

     13.    By way of background, many DAFHs require that the City Defendant re-evaluate

its decision to deny care, while other DAFHs order the City Defendant to institute home health

care without requiring any re-evaluation. Plaintiffs' counsel determined the date of City

Defendant's compliance with each state-issued DAFH in one of two ways, depending on whether

the City Defendant was ever required to implement care:

- With respect to individuals whose DAFHs or DAFH-required re-evaluations state that the City Defendant must implement home health services, Plaintiffs' counsel determined the compliance date to be the compliance date indicated by the HALO printout provided by City Defendant, to the extent that information was produced by the City Defendant.

- With respect to individuals whose DAFH-required re-evaluations did not require any home health services, Plaintiffs' counsel determined the compliance date to be the date that the

102330375

City Defendant sent a letter to the individual, notifying him or her of the result of his or her re-evaluation.

14.     Mr. Faust also requested that Plaintiffs' counsel indicate which of the individuals on the State and City Data Charts would be classified as class members in the *Varshavsky* class action settlement. *Varshavsky v. Perales*, 202 A.D.2d 155 (N.Y. App. Div. 1 Dept. 1994). Plaintiffs do not believe that the *Varshavsky* settlement is at all relevant to the issues before this Court. However, State Defendant has argued to the contrary. In an abundance of caution, with respect to that issue, Plaintiffs' counsel identified which of the 525 individuals on the State Data Chart might also be *Varshavsky* class members (because the individuals on the City Data Chart are a subset of the 525 people on the State Data Chart, a separate analysis of the City Data Chart was not required for this purpose).

15.     In order to determine which of the 525 individuals whose data appeared on the State Data Chart would be considered *Varshavsky* class members, Plaintiffs' counsel performed two analyses, described below. (*See* Paragraphs 17, 18 *infra*).

16.     During his March 27, 2008 and July 31, 2008 depositions, State Defendant witness Mark Lacivita twice confirmed that the State Defendant's method of tracking *Varshavsky* class members is the placement of a code, "NYS6," in their FHIS records. (Ex. G: March 27, 2008 Lacivita Dep. at 132:17-20; Ex. H: July 31, 2008 Lacivita Dep. at 258:11-16).

17.     Despite Plaintiffs' Document Request 2 (*see* Paragraph 2, *supra*), State Defendant provided FHIS printouts for only ninety (90) of the 525 individuals who requested a Fair Hearing regarding their Home Health Services between May 1, 2005 and April 30, 2006. At Mr. Faust's direction, Plaintiffs' counsel reviewed these ninety records and indicated on the State Data Chart those individuals who were identified as *Varshavsky* class members by the NYS6 code (in the documents made available by the State Defendant).

- 6 -

18.     With respect to the remaining 435 individuals for whom the State Defendant failed to provide a FHIS printout, Mr. Faust requested that Plaintiffs' counsel perform text searches within those individuals' DAFHs for certain key phrases associated with *Varshavsky* class members. Plaintiffs' counsel used an electronic database program to search the DAFHs for two phrases: "Nina Keilin," (the *Varshavsky* class counsel to whom all *Varshavsky* DAFHs were forwarded), and "legal services for the elderly." Plaintiffs' counsel believed, and continues to believe, that all *Varshavsky* class members' DAFHs would contain one or both of these terms. Plaintiffs' counsel then indicated on the State Data Chart which individuals' DAFHs contain either of these phrases.

19.     Mr. Faust also requested that Plaintiffs' counsel calculate the length of any purportedly "tolled" periods for each of the individuals on the State Data Chart. In order to do this, Plaintiffs' counsel calculated the period of adjournments for each individual on the State Data Chart whose fair hearing was shown to have been adjourned by the data produced by State Defendant. Plaintiffs' counsel then subtracted that period from the total number of days between the date the fair hearing was requested and the date the DAFH was issued. Plaintiffs' counsel provided Mr. Faust with this information.

20.     Mr. Faust also requested that Plaintiffs' counsel calculate any purportedly "tolled" period which might apply to City Defendants. As discussed in Paragraph 13, *supra*, because many DAFHs require that the City Defendant re-evaluate its decision to deny care, the City Defendant often requires that recipients of and/or applicants for Home Health Services return to City Defendant a medical form to be completed by the individual's physician. This form is referred to as an M-11q. In order to inform the individual that he or she must have his or her physician complete the M-11q, the City Defendant mails to the individual another form called a 3000-E. City Defendant did not provide the dates that 3000-Es were issued, and/or that M-11qs

- 7 -

were returned, for many of the 100 individuals whose records the City was directed to produce. However, with respect to those individuals for whom the City did provide this information, Plaintiffs' counsel, at Mr. Faust's direction, calculated the number of days between the date 3000-E was sent and the date the M-11q was returned, and then subtracted that time period from the total number of elapsed days from DAFH to the date compliance was achieved (to the extent possible given City's incomplete production).

21.     At the July 31, 2008 deposition of State witness Mark Lacivita, Plaintiffs' counsel requested that the OTDA produce, *inter alia*, information regarding "New York City applicants or recipients of home health services that indicates the date of request [of fair hearing], the date the hearing was scheduled, whether the hearing was adjourned, the date the hearing was held, and the date the decision was issued" for all of 2008 available to OTDA.  (Ex. H: Lacivita 7/31/08 Dep. at 370:19-371:8).

22.     On September 11, 2008, OTDA produced to Plaintiffs, in hard copy, several charts providing information regarding class members who had requested fair hearings between January 1, 2008 and July 31, 2008.

23.     At Mr. Faust's instruction, Plaintiffs' counsel converted this information into an Excel spreadsheet, and then removed from the spreadsheet the following class members:

• Any individual who requested a fair hearing on or after July 12, 2008; and

• Any individual who requested a fair hearing whose fair hearing was ever adjourned, withdrawn, defaulted or otherwise rescheduled (so as not to include any individuals with a purported "tolled" period).

Additionally, Plaintiffs' counsel removed any duplicative entries.  Plaintiffs' counsel then provided this spreadsheet to Mr. Faust.

10232075

24.    I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 5, 2008

_____
                    Robert W. Gifford

10232075



**SONNENSCHEIN NATH & ROSENTHAL LLP**

1221 Avenue of the Americas
New York, NY 10020-1089
212.768.6700
212.768.6800 fax
www.sonnenschein.com

Eva Lopez-Paredes
212.398.4877
elopez@sonnenschein.com

March 1, 2007

<u>VIA FACSIMILE AND E-MAIL</u>

George Alvarez, Esq.                        Deborah Hochhauser, Esq.
Assistant Attorney General                  Assistant Attorney General
Office of the New York State Attorney        Office of the New York State Attorney
General                                      General
120 Broadway – 24th Floor                   120 Broadway – 24th Floor
New York, NY  10271                         New York, NY  10271

          Re:   <u>Shakhnes v. Eggleston 06 Civ. 04778 (RJH)</u>

Dear George and Debbie:

          We have received and reviewed State Defendants' supplemental production, made on
January 18, 2007. We also understand that OTDA is going to provide us with all 6,000 case files
you identified in the State's Supplemental Responses which are currently in Albany. We
appreciate your help in getting these documents. There remain, however, certain deficiencies in
State Defendants' supplemental responses which are discussed below.

**I.      OTDA Commissioner's Responses to Plaintiffs' Revised Interrogatories and
         Request for Production of Documents**

<u>Document Request Number 6</u>

          Document request number 6 requests "[d]ocuments identifying all New York City
applicants for or recipients of Home Health Services who, as of June 20, 2006, or any
subsequent date, have requested a Fair Hearing to challenge an Adverse Action
concerning the provision of Home Health Services, and who indicated in the request for a
Fair Hearing that they did not receive notice of the Adverse Action."

          State OTDA Commissioner responded that he has no documents responsive to this
request. However, Plaintiffs are aware of documents, such as Fair Hearing Request
forms (which are submitted to OTDA), that contain the requested information. Please
provide all such responsive documents, including but not limited to the aforementioned
Fair Hearing Request forms.

Brussels    Chicago    Dallas    Kansas City    Los Angeles    New York    Phoenix    St. Louis
                  San Francisco    Short Hills, N.J.    Washington, D.C.    West Palm Beach



**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

March 1, 2007
Page 2

Document Request Number 7

Document request number 7 requests "[d]ocuments identifying all New York City applicants for or recipients of Home Health Services who, as of June 20, 2006, or any subsequent date, have requested a Fair Hearing to challenge an Adverse Action concerning the provision of home health services, and for whom OTDA has coded notice as an issue at their Fair Hearing."

State OTDA Commissioner responded that he has no documents responsive to this request. Yet, Fair Hearing Request forms (which are submitted to OTDA) indicate whether an appellant received a notice of an Adverse Action from the local social services department. Furthermore, in our experience, Administrative Law Judges are apprised that notice is at issue in a case by OTDA; thus, the issue of notice must be identified in some way in OTDA's systems. Please provide all documents that indicate that an appellant has not received notice of an Adverse Action, including those documents that are made available to Administrative Law Judges prior to holding fair hearings.

Document Request Number 10

Document request number 10 requests "[d]ocuments setting forth the numbers of New York City applicants for or recipients of Home Health Services for whom Aid-continuing Orders had been issued as of July 7, 2006, indicating which Orders were being implemented."

State OTDA Commissioner responded by providing a list of Aid-Continuing requests from July 7, 2006 until the present. However, this request seeks information regarding Aid-Continuing requests that had been made as of July 7, 2006, meaning on or before July 7, 2006. Please supplement your response to include all New York City applicants for or recipients of Home Health Services for whom Aid-Continuing Orders had been issued between July 8, 2005 and July 7, 2006.

Document Request Number 27

Document request number 27 requests "[d]ocuments setting forth the numbers of New York City applicants for or recipients of Home Health Services who, as of June 20, 2006, or any subsequent date, have a pending request for a Fair Hearing concerning Home Health Services and who have not yet received a Fair Hearing, indicating a) the Fair Hearing number; b) the date on which the Fair Hearing request was made; c) the date on which the Fair Hearing was first scheduled; d) the date(s) of any request(s) for adjournments and by whom the adjournments were requested; e) the date(s) on which the Fair Hearing was subsequently scheduled; f) whether Aid-Continuing was directed; g)



**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

March 1, 2007
Page 3

the date Aid-Continuing was directed; h) whether the Aid-Continuing directive was obeyed."

State OTDA Commissioner responded by providing a list of requests for Fair Hearings made from June 20, 2006 until the present. However, this request seeks information regarding requests that were pending scheduling <u>on</u> June 20, 2006, meaning that the Fair Hearing was requested on or before June 20, 2006. Please supplement your response to include all New York City applicants for or recipients of Home Health Services who on June 20, 2006 had a pending request for a Fair Hearing concerning Home Health Services.

<u>Document Request Number 28</u>

Document request number 28 requests "[d]ocuments setting forth the numbers of New York City applicants for or recipients of Home Health Services who, as of June 20, 2006, or any subsequent date, have had a Fair Hearing concerning Home Health Services and have not yet received a DAFH, indicating a) the Fair Hearing number; b) the date on which the Fair Hearing request was made; c) the date on which the Fair Hearing was first scheduled; d) the date(s) of any request(s) for adjournments and by whom the adjournments were requested; e) the date(s) on which the Fair Hearing was subsequently scheduled; f) whether Aid-Continuing was directed; g) the date Aid-Continuing was directed; h) whether the Aid-Continuing directive was obeyed."

State OTDA Commissioner responded by providing a list of Fair Hearings that had occurred between June 20, 2006, until October 19, 2006, where a DAFH had not been issued. However, this request seeks a list of Fair Hearings including those that had occurred <u>before</u> June 20, 2006 where the DAFH had not yet been issued. Please supplement your response to include all New York City applicants for or recipients of Home Health Services who had had a Fair Hearing on or before June 20, 2006, and for whom a DAFH has not been issued.

II.    **New Requests and Plaintiffs' Proposal to Cure the Deficiencies in the Production**

As a result of our review of the documents produced to date, and our discussions with all Defendants, we have written a brief supplemental discovery request, enclosed herewith. As you will see, Plaintiffs' Second Set of Interrogatories and Requests for Production of Documents to State OTDA Commissioner, asks for some of the same information that remains outstanding from the original requests, as well as some additional information. Please note that we have attempted to minimize the burden of these requests by narrowing the time period of the requests. Also, we have asked only for data that prior discovery shows is in the possession of State defendants. Please respond to these requests by no later than March 30, 2007.



**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

March 1, 2007
Page 4

We are hoping that after you review these new requests we can reach an agreement about an efficient and non-burdensome way for State Defendants to provide the information we need. For instance, it may make sense for the State to consolidate some of the requested data into a chart. For your convenience we have enclosed a suggested form that lays out the types of data needed in tabular format similar to the format OTDA previously used in its production. This is only a suggestion, of course; we are open to discussion about how the State might best provide this information.

### III. Defendant Novello's Responses to Plaintiffs' Revised Interrogatories and Request for Production of Documents

<u>Document Request Number 11</u>

Document request number 11 requests "[f]or each type of Home Health Service, documents setting forth the respective roles of DOH, OTDA and City Defendant in providing and ensuring the provision of compliance with DAFHs to Class Members."

Defendant Novello objected to the production of a supplemental document responsive to this Request on the ground of attorney-client privilege. Please provide a privilege log for any documents withheld on this ground.

We very much hope that as soon as you review this letter and the enclosed requests, we can confer about them, in order to facilitate and speed up your responses. Thank you for your cooperation in this matter.

Sincerely,

Eva Lopez-Paredes

cc:   Kim Conway, Esq.
      Jane Greengold Stevens, Esq.
      Sandy Hauser, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
BORIS SHAKHNES by his next friend ALLA
SHAKHNES, MIKHAIL FELDMAN, FEI MOCK,
SHA-SHA WILLIS, and CHIAO ZHANG, individually
and on behalf of all others similarly situated,
                              Plaintiffs,

                                                                06 Civ. 04778 (RJH)(RLE)

           -against-

VERNA EGGLESTON, as Commissioner
of the New York City Human Resources
Administration, ROBERT DOAR, as
Commissioner of the New York State Office
of Temporary and Disability Assistance;
and ANTONIA C. NOVELLO, as
Commissioner of the New York State
Department of Health,

                              Defendants.
-------------------------------------------------------------x

## PLAINTIFFS' SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT STATE OTDA COMMISSIONER

To:    George Alvarez
       Assistant Attorney General
       120 Broadway
       New York, New York 10271

       PLEASE TAKE NOTICE that, pursuant to Rules 33 and 34 of the Federal Rules

of Civil Procedure ("Fed. R. Civ. P."), this Court's Local Civil Rules, Plaintiffs hereby

request that Defendant State OTDA Commissioner respond to the following

Interrogatories and produce all of the following documents in their possession, custody or

control for inspection by Plaintiffs at the offices of its counsel, Sonnenschein Nath &

Rosenthal, LLP 1221 Avenue of the Americas, New York, New York, by March 16,

2007.

## DEFINITIONS

This Request incorporates by reference the definitions contained in Rule 26.3 of this Court's Local Civil Rules ("Rule 26.3") and Fed. R. Civ. P. Rules 33 and 34(a).

The word "Document" is used herein as defined in Local Rule 26.3 and includes without limitation, both paper records and electronic mail and database records, and executable and source programming materials in electronic form.

"Concerning" has the definition ascribed to it by Local Rule 26.3, and is inclusive of all documents or information meeting that definition.

"HRA" or "City Defendant" shall mean Defendant Doar and the New York City Human Resources Administration and its officers, directors, employees, agents, attorneys, divisions, affiliates, or other representatives.

"OTDA" shall mean Defendant State Commissioner of OTDA and the New York State Office of Temporary and Disability Assistance and its officers, directors, employees, agents, attorneys, divisions, affiliates, or other representatives.

"DOH" shall mean Defendant Novello and the New York State Department of Health and its officers, directors, employees, agents, attorneys, divisions, affiliates, or other representatives.

"State Defendants" shall mean OTDA and DOH, whether acting together or separately.

"Class Member" shall mean any member of the proposed plaintiff class as defined in the Amended Complaint.

"Plaintiff" shall mean any of the named plaintiffs or plaintiff Class Members in this action.

2

"Home Health Services" shall mean any of the range of services provided to Medicaid eligible residents of New York City in their homes, including, but not limited to, personal care services, home attendant services, Certified Home Health Agency ("CHHA") services, "Lombardi" services, Long Term Home Health Care Services, Managed Long Term Care, at home Licensed Practical Nurse Services, at home Registered Nurse Services, home care services through the Traumatic Brain Injury Waiver Program, and any other services rendered in the home of Medicaid recipients performed to enable such individuals to continue to live in their homes.

"Home Health Services Provider" shall mean all vendors, agencies and hospitals that provide Medicaid-funded Home Health Services as defined above.

"Adverse Action" shall mean any denial, reduction or termination of Home Health Services.

"Aid-Continuing" shall mean the provision of Home Health Services at the same level and number of hours as class members received prior to reductions or terminations of Home Health Services, and/or any other instances in which OTDA issues directives to HRA or any Home Health Services Provider which are coded as, or internally described as, Aid-Continuing, including but not limited to *Varshevsky* cases.

"Aid-Continuing Order" shall mean an order, directive, or other instruction issued by State Defendants mandating the provision of Aid-Continuing.

"Aid-Continuing Redirect Order" shall mean an order, directive, or other instruction issued by State Defendants mandating the provision of Aid-Continuing when the initial Aid-Continuing Order has not been implemented.

3

"Fair Hearing" shall mean a fair hearing in any case concerning or potentially effecting the provision of Home Health Services.

"DAFH" shall mean a Decision After Fair Hearing.

"You" and "Your" shall mean OTDA and Defendant State OTDA Commissioner, and their possessive variants.

## INSTRUCTIONS

1.      These requests and interrogatories adopt the rules of construction provided by Local Rule 26.3(d).

2.      For all information provided pursuant to an Interrogatory, indicate whether OTDA or DOH is responsible for the information, and which is responsible for the action at issue in the question or response. In the event that both OTDA and DOH are responsible for the information or action, indicate and distinguish the relative responsibilities of each.

3.      Unless otherwise specified, the relevant period for all requests and interrogatories herein shall be from January 1, 2004, through the date of your response.

4.      Each paragraph herein shall be construed independently and without reference to any other paragraph herein, unless otherwise specified.

5.      If any document described herein or any information requested herein is not produced because of any claim of privilege or work product protection, please specify all information required by Local Rule 26.2, and in particular:

     a. each person who prepared or authored the document;
     b. each person to whom it was sent or communicated;
     c. the date(s) on which the document was prepared or transmitted;
     d. the subject matter of the document;

4

**JA247**

     e. the nature of the document (e.g., letter, telegram, notice, etc.);

     f. the privilege claimed; and

     g. for any redaction made to any produced document, state the nature of the subject matter redacted and the privilege basis therefore.

6.     This request is deemed to be continuing in nature, and requires supplemental responses as additional responsive documents and information are located and/or discovered.

7.     If any document has been lost, discarded or destroyed, each document so lost, discarded or destroyed shall be identified as completely as possible. Identification of such documents shall include, without limitation, the information required of privileged or redacted documents, as well as the date of disposal and persons disposing of the document.

8.     The documents produced in response to these requests shall be either organized and designated to correspond to the categories in these requests, or produced in a form that accurately reflects how they are maintained by State OTDA Commissioner in the normal course of business. All associated file labels, file headings and file folders (and for electronic records, all associated metadata) shall be produced together with the responsive documents from each file and each file be identified as to its owner or custodian; all pages not stapled or fastened together shall be produced, stapled or fastened together; and all documents that cannot be legibly copied shall be produced in their original form.

9.     If any interrogatory can be fully answered by provision of a document, provision of that document shall be acceptable.

5

## INTERROGATORIES

       1.     State, for each New York City applicant for, or recipient of, Home Health Services who between May 1, 2005, and April 30, 2006 requested a Fair Hearing relating to an Adverse Action taken with regard to Home Health Services the following information:

a) Name;

b) the Fair Hearing number;

c) the Fair Hearing request date;

d) whether, and on what date, Aid-Continuing was requested with regard to that Fair Hearing request;

e) whether, and on what date, Aid-Continuing was ordered with regard to that Fair Hearing request;

f) whether, and on what date, Aid-Continuing was Redirected with regard to that Fair Hearing request;

g) the date for which the Fair Hearing was originally scheduled (or state if not yet scheduled);

h) whether one or more adjournments was requested;

i) to what date the Fair Hearing was adjourned (or state if not yet adjourned);

j) the reason(s) for adjournment (including who requested the adjournment);

k) the Fair Hearing date;

l) the date that the DAFH was issued (or state if not yet issued); and

m) the date HRA was notified of the DAFH (or state if not yet notified).

       If any category of the requested information is not available for any individual, please provide any and all of the requested information that is available. This information can be provided in a table or a system-generated report.

       2.     A list of each New York City applicant for, or recipient of, Home Health Services who had a DAFH issued between May 1, 2005, and April 30, 2006 concerning an Adverse Action taken with regard to his or her Home Health Services.

       3.     State the meaning of any and all codes used in each of:

       (a) Your response to Interrogatory #1, above;

6

**JA249**

(b) the columns denominated "Issue Cd," "Reason Cd," and "AC Cd," in the document titled "Document Request #27 – Requests Pending Scheduling" produced by OTDA Commissioner at Bates Nos. 3269 to 3305; and

(c) the columns denominated "Disp Cd," (both columns), "Issue Cd," and "AC Cd," in the document titled "Document Request #28 Heard but not Issued" produced by OTDA Commissioner at Bates Nos. 3306 to 3307.

## DOCUMENT REQUESTS

1. Each DAFH issued following a request by a New York City applicant for, or recipient of, Home Health Services who between May 1, 2005, and April 30, 2006 requested a Fair Hearing concerning an Adverse Action taken with regard to his or her Home Health Services.

2. Printouts of all pages of all files from the Fair Hearing Information System for all New York City applicants for, or recipients of, Home Health Services who between May 1, 2005, and April 30, 2006 requested a Fair Hearing concerning an Adverse Action taken with regard to his or her Home Health Services.

Dated: March 1, 2007
New York, New York

YISROEL SCHULMAN, ESQ
New York Legal Assistance Group
Jane Greengold Stevens, of counsel (JS 4790)
Deborah B. Berkman (DB8086)
450 West 33rd St., 11th Floor
New York, NY 10001
212-613-5000

SONNENSCHEIN NATH & ROSENTHAL LLP
Sandra D. Hauser (SH 8283)
Eva Lopez-Paredes (EL 5476)
1221 Avenue of the Americas
New York, NY 10020
Ph.: (212) 768-6700
*Attorneys for Plaintiffs*

7

**JA250**

**Shakhnes v. Eggleston**

**Plaintiffs' Request of Information to State Defendants**

| FH[1] number | Name | FH request date | AC[2] Req. (Y/N) | AC order date | Redirect date | FH Scheduled | Adj.[3] Request (Y/N) | Adj. Date | Adj. Reason[4] | FH Date | Notice[5] (Y/N) | DAFH[6] date | DAFH (Pet. or Resp.)[7] | DAFH HRA notice date[8] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

[1] (Fair Hearing)
[2] (Aid Continuing). Indicate whether Aid Continuing was ordered.
[3] (Adjournment)
[4] If using reason codes, please provide description of code
[5] Check 'Y (Yes) if file indicates that petitioner did not receive Notice of Adverse Action
[6] Decision After Fair Hearing
[7] Indicate whether DAFH was in favor of petitioner (Pet.) or respondant (Resp.)
[8] Provide date when notice of DAFH was issued to Human Resources Administration (HRA)


**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

**Eva Lopez-Paredes**
212.398.4877
elopez@sonnenschein.com

1221 Avenue of the Americas
New York, NY 10020-1089
212.768.6700
212.768.6800 fax
www.sonnenschein.com

April 13, 2007

<u>VIA FACSIMILE AND E-MAIL</u>

George Alvarez, Esq.
Assistant Attorney General
Office of the New York State Attorney
General
120 Broadway – 24th Floor
New York, NY 10271

      Re:   <u>Shakhnes v. Eggleston</u>; Index No.: 06 Civ. 04778 (RJH)

Dear George:

      I write to confirm the agreement that the parties reached during our April 12, 2007 meet and confer concerning Plaintiffs' outstanding discovery requests.

      State Defendants have agreed to respond in full to Interrogatory #1 of Plaintiffs' Second Set of Interrogatories and Requests for Production to OTDA, and agreed to create and produce, in electronic format, a table or chart containing the requested data. State Defendants also have agreed to include on that chart a narrative with all of the comments included in the FHIS files (from which the data for the chart is being collected), and an explanation of all the codes and acronyms reflected on the chart. In addition, State Defendants will respond in full to Document Request #1 of Plaintiffs' Second Set, and thus will produce copies of all Decisions After Fair Hearing ("DAFH") issued to any New York City applicant for, or recipient of Home Health Services, who between May 1, 2005, and April 30, 2006, made a request for a fair hearing concerning an adverse action taken with regard to his or her home health services.

      State Defendants indicated that the production shall be delivered in electronic format, likely by DVD, within three weeks from today.

Brussels    Chicago    Dallas    Kansas City    Los Angeles    New York    Phoenix    St. Louis
San Francisco    Short Hills, N.J.    Washington, D.C.    West Palm Beach

# Sonnenschein

SONNENSCHEIN NATH & ROSENTHAL LLP

March 1, 2007
Page 2

This agreement resolves the parties disagreements about Plaintiffs First and Second set of discovery requests. We appreciate your efforts to resolve our discovery disputes and look forward to receiving the above-described data and to proceeding in an organized and cooperative effort.

Sincerely,

Eva López-Paredes

cc:     Kim Conway
        Jane Greengold Stevens
        Sandra Hauser



**STATE OF NEW YORK**
**OFFICE OF THE ATTORNEY GENERAL**
(212) 416-8663

ANDREW M. CUOMO
ATTORNEY GENERAL

DIVISION OF STATE COUNSEL
LITIGATION BUREAU

April 19, 2007

Eva Lopez-Paredes, Esq.
Sonnenschein
1221 Avenue of the Americas
New York, NY 10020-1089

Re: <u>Shakhnes v. Eggleston</u>, 06 Civ. 04778 (RJH)

Dear Ms. Lopez-Paredes:

I am writing in reference to your letter, dated April 13, 2007, in which you recite plaintiffs' understanding of the agreement reached with State defendant concerning plaintiffs' outstanding discovery requests. The information contained in your letter is essentially correct, with the following two clarifications.

First, OTDA will provide the requested data in not one, but three, tables/charts. This is necessary because the data requested is too voluminous for a single table/chart. However, the data will be identified by fair hearing number for easy cross-reference.

Second, it is specified that the date being provided in the above referenced tables/charts is for the period of January 2004 to December 2006.

I would like to reiterate that this information is being provided in lieu of any outstanding discovery requests to data.

Sincerely,

George A. Alvarez
Assistant Attorney General

cc: Kimberly Conway, Esq.

**JA254**



**NYLAG**

N   E   W   ·   Y   O   R   K
**LEGAL ASSISTANCE GROUP**

RECEIVED
MAY – 4 2007
CHAMBERS OF
RICHARD J. HOLWELL

*Yisroel Schulman, Esq.*
*President & Attorney-in-Charge*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/16/07

By Facsimile

May 3, 2007

Hon. Richard J. Holwell
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   Shakhnes v. Eggleston, 06 Civ. 04778 (RJH)(RLE)

Dear Judge Holwell:

We represent Plaintiffs in the above-referenced matter. With the consent of all parties,
we write pursuant to the Court's direction at the discovery conference on April 24, 2007. At the
conference, Your Honor directed as follows:

1)      Plaintiffs are to provide City Defendant with information identifying fifty
individuals who are entitled to compliance from City Defendant with a favorable Decision after
Fair Hearing ("DAFH"). Plaintiffs are to select cases from a list produced by State Defendants
of applicants for, and recipients of, home health services who had a DAFH issued in the pertinent
time period regarding an adverse action taken with regard to their home health services.

2)      City Defendant is to provide Plaintiffs with the documents previously requested
by plaintiffs, and in the custody or control of HRA, for those fifty cases including, but not
limited to, the specific types of documents identified by Plaintiffs;

3)      City Defendant is to record, while gathering the fifty case files, the specific
amount of time it took HRA personnel to retrieve the files;

4)      Counsel for Plaintiffs and City Defendant are to meet and confer within one week
of the discovery conference, to determine how long it would take to identify and produce the
fifty files; and

5)      Counsel for Plaintiffs is to inform the Court how long the process is estimated to
take, so that the Court can enter an appropriate Scheduling Order for the case.

Plaintiffs yesterday received the master list from State Defendants. Plaintiffs will be able
to provide a list of the fifty cases to City Defendant no later than Monday, May 7, 2007. City
Defendant has told us that it will take HRA approximately eight weeks from the receipt of the
list to produce the fifty files.

450 West 33ʳᵈ Street · New York, NY · 10001-2603 · Telephone (212) 613-5000 · Fax (212) 750-0820
www.nylag.org

Hon. Richard J. Holwell
May 3, 2007
Page 2


In light of the length of time City Defendant projects it will take to produce this new set of documents, the fact that other discovery is still owed to Plaintiffs from City Defendant, and that depositions will have to follow receipt of the City's documents, we propose the following discovery deadlines, (as previously requested in the parties' letter to the Court of March 29, 2007 with the addition of a date regarding the 50 files):

- City Defendant will produce the above described fifty case files and all outstanding discovery by July 2, 2007;
- Fact discovery will conclude by September 30, 2007;
- Each party's expert disclosures and expert reports, if any, will be exchanged by October 30, 2007;
- Each party's rebuttal expert disclosures and rebuttal expert reports, if any, will be exchanged by January 3, 2008; and
- All discovery, including expert discovery, will conclude by February 4, 2008.

Plaintiffs may have to seek a further modification of this schedule if, *inter alia*, Plaintiffs determine, after review, that the fifty files produced by City Defendant are not sufficient to meet the evidentiary needs of the case.

Thank you for your consideration.

*Above schedule is hereby adopted. A status conference shall be held on October 12, 2007 at 10:00 am*

*SO ORDERED*

Respectfully,

Jane Greengold Stevens
One of the Attorneys for the Plaintiffs

cc:   Kimberly Conway
      George Alvarez
      Sandra Hauser

*US DJ*
*5/15/07*

*NEXT PTC 10/12/07 @ 10:15 am*